UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| SANDRA MORENO, CARLOS MORENO, ELISEO CASTANEDA, FEDERICO VELA, JOSE GARCIA, JOSE VEGA GONZALES, MARTHA JARAMILLO, and ROGELIO MARTINEZ,<br>          Plaintiffs,<br><br>v.<br><br>THE CITY OF BOVINA, TEXAS, JANA PITCOCK, Individually and in Her Former Capacity as City Manager, DONNA MITCHELL, Individually and in Her Capacity as Municipal Judge, GARY SINCLAIR, Individually and in His Former Capacity as Chief of Police, JONATHAN JIMENEZ, Individually and in His Former Capacity as a Police Officer of Bovina, Texas, MANNY JIMENEZ, Individually and in His Former Capacity as a Police Officer of Bovina, Texas, and OWEN FOSTER, Individually and in His Former Capacity as a Police Officer of Bovina, Texas,<br>          Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CASE NO. 2:12-cv-00264 |

## AFFIDAVIT OF OWEN FOSTER

| | |
|---|---|
| STATE OF TEXAS | §<br>§ |
| COUNTY OF _____ | § |

On this day personally appeared OWEN FOSTER who, after being by me, first duly sworn, upon his oath, deposed and states as follows.

1.      My name is OWEN FOSTER.  I am over the age 18 years and have personal knowledge of the facts set forth in this affidavit.  I have never been convicted of a crime and am fully competent to make this affidavit.

2.      I am familiar with the parties' claims and defenses in this case. This knowledge is based upon my personal involvement in this case and review of the incident report and arrest report concerning the December 28, 2010 incident with Martha Jaramillo.

3.      I have almost 9 years experience in law enforcement as a peace officer. I graduated from the Panhandle Regional Police Academy in Amarillo, Texas, in March 2002. Immediately following graduation, I became a police officer with the Perryton Police Department. From there, I was a peace officer for Lipscomb County Sheriff's Department, then Hemphill County Sheriff's Department. Next, I worked in Lubbock for the Texas Department of Criminal Justice as a guard at Formby and Montford. I also worked for Hale Center as a peace officer.

4.      After approximately one (1) year in Lubbock, I left for military duty. When I returned from military service in September 2010, I went to work for the Bovina Police Department.

5.      My law enforcement experience includes, but is not limited to, conducting traffic stops, participating in investigations, detaining suspects, and arresting individuals for many years.

6.      I was employed with the Bovina Police Department as a peace officer from September 13, 2010 to February 10, 2011. I did not have any disciplinary actions, suspensions, or revocations of my peace officer license while serving as peace officer before December 28, 2010, nor after that related to the December 28, 2010, incident.

7.      I received training in the use of Tasers prior to my employment with the Bovina Police Department. However, I was not issued a Taser on my date of hire with the Bovina Police

Department. I participated in an eight-hour training course conducted by Bovina Police Chief Gary Sinclair and then received a Taser.

8.    My employment with the Bovina Police Department ended on February 10, 2011; thus, I was not involved with the incidents complained of in this lawsuit that occurred after February 10, 2011.

9.    On December 28, 2010, I was involved in a traffic stop with Denise Lara (driver), Jorge Jaramillo (passenger), Martha Jaramillo (Jorge Jaramillo's mother who came to the scene in her dodge truck after I initiated the traffic stop) and Maria Jaramillo (Jorge's sister who was in the Dodge truck with Martha).

10.    After speaking with Denise Lara and Jorge Jaramillo, they indicated to me that neither of them had a driver's license. At that time, I informed them I would have to tow the vehicle they were driving.

11.    When Martha Jaramillo arrived on the scene of the traffic stop, she was mad and yelled at her son, Jorge Jaramillo.

12.    I deployed my Taser against Martha Jaramillo one time.

13.    EMS arrived at the scene and evaluated Martha Jaramillo after she was tased. Martha Jaramillo was not transported to the hospital; she was transported from the scene of the incident to the jail in Farwell.

14.    While I was an officer in Bovina, the Bovina Police Department allowed residents of Bovina who were arrested on a capias warrant issued by the Municipal Judge to pay the bond amount set out on the warrants in lieu of being taken to jail, provided that they could arrange to have that bond made within 20 minutes of being arrested. This was done as a courtesy to Bovina residents only, in order to prevent interruption with their job or family obligations where it was

possible to do so. Neither I nor anyone else in the Bovina Police Department had anything to do with setting the bond amount on the warrants.

15.    While I was a peace officer in Bovina, each officer was required to be a licensed peace officer of the State of Texas, licensed through the Texas Commission on Law Enforcement Officer Standards and Education ("TCLEOSE") (now Texas Commission on Law Enforcement "TCOLE") and trained in accordance with the requirements of the State of Texas through TCLEOSE/TCOLE. Therefore, I have attended a law enforcement officer training academy where I received training on appropriate use of force and the constitutional limitations on it, as well as on proper arrest and detention procedures and the relevant constitutional requirements applicable to valid arrests with probable cause. I was also required to complete 40 additional hours of continuing education training each year in order to maintain my TCLEOSE peace officer license. A copy of my training record is attached to this affidavit, and it accurately reflects courses taken while I was a law enforcement officer through February 10, 2011.

16.    In addition to TCLEOSE/TCOLE training and licensing/certification, I received on the job training and instruction as needed while working as a police officer for the Bovina Police Department.

17.    While I was a police officer for Bovina, the City's Chief of Police supervised the police officers in his department. I operated within a chain-of-command where I viewed Chief Sinclair as my supervisor and not any of my fellow officers.

18.    City Manager Jana Pitcock did not train or supervise me while I was a police officer for the City of Bovina, other than on an occasion where she requested that I take down notes of code violations while on patrol and turn them over to the code enforcement officer.

19.     Municipal Judge Donna Mitchell did not hire, train, or supervise me while I was a police officer for the City of Bovina.

20.     While I was a police officer in Bovina, I never made or participated in any agreement, whether express or implicit, with Municipal Judge Donna Mitchell or any other City official or other person as to how Judge Mitchell was to conduct any of the business before her court.  I never made or participated in any agreement, whether express or implicit, with former City Manager Jana Pitcock or any other City official or other person as to how Jana Pitcock was to conduct any of the City business in her role as City Manager.

21.     I have never made or participated in any agreement, whether express or implicit, with former Police Chief Gary Sinclair, Municipal Judge Donna Mitchell, former City Manager Jana Pitcock, or any Bovina police officers to violate the civil rights of any individual, including the named Plaintiffs herein.  I specifically was not involved in any conspiracy to encourage a policy of arrests without warrants, prosecute individuals without sufficient evidence or convict individuals without affording them their constitutional rights.  I did not discuss the facts of pending criminal cases or investigations with City Manager Jana Pitcock; rather, my duty as a law enforcement officer required me to discuss such matters with former Police Chief Gary Sinclair.  I did not discuss the facts of cases pending before the Municipal Court with Municipal Judge Donna Mitchell outside of normal court proceedings.  I never interrogated anyone after the initiation of legal proceedings.

22.     The rest of this page is intentionally left blank.

8801.153
759010_1.docx

STATE OF TEXAS                §
                              §
COUNTY OF _Potter_            §


OWEN FOSTER


     SUBSCRIBED AND SWORN TO BEFORE ME, by OWEN FOSTER, on this the 4th day of November 2013, to certify which witness my hand and seal of office.


NOTARY PUBLIC
STATE OF TEXAS

SHERIDA STONE
NOTARY PUBLIC,
STATE OF TEXAS
My Commission Expires 04-11-2015

# Officer Foster

## (Training Record)

# Texas Commission On Law Enforcement Officer Standards And Education

## Personal Information

| Name | | TCLEOSE ID (P ID) | STATUS |
|------|--|-------------------|--------|
| OWEN D. FOSTER | | 282584 | |

| Citizen | Race | Gender | Federal ID | State ID |
|---------|------|--------|-----------|----------|
| Yes | Hispanic | Male | | 10094423 |

## Education Information

| Institution | Hours | Education |
|-------------|-------|-----------|
| | 137 | Bachelor |
| Total Hours | 137 | |
| Total Education Hours | 2740 | |

## Service History

| Appointed As | Department | Award | Service Start Date | Service End Date | Service Time |
|--------------|-----------|-------|-------------------|------------------|--------------|
| Peace Officer | BOVINA POLICE DEPT. | Peace Officer License | 9/13/2010 | 2/10/2011 | 0 years, 5 months |
| Peace Officer | HALE CENTER POLICE DEPT. | Peace Officer License | 9/16/2008 | 9/21/2010 | 2 years, 0 months |
| Peace Officer | HEMPHILL CO. SHERIFF'S OFFICE | Peace Officer License | 1/1/2005 | 2/12/2007 | 2 years, 1 months |
| Peace Officer | LIPSCOMB CO. SHERIFF'S OFFICE | Peace Officer License | 7/22/2003 | 12/30/2004 | 1 years, 5 months |
| Peace Officer | PERRYTON POLICE DEPT. | Peace Officer License | 3/18/2002 | 7/21/2003 | 1 years, 4 months |

## Total Service Time

| Description | Service Time |
|-------------|--------------|
| Peace Officer | 7 years, 3 months |
| Total officer time | 7 years, 3 months |

## Award Information

| Award | Type | Action | Action Date |
|-------|------|--------|-------------|
| Peace Officer License | License | | |
| | | Granted | 3/28/2002 |
| Basic Peace Officer | Certificate | | |
| | | Certification Issued | 3/31/2003 |
| Intermediate Peace Officer | Certificate | | |
| | | Certification Issued | 12/22/2004 |
| Advanced Peace Officer | Certificate | | |
| | | Certification Issued | 11/1/2008 |

APP8

## Courses Completed

**09/01/2009 - 08/31/2011**

| Course No. | Course Title | Course Date | Course Hours | Institution | Training Mandates |
|---|---|---|---|---|---|
| 3322 | Patrol Rifle | 10/6/2010 | 24 | BOVINA POLICE DEPT. (Training Rosters) | |
| 3344 | Less Lethal Electronic Control Device Training (st | 9/22/2010 | 8 | BOVINA POLICE DEPT. (Training Rosters) | |
| 3214 | Family Violence Web w/ Exercises | 11/30/2009 | 8 | TCLEOSE POSEIT | Part 1 of 4 (POSEIT) Special Investigative Topics |
| | | Unit Hours | 40 | | |

**09/01/2007 - 08/31/2009**

| Course No. | Course Title | Course Date | Course Hours | Institution | Training Mandates |
|---|---|---|---|---|---|
| 5012 | Amber Alert for Law Enforcement | 5/11/2009 | 4 | TCLEOSE POSEIT | |
| 3224 | Child Abuse (POSEIT) | 11/26/2008 | 8 | TCLEOSE POSEIT | Part 2 of 4 (POSEIT) Special Investigative Topics |
| 3244 | Sexual Assault Web with Exercises | 11/26/2008 | 8 | TCLEOSE POSEIT | Part 3 of 4 (POSEIT) Special Investigative Topics |
| 3256 | Racial Profiling | 11/26/2008 | 7 | TCLEOSE POSEIT | Racial Profiling (Intermediate) |
| 3214 | Family Violence Web w/ Exercises | 11/25/2008 | 8 | TCLEOSE POSEIT | Part 1 of 4 (POSEIT) Special Investigative Topics |
| 394 | Cultural Diversity Web with Exercises | 11/25/2008 | 8 | TCLEOSE POSEIT | Cultural Diversity (Intermediate) |
| 3254 | Sex Offender Characteristics Web with Exercises | 11/25/2008 | 8 | TCLEOSE POSEIT | Part 4 of 4 (POSEIT) Special Investigative Topics |
| | | Unit Hours | 51 | | |

**09/01/2005 - 08/31/2007**

| Course No. | Course Title | Course Date | Course Hours | Institution | Training Mandates |
|---|---|---|---|---|---|
| 3300 | Patrol/Tactical | 10/29/2006 | 16 | TEEX Central Texas Police Academy | |
| 3841 | Crisis Intervention Training | 5/18/2006 | 16 | Sheriff's Association of Texas | Crisis Intervention Training Crisis Intervention Training (AdvPOC) For IntPOC issued before 9/1/2005) Peace Officer Intermediate Options Peace Officer Intermediate Options 1987-01 Peace Officer Intermediate Options 2005-01 Peace Officer Intermediate Options 2006-01 Peace Officer Intermediate Options 2009-09 |
| 3800 | Technical/Specialized | 5/6/2006 | 8 | Panhandle Regional LEA | |

*Print Date:*  1/3/2013

*Page Number:*  2

# Courses Completed

**09/01/2005 - 08/31/2007**

| Course No. | Course Title | Course Date | Course Hours | Institution | Training Mandates |
|---|---|---|---|---|---|
| 3400 | Traffic | 12/5/2005 | 4 | Alamo Area LEA | |
| | | **Unit Hours** | 44 | | |

**09/01/2003 - 08/31/2005**

| Course No. | Course Title | Course Date | Course Hours | Institution | Training Mandates |
|---|---|---|---|---|---|
| 3800 | Technical/Specialized | 8/23/2005 | 16 | Panhandle Regional LEA | |
| 3800 | Technical/Specialized | 8/23/2005 | 16 | Panhandle Regional LEA | |
| 3200 | Investigations | 3/18/2005 | 80 | DRUG ENFORCEMENT ADMINISTRATION | |
| 3802 | TCIC/NCIC for full Access Operators | 2/15/2005 | 16 | Texas Department of Public Safety LEA | Telecommunicator Intermediate Options |
| 32004 | Legal Standards for Law Enforcement Officers (DE) | 12/28/2004 | 6 | TCLEOSE POSEIT | |
| 3214 | Family Violence Web w/ Exercises | 12/28/2004 | 8 | TCLEOSE POSEIT | Part 1 of 4 (POSEIT) Special Investigative Topics |
| 3255 | Asset Forfeiture | 12/26/2004 | 4 | TCLEOSE POSEIT | Asset Forfeiture (Intermediate) |
| 3256 | Racial Profiling | 12/18/2004 | 7 | TCLEOSE POSEIT | Racial Profiling (Intermediate) |
| 3277 | Identity Theft | 12/14/2004 | 4 | TCLEOSE POSEIT | Identity Theft (Intermediate) |
| 2109 | Spanish for Law Enforcement (Intermediate) | 12/8/2004 | 24 | South Plains Association of Government LEA | Spanish for Law Enforcement (Intermediate) Spanish for Telecommunicators (Intermediate) |
| 3800 | Technical/Specialized | 2/6/2004 | 40 | Tarrant County College District Training Center Po | |
| 3800 | Technical/Specialized | 1/20/2004 | 40 | OTHER TRAINING | |
| 32006 | Overview of Drugs (DE) | 10/18/2003 | 3 | TCLEOSE POSEIT | |
| 32002 | Rural Organized Crime DE | 10/3/2003 | 3 | TCLEOSE POSEIT | |
| | | **Unit Hours** | 267 | | |

**09/01/2001 - 08/31/2003**

| Course No. | Course Title | Course Date | Course Hours | Institution | Training Mandates |
|---|---|---|---|---|---|
| 3200 | Investigations | 6/14/2003 | 8 | Panhandle Regional LEA | |
| 3200 | Investigations | 4/24/2003 | 24 | Grand Prairie Police Academy | |
| 2107 | Use of Force (Intermediate) | 3/12/2003 | 16 | Panhandle Regional LEA | Use of Force (Intermediate) |
| 1999 | Personnel Orientation by Dept. Basic Proficiency | 3/3/2003 | 0 | OTHER TRAINING | Personnel Orientation |

APP10

# Courses Completed

**09/01/2001 - 08/31/2003**

| Course No. | Course Title | Course Date | Course Hours | Institution | Training Mandates |
|---|---|---|---|---|---|
| 2108 | Arrest, Search, and Seizure (Intermediate) | 2/25/2003 | 16 | Panhandle Regional LEA | Arrest, Search, and Seizure (Intermediate) |
| 2106 | Crime Scene Investigation (Intermediate) | 2/9/2003 | 24 | Panhandle Regional LEA | Crime Scene Investigation (Intermediate) |
| 2105 | Child Abuse Prevention and Investigation (Interm.) | 1/24/2003 | 24 | Panhandle Regional LEA | Child Abuse Prevention and Investigation (Intermediate) |
| 3257 | Combined Asset Forfeiture and Racial Profiling | 8/20/2002 | 6 | Panhandle Regional LEA | Asset Forfeiture (Intermediate) Racial Profiling (Intermediate) |
| 3303 | Law Enforcement Officer Flying Armed - (FAA) | 8/20/2002 | 2 | Panhandle Regional LEA | |
| 1000 | Basic Peace Officer | 3/1/2002 | 668 | Panhandle Regional LEA | Cultural Diversity (Mandate) Special Investigative Topic (Mandate) |
| 3300 | Patrol/Tactical | 2/2/2002 | 8 | Panhandle Regional LEA | |

| | | | |
|---|---|---|---|
| | **Unit Hours** | 796 | |
| | **Total Hours** | 1198 | |

## Total Hours

| | |
|---|---|
| **Total Education Hours** | 2740 |
| **Total Training Hours** | 1198 |
| **Total Hours** | 3938 |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

SANDRA MORENO, CARLOS MORENO, §
ELISEO CASTANEDA, FEDERICO VELA, §
JOSE GARCIA, JOSE VEGA GONZALES, §
MARTHA JARAMILLO, and §
ROGELIO MARTINEZ, §
    Plaintiffs, §
     §
     §
v. §
     §
THE CITY OF BOVINA, TEXAS, JANA §
PITCOCK, Individually and in Her Former §    CASE NO. 2:12-cv-00264
Capacity as City Manager, DONNA §
MITCHELL, Individually and in Her Capacity §
as Municipal Judge, GARY SINCLAIR, §
Individually and in His Former Capacity as §
Chief of Police, JONATHAN JIMENEZ, §
Individually and in His Former Capacity as a §
Police Officer of Bovina, Texas, MANNY §
JIMENEZ, Individually and in His Former §
Capacity as a Police Officer of Bovina, §
Texas, and OWEN FOSTER, Individually §
and in His Former Capacity as a Police §
Officer of Bovina, Texas, §
    Defendants. §

## AFFIDAVIT OF JONATHAN JIMENEZ

STATE OF TEXAS     §
                      §
COUNTY OF Dallas   §

On this day personally appeared JONATHAN JIMENEZ who, after being by me, first

duly sworn, upon his oath, deposed and states as follows.

1.    My name is JONATHAN JIMENEZ. I am over the age 18 years and have

personal knowledge of the facts set forth in this affidavit and am fully competent to make this

affidavit.

2.      I am familiar with the parties' claims and defenses in this case.  This knowledge is based upon my personal involvement in this case and review of the incident reports and arrest reports concerning the various Plaintiffs.

3.      I became a licensed peace officer in August 2009 after attending the South Plains College Police Academy.  My service as a peace officer includes time with the Parmer County Sheriff's Department, Earth Police Department, and Castro County Sheriff's Office. I worked as a police officer for the City of Bovina Police Department from March 15, 2011 until May 30, 2012.

4.      My law enforcement experience includes, but is not limited to, conducting traffic stops, participating in investigations, detaining suspects, and arresting individuals for many years.

5.      In addition to TCLEOSE/TCOLE training and licensing/certification, I received on the job training and instruction as needed while working as a police officer for Bovina Police Department.

6.      While I was a peace officer in Bovina, each officer was required to be a licensed peace officer of the State of Texas, licensed through the Texas Commission on Law Enforcement Officer Standards and Education ("TCLEOSE") (now Texas Commission on Law Enforcement "TCOLE") and trained in accordance with the requirements of the State of Texas through TCLEOSE/TCOLE.  Therefore, I have attended a law enforcement officer training academy, where I received training on appropriate use of force and the constitutional limitations on it, as well as on proper arrest and detention procedures and the relevant constitutional requirements applicable to valid arrests with probable cause.  I was also required to complete 40 additional hours of continuing education training each year in order to maintain my TCLEOSE peace

officer license. A copy of my training record is attached to this affidavit, and it accurately reflects courses taken while I was a law enforcement officer through May 30, 2012.

7.     While I was a police officer for Bovina, the City had a custom, policy, and practice of supervising its police officers. I operated within a chain-of-command where I viewed Chief Sinclair as my supervisor and not any of my fellow officers.

8.     I did not arrest Rogelio Martinez on August 24, 2011. However, I did search Mr. Martinez incident to Officer Manny Jimenez's arrest of him.

9.     With respect to Eliseo Castaneda, it is my understanding that City Inspector Cesar Marquez was the individual responsible for enforcing the city ordinance requiring that homes have their house numbers painted on the curbs or somewhere else visible. At no time while I was an officer for the City of Bovina did I issue a citation for not having a house number on the curb to Mr. Castaneda. I executed an arrest warrant on Mr. Castaneda on June 5, 2011 for "911 Emergency Curb Painting Violation - No Number On Curb." On June 5, 2011, I was not aware one way or the other when I executed that arrest warrant for Mr. Castaneda if he had been informed of the citation or the warrant.

10.     I executed an arrest warrant on Martha Jaramillo on December 6, 2011 for "DL-Non-Guardian Permitted unlicensed Drive to Drive." At the time that I executed the warrant, I was not aware of any facts indicating one way or the other whether Ms. Jaramillo was current on her payment of the fine amounts to the City. I simply did as the warrant instructed me to and arrested Ms. Jaramillo.

11.     Because of the incident involving Jose Garcia on May 7, 2011, I became familiar with Mr. Garcia. This was due to our interactions that evening. At no time on the evening of May 7, 2011 did I arrest Mr. Garcia. To the best of my recollection, at no time after May 7, 2011

while I was employed as a City of Bovina police officer did I arrest Jose Garcia. I never executed an arrest warrant for Jose Garcia.

12. The only person that was arrested the night of the May 7, 2011 incident at Jose Garcia's home was Miguel Ramirez.

13. Later in the evening of May 7, 2011 after the conclusion of the incident at Jose Garcia's home, I sought medical treatment for an injury to my wrist that I received during the course of that incident.

14. A few days prior to the Sandra Moreno arrest on May 11, 2011, I was involved in the arrest of Miguel Ramirez at the home of Jose Garcia. It is my belief and perception that the injury I sustained to my wrist that evening at Mr. Garcia's home was due, at least in part, to what I viewed as the interference with my duties by third parties who were not connected to the traffic stop that I was conducting that evening.

15. While I was an officer in Bovina, the Bovina Police Department allowed residents of Bovina who were arrested on a capias warrant issued by the Municipal Judge to pay the bond amount set out on the warrants in lieu of being taken to jail, provided that they could arrange to have that bond made within 20 minutes of being arrested. This was done as a courtesy to Bovina residents only, in order to prevent interruption with their job or family obligations where it was possible to do so. Neither I nor anyone else in the Bovina Police Department had anything to do with setting the bond amount on the warrants.

16. City Manager Jana Pitcock did not train or supervise me while I was a police officer for the City of Bovina, other than on an occasion where she requested that I take down notes of code violations while on patrol and turn them over to the code enforcement officer.

17.     Municipal Judge Donna Mitchell did not hire, train, or supervise me while I was a police officer for the City of Bovina.

18.     While I was a police officer for Bovina, I never made or participated in any agreement, whether express or implicit, with Municipal Judge Donna Mitchell or any other City official or other person as to how Judge Mitchell was to conduct any of the business before her court. I never made or participated in any agreement, whether express or implicit, with City Manager Jana Pitcock or any other City official or other person as to how Jana Pitcock was to conduct any of the City business.

19.     I have never made or participated in any agreement, whether express or implicit, with former Police Chief Gary Sinclair, Municipal Judge Donna Mitchell, City Manager Jana Pitcock, or any Bovina police officers to violate the civil rights of any individual, including the named Plaintiffs herein. I specifically was not involved in any conspiracy to encourage a policy of arrests without warrants, prosecute individuals without sufficient evidence or convict individuals without affording them their constitutional rights. I did not discuss the facts of pending criminal cases or investigations with City Manager Jana Pitcock; rather, my duty as a law enforcement officer required me to discuss such matters with former Police Chief Gary Sinclair. I did not discuss the facts of cases pending before the Municipal Court with Municipal Judge Donna Mitchell outside of normal court proceedings. I never interrogated anyone after the initiation of legal proceedings.

20.     The rest of this page is intentionally left blank.

STATE OF TEXAS                          §
                                        §
COUNTY OF Dallas                        §


_____
                JONATHAN JIMENEZ


SUBSCRIBED AND SWORN TO BEFORE ME, by JONATHAN JIMENEZ, on this the 3rd day of December 2013, to certify which witness my hand and seal of office.

Steven S Homorodean
My Commission Expires
08/30/2016

_____
NOTARY PUBLIC
STATE OF TEXAS

APP17

# Officer Jonathan Jimenez

## (Training Record)

# Texas Commission On Law Enforcement Officer Standards And Education

## Personal Information

| Name | TCLEOSE ID (P ID) | STATUS |
|------|-------------------|--------|
| JONATHAN R. JIMENEZ | 294280 | |

| Citizen | Race | Gender | Federal ID | State ID |
|---------|------|--------|-----------|----------|
| Yes | Hispanic | Male | | |

## Education Information

| Institution | Hours | Education |
|-------------|-------|-----------|
| | 0 | High School |
| | 0 | College Credits |
| Total Hours | 0 | |
| Total Education Hours | 0 | |

## Service History

| Appointed As | Department | Award | Service Start Date | Service End Date | Service Time |
|--------------|-----------|-------|--------------------|------------------|--------------|
| Peace Officer (Full Time) | BOVINA POLICE DEPT. | Peace Officer License | 3/15/2011 | 5/30/2012 | 1 years, 3 months |
| Peace Officer | PARMER CO. SHERIFF'S OFFICE | Peace Officer License | 6/14/2010 | 1/19/2011 | 0 years, 7 months |
| Jailer | PARMER CO. SHERIFF'S OFFICE | Jailer License | 6/14/2010 | 1/24/2011 | 0 years, 7 months |
| Peace Officer | EARTH POLICE DEPT. | Peace Officer License | 4/10/2010 | 5/18/2010 | 0 years, 1 months |
| Peace Officer | CASTRO CO. SHERIFF'S OFFICE | Peace Officer License | 8/17/2009 | 6/14/2010 | 0 years, 10 months |
| Jailer | CASTRO CO. SHERIFF'S OFFICE | Jailer License | 8/17/2009 | 6/14/2010 | 0 years, 10 months |
| Jailer | LAMB CO. SHERIFF'S OFFICE | Jailer License | 12/30/2008 | 2/4/2009 | 0 years, 1 months |
| Jailer | HALE CO. SHERIFF'S OFFICE | Jailer License | 5/24/2004 | 5/24/2004 | 0 years, 0 months |
| Jailer | WICHITA CO. SHERIFF'S OFFICE | Jailer License | 12/1/2003 | 5/28/2004 | 0 years, 6 months |
| Jailer | LAMB CO. SHERIFF'S OFFICE | Jailer License | 3/3/2003 | 5/22/2003 | 0 years, 3 months |
| Jailer | HALE CO. SHERIFF'S OFFICE | Temporary Jailer License | 2/3/2003 | 3/3/2003 | 0 years, 1 months |

## Total Service Time

| Description | Service Time |
|-------------|--------------|
| Jailer | 2 years, 4 months |
| Peace Officer | 2 years, 8 months |
| Total officer time | 2 years, 8 months |

## Award Information

| Award | Type | Action | Action Date |
|---|---|---|---|
| Temporary Jailer License | License | | |
| | | Granted | 2/14/2003 |
| | | Expired - Time limit exceeded | 1/11/2007 |
| Jailer License | License | | |
| | | Granted | 3/3/2003 |
| | | Enforcement Hold | 7/12/2012 |
| Peace Officer License | License | | |
| | | Granted | 8/21/2009 |
| | | Enforcement Hold | 7/12/2012 |
| Basic Jailer | Certificate | | |
| | | Certification Issued | 11/1/2004 |
| Basic Peace Officer | Certificate | | |
| | | Certification Issued | 8/2/2010 |

## Courses Completed

### 09/01/2011 - 08/31/2013

| Course No. | Course Title | Course Date | Course Hours | Institution | Training Mandates |
|---|---|---|---|---|---|
| 40062 | TFSA Basic Property Technician | 3/31/2012 | 16 | TEEX Central Texas Police Academy | |
| 2054 | Radar | 12/6/2011 | 4 | Alamo Area LEA | |
| 3182 | 82nd Legislative Session Legal Update | 10/17/2011 | 8 | Panhandle Regional LEA | 82nd Session State and Federal Law Update |
| 3800 | Technical/Specialized | 9/7/2011 | 4 | TEEX Central Texas Police Academy | |
| | **Unit Hours** | | 32 | | |

### 09/01/2009 - 08/31/2011

| Course No. | Course Title | Course Date | Course Hours | Institution | Training Mandates |
|---|---|---|---|---|---|
| 3896 | Technical/Specialized Seminar | 7/5/2011 | 8 | Hale County Sheriff's Office | |
| 2098 | Alcoholic Beverage Code | 9/23/2010 | 8 | Texas Alcoholic Beverage Commission LEA | |
| 2106 | Crime Scene Investigation (Intermediate) | 9/16/2010 | 32 | Randall County Sheriff's Office | Crime Scene Investigation (Intermediate) |
| 2049 | Report Writing - general | 4/21/2010 | 8 | Panhandle Regional LEA | |
| 2054 | Radar | 2/20/2010 | 8 | Panhandle Regional LEA | |
| 3800 | Technical/Specialized | 1/26/2010 | 7 | Panhandle Regional LEA | |
| 3200 | Investigations | 1/12/2010 | 4 | Lubbock Co. Sheriff's Academy | |
| 3101 | Civil Process | 12/2/2009 | 8 | Sheriff's Association of Texas | Course counts toward 20 hour requirement |

APP20

# Courses Completed

**09/01/2009 - 08/31/2011**

| Course No. | Course Title | Course Date | Course Hours | Institution | Training Mandates |
|---|---|---|---|---|---|
| 3101 | Civil Process | 12/1/2009 | 8 | Sheriff's Association of Texas | Course counts toward 20 hour requirement |
| 3300 | Patrol/Tactical | 10/15/2009 | 3 | Texas Municipal League | |
| 3722 | Peace Officer Field Training | 9/21/2009 | 160 | CASTRO CO. SHERIFF'S OFFICE | Peace Officer Field Training |
| 3181 | 81st Legislative Session Legal Update | 9/9/2009 | 8 | Panhandle Regional LEA | State and Federal Law Update |
| | | Unit Hours | 262 | | |

**09/01/2007 - 08/31/2009**

| Course No. | Course Title | Course Date | Course Hours | Institution | Training Mandates |
|---|---|---|---|---|---|
| 1000 | Basic Peace Officer | 8/5/2009 | 618 | South Plains College Academy | Crisis Intervention Training Cultural Diversity (Mandate) Special Investigative Topic (Mandate) |
| 3842 | CIT(16hr)-BPOC | 8/5/2009 | 0 | South Plains College Academy | Crisis Intervention Training Crisis Intervention Training (AdvPOC) For IntPOC issued before 9/1/2005) Peace Officer Intermediate Options Peace Officer Intermediate Options 1987-01 Peace Officer Intermediate Options 2005-01 Peace Officer Intermediate Options 2006-01 Peace Officer Intermediate Options 2009-09 |
| 2176 | S.F.S.T. NHTSA 24hour Practitioner - BPOC | 8/5/2009 | 0 | South Plains College Academy | |
| | | Unit Hours | 618 | | |

**09/01/2003 - 08/31/2005**

| Course No. | Course Title | Course Date | Course Hours | Institution | Training Mandates |
|---|---|---|---|---|---|
| 3300 | Patrol/Tactical | 3/18/2005 | 8 | OTHER TRAINING | |
| 3300 | Patrol/Tactical | 10/22/2004 | 1 | Texas Association of Counties | |
| 3500 | Jail | 10/22/2004 | 1 | Texas Association of Counties | |
| 3500 | Jail | 10/22/2004 | 1 | Texas Association of Counties | |
| 3801 | TCIC/NCIC for Peace Officers | 10/12/2004 | 4 | Texas Department of Public Safety LEA | |

APP21

## Courses Completed

**09/01/2003 - 08/31/2005**

| Course No. | Course Title | Course Date | Course Hours | Institution | Training Mandates |
|---|---|---|---|---|---|
| 3800 | Technical/Specialized | 10/7/2004 | 8 | Hale County Sheriff's Office | |
| 3300 | Patrol/Tactical | 9/10/2004 | 1 | Texas Association of Counties | |
| 3300 | Patrol/Tactical | 9/10/2004 | 1 | Texas Association of Counties | |
| 3300 | Patrol/Tactical | 9/10/2004 | 1 | Texas Association of Counties | |
| 3300 | Patrol/Tactical | 8/22/2004 | 1 | Texas Association of Counties | |
| 3500 | Jail | 8/22/2004 | 1 | Texas Association of Counties | |
| 3300 | Patrol/Tactical | 8/11/2004 | 4 | Hale County Sheriff's Office | |
| 1999 | Personnel Orientation by Dept. Basic Proficiency | 6/16/2004 | 0 | Hale County Sheriff's Office | Personnel Orientation |
| 3500 | Jail | 5/31/2004 | 2 | Wichita County Sheriff's Office | |
| 3500 | Jail | 4/30/2004 | 2 | Wichita County Sheriff's Office | |
| 3500 | Jail | 3/31/2004 | 2 | Wichita County Sheriff's Office | |
| 3939 | Cultural Diversity | 1/29/2004 | 8 | Wichita County Sheriff's Office | Cultural Diversity (Intermediate) |
| | | **Unit Hours** | 46 | | |

**09/01/2001 - 08/31/2003**

| Course No. | Course Title | Course Date | Course Hours | Institution | Training Mandates |
|---|---|---|---|---|---|
| 3502 | Inmate Rights and Privileges (Intermediate) | 5/9/2003 | 16 | South Plains Association of Government LEA | Inmate Rights and Responsibilities (Intermediate) |
| 1070 | Basic County Corrections D. E. Component | 10/1/2002 | 40 | Hale County Sheriff's Office | Cultural Diversity (Intermediate) |
| 1071 | Basic County Corrections Classroom Component | 10/1/2002 | 40 | Hale County Sheriff's Office | |
| | | **Unit Hours** | 96 | | |
| | | **Total Hours** | 1054 | | |

## Total Hours

| | |
|---|---|
| **Total Education Hours** | 0 |
| **Total Training Hours** | 1054 |
| **Total Hours** | 1054 |

*Print Date:* 1/3/2013

*Page Number:* 4

# JONATHAN JIMENEZ TASER TRAINING CERTIFICATE

STATE OF TEXAS                     §
                                   §
COUNTY OF _Parmer_                 §

## AFFIDAVIT

Before me, the undersigned authority, personally appeared _Randy Geries_,

who being by me duly sworn, deposed as follows:

My name is _Randy Geries_. I am of sound mind, capable of making this

affidavit, and personally acquainted with the facts herein stated:

I am custodian of the records of the Parmer County Sheriff's Office. Attached hereto are

_1_ pages of records from the records of the Parmer County Sheriff's Office. These said _1_

pages of records are kept by the Parmer County Sheriff's Office in the regular course of

business, and it was the regular course of business of the Parmer County Sheriff's Office for an

employee or representative of the Parmer County Sheriff's Office with knowledge of the act,

event, condition, opinion, or diagnosis, recorded to make the record or to transmit information

thereof to be included in such record; and the record was made at or near the time or reasonably

soon thereafter. The records attached hereto are the original or exact duplicates of the original.

AFFIANT

SUBSCRIBED AND SWORN TO BEFORE ME on the _14th_ day of

_November_, 2013, to certify which witness my hand and official seal.

_Rhonda Webb_
Notary Public, State of Texas
My Commission Expires: _10-24-2014_

8801.153
760280_1.DOCX

_Employment File of Jonathan Jimenez_
_1 Record - Taser Training record - 7-15-2009_

APP24



## M26 Advanced TASER® & TASER X26

**Jonathan Jimenez**
Certified User

*This Certifies that*

## Jonathan Jimenez

*is trained in the proper and safe use of the M26 Advanced TASER® and TASER® X26 Electronic Control Device and has passed the requirements of the **South Plains College Police Academy** M26 Advanced TASER® and TASER X26 training program under the supervision of a Certified Instructor.*

*In Witness Whereof, Certified Instructor*

**Jimmy Richey**
*has certified the successful completion of the training requirements this day:*

**July 15, 2009**

*Certified Instructor:* _____

*Certified Instructor ID:* _____

© 2008 TASER International, Inc. TASER®, Shaped Pulse™ and the Globe & Lightning Bolt Logo are trademarks of TASER International, Inc.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| SANDRA MORENO, CARLOS MORENO, | § | |
| ELISEO CASTANEDA, FEDERICO VELA, | § | |
| JOSE GARCIA, JOSE VEGA GONZALES, | § | |
| MARTHA JARAMILLO, and | § | |
| ROGELIO MARTINEZ, | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| THE CITY OF BOVINA, TEXAS, JANA | § | |
| PITCOCK, Individually and in Her Former | § | CASE NO. 2:12-cv-00264 |
| Capacity as City Manager, DONNA | § | |
| MITCHELL, Individually and in Her Capacity | § | |
| as Municipal Judge, GARY SINCLAIR, | § | |
| Individually and in His Former Capacity as | § | |
| Chief of Police, JONATHAN JIMENEZ, | § | |
| Individually and in His Former Capacity as a | § | |
| Police Officer of Bovina, Texas, MANNY | § | |
| JIMENEZ, Individually and in His Former | § | |
| Capacity as a Police Officer of Bovina, | § | |
| Texas, and OWEN FOSTER, Individually | § | |
| and in His Former Capacity as a Police | § | |
| Officer of Bovina, Texas, | § | |
| Defendants. | § | |

## AFFIDAVIT OF MANUEL JIMENEZ

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF Presidio | § |

On this day personally appeared MANUEL JIMENEZ who, after being by me, first duly

sworn, upon his oath, deposed and states as follows.

1.      My name is MANUEL JIMENEZ; I also go by the name of MANNY JIMENEZ.

I am over the age 18 years and have personal knowledge of the facts set forth in this affidavit. I

have never been convicted of a crime and am fully competent to make this affidavit.

2.      I am familiar with the parties' claims and defenses in this case. This knowledge is based upon my personal involvement in this case and review of the incident reports and arrest reports concerning the various Plaintiffs.

3.      I have over 10 years in law enforcement as a peace officer. I graduated from the El Paso Community College Law Enforcement Academy August 15, 1999. In 2000, I became a peace officer with El Paso County Constable Precinct 3. In 2001, I went on to work for Hudspeth County Sheriff's Office. From March 2002 until April 2003, I worked for Culberson County Sheriff's Office. I briefly worked at Overton Police Department after I worked for Culberson County Sheriff's Office. From there, I was a peace officer for Florence Police Department, then Marfa Police Department. My career also includes service as a peace officer for Reeves County Sheriff's Department, Stratford Police Department, and Colorado City Police Department. I currently work as a full-time peace officer for Presidio Police Department. I hold a TCOLE Peace Officer Advanced Certification. While I was a peace officer for Bovina Police Department I held a TCOLE Peace Officer Intermediate Certification.

4.      My law enforcement experience includes, but is not limited to, conducting traffic stops, participating in investigations, detaining suspects, and arresting individuals for many years.

5.      I became a peace officer for Bovina Police Department on April 26, 2010, and left the Department on November 12, 2011. I did not have any disciplinary actions, suspensions, or revocations of my peace officer license while serving as peace officer with Bovina Police Department.

6.      I had completed all of the training requirements legislatively mandated and established by TCOLE at the time of the incidents in question.

7.     Because of the incident involving Jose Garcia on May 7, 2011, I became familiar with Mr. Garcia. This was due to our interactions that evening. At no time on the evening of May 7, 2011 did I arrest Mr. Garcia. To the best of my recollection, at no time after May 7, 2011 while I was employed as a City of Bovina police officer did I arrest Jose Garcia. I never executed an arrest warrant for Jose Garcia.

8.     The only person that was arrested the night of the May 11, 2011 incident at Jose Garcia's home was Miguel Ramirez.

9.     On January 23, 2011, I accompanied Bovina Police Officer Kelly Helton during his investigating of a citizen complaint involving Federico Vela. It was reported that Mr. Vela was shooting dogs within the City limits. I then arrested Federico Vela on February 7, 2011 pursuant to a warrant.

10.     With respect to the August 24, 2011 incident involving Rogelio Martinez, as I was following him in my marked patrol car on Highway 86, I turned on my overhead red and blue lights. Once I was at his residence, I told Rogelio Martinez several times to "come back," but Mr. Martinez entered his residence. Once Mr. Martinez came outside, I began the processing of arresting him.  After Mr. Martinez was arrested and searched, I placed him in the patrol car. Mr. Martinez was booked for Evading Arrest/Detention, Terrorist Threat, No Driver License and Failure to Signal Lane Change.

11.     On September 4, 2011, I observed Jose Vega Gonzales fall down before he entered a residence.

12.     While I was an officer in Bovina, the Bovina Police Department allowed residents of Bovina who were arrested on a capias warrant issued by the Municipal Judge to pay the bond amount set out on the warrants in lieu of being taken to jail, provided that they could arrange to

have that bond made within 20 minutes of being arrested. This was done as a courtesy to Bovina residents only, in order to prevent interruption with their job or family obligations where it was possible to do so. Neither I nor anyone else in the Bovina Police Department had anything to do with setting the bond amount on the warrants.

13.     While I was a peace officer in Bovina, each officer was required to be a licensed peace officer of the State of Texas, licensed through the Texas Commission on Law Enforcement Officer Standards and Education ("TCLEOSE") (now Texas Commission on Law Enforcement "TCOLE") and trained in accordance with the requirements of the State of Texas through TCLEOSE/TCOLE. Therefore, I have attended a law enforcement officer training academy, where I received training on appropriate use of force and the constitutional limitations on it, as well as on proper arrest and detention procedures and the relevant constitutional requirements applicable to valid arrests with probable cause. I was also required to complete 40 additional hours of continuing education training each year in order to maintain my TCLEOSE peace officer license. A copy of my training record is attached to this affidavit, and it accurately reflects courses taken while I was a law enforcement officer through November 12, 2011.

14.     In addition to TCLEOSE/TCOLE training and licensing/certification, I received on the job training and instruction as needed while working as a police officer for Bovina Police Department.

15.     While I was a police officer for Bovina, the City had a custom, policy, and practice of supervising its police officers. I operated within a chain-of-command where I viewed Chief Sinclair as my supervisor and not any of my fellow officers.

16.     City Manager Jana Pitcock did not train or supervise me while I was a police officer for the City of Bovina, other than on an occasion where she requested that I take down notes of code violations while on patrol and turn them over to the code enforcement officer.

17.     Municipal Judge Donna Mitchell did not hire, train, or supervise me while I was a police officer for the City of Bovina.

18.     While I was a police officer for Bovina, I never made or participated in any agreement, whether express or implicit, with Municipal Judge Donna Mitchell or any other City official or other person as to how Judge Mitchell was to conduct any of the business before her court. I never made or participated in any agreement, whether express or implicit, with City Manager Jana Pitcock or any other City official or other person as to how Jana Pitcock was to conduct any of the City business.

19.     I have never made or participated in any agreement, whether express or implicit, with former Police Chief Gary Sinclair, Municipal Judge Donna Mitchell, City Manager Jana Pitcock, or any Bovina police officers to violate the civil rights of any individual, including the named Plaintiffs herein. I specifically was not involved in any conspiracy to encourage a policy of arrests without warrants, prosecute individuals without sufficient evidence or convict individuals without affording them their constitutional rights. I did not discuss the facts of pending criminal cases or investigations with City Manager Jana Pitcock; rather, my duty as a law enforcement officer required me to discuss such matters with former Police Chief Gary Sinclair. I did not discuss the facts of cases pending before the Municipal Court with Municipal Judge Donna Mitchell outside of normal court proceedings. I never interrogated anyone after the initiation of legal proceedings.

20.     The rest of this page is intentionally left blank.

STATE OF TEXAS          §
                        §
COUNTY OF _Presidio_    §


_____
MANUEL JIMENEZ


SUBSCRIBED AND SWORN TO BEFORE ME, by MANUEL JIMENEZ, on this

the _28_ day of ~~September~~ _October_ 2013, to certify which witness my hand and seal of office.


_____
NOTARY PUBLIC
STATE OF TEXAS

# <u>Officer Manny Jimenez</u>

## <u>(Training Record)</u>

# Texas Commission On Law Enforcement Officer Standards And Education

## Personal Information

| Name | | TCLEOSE ID (P ID) | STATUS |
|------|------|------|------|
| MANUEL H. JIMENEZ | | 254179 | |

| Citizen | Race | Gender | Federal ID | State ID |
|------|------|------|------|------|
| Yes | Hispanic | Male | | 10096741 |

## Education Information

| Institution | Hours | Education |
|------|------|------|
| | 0 | College Credits |
| Total Hours | 0 | |
| Total Education Hours | 0 | |

## Service History

| Appointed As | Department | Award | Service Start Date | Service End Date | Service Time |
|------|------|------|------|------|------|
| Peace Officer (Full Time) | PRESIDIO POLICE DEPT. | Peace Officer License | 11/14/2011 | | 1 years, 2 months |
| Peace Officer | BOVINA POLICE DEPT. | Peace Officer License | 4/26/2010 | 11/12/2011 | 1 years, 7 months |
| Peace Officer | EL PASO CO. CONST. PCT. 3 | Peace Officer License | 12/1/2008 | 4/23/2010 | 1 years, 5 months |
| Peace Officer | COLORADO CITY POLICE DEPT. | Peace Officer License | 8/2/2008 | 11/24/2008 | 0 years, 4 months |
| Peace Officer | STRATFORD POLICE DEPT. | Peace Officer License | 6/18/2007 | 7/29/2008 | 1 years, 1 months |
| Peace Officer | REEVES CO. SHERIFF'S OFFICE | Peace Officer License | 8/14/2006 | 6/15/2007 | 0 years, 10 months |
| Peace Officer | MARFA POLICE DEPT. | Peace Officer License | 11/7/2005 | 8/12/2006 | 0 years, 9 months |
| Peace Officer | REEVES CO. SHERIFF'S OFFICE | Peace Officer License | 9/12/2005 | 11/4/2005 | 0 years, 2 months |
| Peace Officer | CULBERSON CO. SHERIFF'S OFFICE | Peace Officer License | 4/30/2004 | 4/30/2004 | 0 years, 0 months |
| Peace Officer | MARFA POLICE DEPT. | Peace Officer License | 10/29/2003 | 5/1/2004 | 0 years, 6 months |
| Peace Officer | FLORENCE POLICE DEPT. | Peace Officer License | 7/8/2003 | 10/27/2003 | 0 years, 4 months |
| Peace Officer | HUDSPETH CO. SHERIFF'S OFFICE | Peace Officer License | 6/25/2001 | 7/7/2003 | 2 years, 0 months |
| Reserve Officer | EL PASO CO. CONST. PCT. 3 | Peace Officer License | 1/4/2000 | 6/15/2001 | 1 years, 5 months |

## Total Service Time

| Description | Service Time |
|------|------|
| Peace Officer | 10 years, 1 months |
| Reserve Officer | 1 years, 5 months |

APP33

# Total Service Time

| Description | Service Time |
|---|---|
| Total officer time | 11 years, 7 months |

# Award Information

| Award | Type | Action | Action Date |
|---|---|---|---|
| Peace Officer License | License | | |
| | | Granted | 2/22/2000 |
| Basic Peace Officer | Certificate | | |
| | | Certification Issued | 7/5/2001 |
| Intermediate Peace Officer | Certificate | | |
| | | Certification Issued | 6/17/2008 |

# Courses Completed

### 09/01/2011 - 08/31/2013

| Course No. | Course Title | Course Date | Course Hours | Institution | Training Mandates |
|---|---|---|---|---|---|
| 3322 | Patrol Rifle | 12/6/2012 | 24 | El Paso Co. Sheriff's Academy | |
| 3807 | TCIC/NCIC for Less than Full Access Operators | 10/20/2012 | 8 | Texas Department of Public Safety LEA | |
| 2024 | Narcotics/Dangerous Drug Inv. | 6/14/2012 | 8 | Sul Ross State University LEA | |
| 3200 | Investigations | 3/2/2012 | 40 | Lubbock Co. Sheriff's Academy | |
| 3333 | Border Violence Issues-General | 1/30/2012 | 8 | El Paso Co. Sheriff's Academy | |
| | | Unit Hours | 88 | | |

### 09/01/2009 - 08/31/2011

| Course No. | Course Title | Course Date | Course Hours | Institution | Training Mandates |
|---|---|---|---|---|---|
| 2024 | Narcotics/Dangerous Drug Inv. | 7/13/2011 | 24 | El Paso Co. Sheriff's Academy | |
| 3305 | Active Shooter Response | 4/9/2011 | 12 | South Plains Association of Government LEA | |
| 3181 | 81st Legislative Session Legal Update | 2/11/2011 | 2 | Texas Commission on Law Enforcement | State and Federal Law Update |
| 3322 | Patrol Rifle | 10/6/2010 | 24 | BOVINA POLICE DEPT. (Training Rosters) | |
| 3344 | Less Lethal Electronic Control Device Training (st | 9/22/2010 | 8 | BOVINA POLICE DEPT. (Training Rosters) | |
| 2054 | Radar | 6/17/2010 | 4 | Alamo Area LEA | |
| 3854 | Computer Operations | 12/8/2009 | 3 | El Paso Co. Sheriff's Academy | |

APP34

# Courses Completed

**09/01/2009 - 08/31/2011**

| Course No. | Course Title | Course Date | Course Hours | Institution | Training Mandates |
|---|---|---|---|---|---|
| 3800 | Technical/Specialized | 10/16/2009 | 7 | Texas School Safety Center | |
| | | Unit Hours | 84 | | |

**09/01/2007 - 08/31/2009**

| Course No. | Course Title | Course Date | Course Hours | Institution | Training Mandates |
|---|---|---|---|---|---|
| 3131 | Basics of Civil Process | 8/28/2009 | 20 | Classen Buck Seminars, Inc. | Civil Process |
| 3101 | Civil Process | 6/30/2009 | 8 | Sheriff's Association of Texas | Course counts toward 20 hour requirement |
| 3101 | Civil Process | 6/29/2009 | 4 | El Paso Co. Sheriff's Academy | Course counts toward 20 hour requirement |
| 3022 | Records System Management | 2/11/2009 | 24 | El Paso Co. Sheriff's Academy | |
| 3807 | TCIC/NCIC for Less than Full Access Operators | 1/22/2009 | 8 | El Paso Co. Sheriff's Academy | |
| 2054 | Radar | 6/12/2008 | 4 | Alamo Area LEA | |
| 2107 | Use of Force (Intermediate) | 5/29/2008 | 16 | El Paso Co. Sheriff's Academy | Use of Force (Intermediate) |
| 2109 | Spanish for Law Enforcement (Intermediate) | 5/23/2008 | 24 | El Paso Co. Sheriff's Academy | Spanish for Law Enforcement (Intermediate) Spanish for Telecommunicators (Intermediate) |
| 3737 | New Supervisor's Course | 5/7/2008 | 20 | South Plains Association of Government LEA | Cultural Diversity (Intermediate) Special Investigative Topics (Intermediate) |
| 2108 | Arrest, Search, and Seizure (Intermediate) | 4/4/2008 | 20 | South Plains Association of Government LEA | Arrest, Search, and Seizure (Intermediate) |
| 3800 | Technical/Specialized | 3/4/2008 | 4 | Texas Department of Public Safety LEA | |
| 3897 | Technical/Specialized Seminar_1 | 3/4/2008 | 4 | STRATFORD POLICE DEPT. (Training Rosters) | |
| | | Unit Hours | 156 | | |

**09/01/2005 - 08/31/2007**

| Course No. | Course Title | Course Date | Course Hours | Institution | Training Mandates |
|---|---|---|---|---|---|
| 2049 | Report Writing - general | 6/21/2007 | 4 | STRATFORD POLICE DEPT. (Training Rosters) | |

APP35

# Courses Completed

**09/01/2005 - 08/31/2007**

| Course No. | Course Title | Course Date | Course Hours | Institution | Training Mandates |
|---|---|---|---|---|---|
| 3841 | Crisis Intervention Training | 9/21/2006 | 16 | Sheriff's Association of Texas | Crisis Intervention Training<br>Crisis Intervention Training (AdvPOC) For IntPOC issued before 9/1/2005)<br>Peace Officer Intermediate Options<br>Peace Officer Intermediate Options 1987-01<br>Peace Officer Intermediate Options 2005-01<br>Peace Officer Intermediate Options 2006-01<br>Peace Officer Intermediate Options 2009-09 |
| 3200 | Investigations | 6/30/2006 | 16 | Sul Ross State University LEA | |
| 2106 | Crime Scene Investigation (Intermediate) | 6/8/2006 | 32 | Sul Ross State University LEA | Crime Scene Investigation (Intermediate) |
| 2105 | Child Abuse Prevention and Investigation (Interm.) | 5/19/2006 | 24 | Sul Ross State University LEA | Child Abuse Prevention and Investigation (Intermediate) |
| 3600 | Juvenile | 1/25/2006 | 8 | El Paso Co. Sheriff's Academy | |
| | | **Unit Hours** | 100 | | |

**09/01/2003 - 08/31/2005**

| Course No. | Course Title | Course Date | Course Hours | Institution | Training Mandates |
|---|---|---|---|---|---|
| 3800 | Technical/Specialized | 5/31/2005 | 8 | Reeves County Sheriff's Office | |
| 3611 | Juvenile Justice Procedures Course w/o Exercises | 5/3/2005 | 4 | Reeves County Sheriff's Office | |
| 3300 | Patrol/Tactical | 4/27/2005 | 4 | Reeves County Sheriff's Office | |
| 3300 | Patrol/Tactical | 1/27/2005 | 8 | Permian Basin LEA | |
| 3277 | Identity Theft | 8/11/2004 | 3 | El Paso Co. Sheriff's Academy | Identity Theft (Intermediate) |
| 3232 | Special Investigative Topics | 8/11/2004 | 5 | El Paso Co. Sheriff's Academy | Special Investigative Topics (Intermediate) |
| 3939 | Cultural Diversity | 8/10/2004 | 8 | El Paso Co. Sheriff's Academy | Cultural Diversity (Intermediate) |
| 3100 | LAW | 6/23/2004 | 4 | Concho Valley Reg. Law Enforcement Academy | |
| 3300 | Patrol/Tactical | 5/27/2004 | 2 | Permian Basin LEA | |
| 3277 | Identity Theft | 4/7/2004 | 4 | Permian Basin LEA | Identity Theft (Intermediate) |
| 3257 | Combined Asset Forfeiture and Racial Profiling | 4/7/2004 | 4 | Permian Basin LEA | Asset Forfeiture (Intermediate)<br>Racial Profiling (Intermediate) |

APP36

# Courses Completed

**09/01/2003 - 08/31/2005**

| Course No. | Course Title | Course Date | Course Hours | Institution | Training Mandates |
|---|---|---|---|---|---|
| 3200 | Investigations | 3/29/2004 | 3 | U. S. DEPT. OF JUSTICE | |
| 3214 | Family Violence Web w/ Exercises | 2/19/2004 | 8 | TCLEOSE POSEIT | Part 1 of 4 (POSEIT) Special Investigative Topics |
| 3807 | TCIC/NCIC for Less than Full Access Operators | 1/16/2004 | 8 | Texas Department of Public Safety LEA | |
| | | **Unit Hours** | **73** | | |

**09/01/2001 - 08/31/2003**

| Course No. | Course Title | Course Date | Course Hours | Institution | Training Mandates |
|---|---|---|---|---|---|
| 3256 | Racial Profiling | 1/28/2003 | 4 | El Paso Co. Sheriff's Academy | Racial Profiling (Intermediate) |
| 3303 | Law Enforcement Officer Flying Armed - (FAA) | 1/28/2003 | 2 | El Paso Co. Sheriff's Academy | |
| 3255 | Asset Forfeiture | 1/28/2003 | 2 | El Paso Co. Sheriff's Academy | Asset Forfeiture (Intermediate) |
| 3800 | Technical/Specialized | 11/22/2002 | 40 | OTHER TRAINING | |
| 3101 | Civil Process | 9/17/2002 | 20 | Reeves County Sheriff's Office | Course counts toward 20 hour requirement |
| 3257 | Combined Asset Forfeiture and Racial Profiling | 4/30/2002 | 8 | El Paso Co. Sheriff's Academy | Asset Forfeiture (Intermediate) Racial Profiling (Intermediate) |
| | | **Unit Hours** | **76** | | |

**09/01/1999 - 08/31/2001**

| Course No. | Course Title | Course Date | Course Hours | Institution | Training Mandates |
|---|---|---|---|---|---|
| 1999 | Personnel Orientation by Dept. Basic Proficiency | 6/11/2001 | 0 | OTHER TRAINING | Personnel Orientation |
| 3300 | Patrol/Tactical | 2/20/2001 | 8 | El Paso Co. Sheriff's Academy | |
| | | **Unit Hours** | **8** | | |

**09/01/1997 - 08/31/1999**

| Course No. | Course Title | Course Date | Course Hours | Institution | Training Mandates |
|---|---|---|---|---|---|
| 1000 | Basic Peace Officer | 8/11/1999 | 560 | El Paso Community College LEA | Cultural Diversity (Mandate) Special Investigative Topic (Mandate) |
| | | **Unit Hours** | **560** | | |

*Print Date:* 1/3/2013

*Page Number:* 5

| | |
|---|---|
| **Total Hours** | 1145 |

## Total Hours

| | |
|---|---|
| **Total Education Hours** | 0 |
| **Total Training Hours** | 1145 |
| **Total Hours** | 1145 |

**AFFIDAVIT OF ALBERT RODRIGUEZ CONCERNING CLAIMS
AGAINST DEFENDANT OWEN FOSTER**

**THE STATE OF TEXAS**

**COUNTY OF TRAVIS**

Before me, the undersigned authority in and for the State of Texas, on this day personally appeared Albert Rodriguez, personally known to me, who, after being by me duly sworn, deposes and says:

## I.   BACKGROUND CONCERNING ALBERT RODRIGUEZ

1.      "My name is Albert Rodriguez. I am over the age of 21, of sound mind, and I am in all respects legally competent and duly authorized to make this Affidavit. I have personal knowledge of the facts contained herein:

2.      I honorably retired from the Texas Department of Public Safety (DPS) on September 30, 2009. I retired with the rank of Commander in the position of Director of Training. Upon retiring, I was commissioned by the DPS as a Special Ranger. On January 2010, I was employed by the Texas Alcoholic Beverage Commission (TABC) as a Lieutenant for the Office of Professional Responsibility. Presently, I hold the position of Director of Training for the TABC with the rank of Captain.

3.      I was employed by the Texas Department of Public Safety (DPS) as a patrol officer in 1977. I served in the Highway Patrol Service as a State Trooper and then promoted to the rank of Training Officer at the Training Academy. At the Training Academy, I was promoted to Staff Development Specialist I, Lieutenant and ultimately to the rank of Commander of the DPS Training Academy in Austin, Texas. I held that position from 1993 to September 30, 2009. I was employed by the DPS as a law enforcement officer and law enforcement trainer for over thirty- two (32) years and was a licensed Texas Peace Officer for that time period. I met all of the standards for licensure set out by statute and by the Texas Commission on Law Enforcement Officer Standards and Education. I have over thirty-six (36) years of law enforcement experience and training.

4.      I hold a Bachelor's Degree in Education from Texas A&M in Kingsville, Texas. I also hold Advanced, Instructors', and Masters' certifications from the Texas Commission on Law Enforcement Officer Standards and Education. I am a graduate of the 147th FBI National Academy in Quantico, Virginia.

5.      I have attended over six thousand (6,000) hours of various law enforcement seminars and schools throughout the United States. I have studied, attended seminars regarding, and instructed classes pertaining to the issues of law enforcement policies and procedures, use of force, detention and arrest procedure, use of force in jail settings, reasonable suspicion, probable cause, police supervision, law enforcement training, patrol procedures, constitutional law and

officer safety. I have been qualified in Federal and State courts as an expert witness in the areas of patrol procedures, use of force, use of deadly force, policies and procedures, use of force in jail settings, reasonable suspicion, probable cause, arrest procedures, driving procedures, police supervision, firearms, officer safety, Texas criminal laws, Texas traffic laws, law enforcement training, and police investigations.

6.    I am or have been a member of the FBI National Academy Graduates Association, Texas Police Association, Texas Sheriff's Association, and International Law Enforcement Educators and Trainers Association. I have served on the Southwest Texas State University Criminal Justice Advisory Board, Texas Alcohol Beverage Commission, and the Austin Community College Law Enforcement Advisory Board. I have instructed at the FBI Academy in Quantico, Virginia; Northwest University in Jacksonville, Florida; Texas Attorney General's Annual Law Enforcement Conferences and instructed police officers throughout the United States, Canada, and Mexico.

7.    I am presently the Director of Training for the Texas Alcoholic Beverage Commission and (a) conduct internal affairs investigations on alleged officer misconduct, including allegations of excessive force; and (b) instruct police officers, including TABC Agents on Use of Force Concepts; (c) and present Use of Force Concepts to Grand Juries to assist them in evaluating police officer use of force and deadly force cases. Attached to this Affidavit as Exhibit A is my resume, which contains a more complete listing of my training and qualifications and is provided for reference of my experience, education, training and skills.

8.    My opinions in this affidavit are based upon my training, experience, and upon having visited Bovina and inspected the site of the incident and having reviewed and researched the materials and documents as outlined in the attached Exhibit B to this affidavit.

## II.    BACKGROUND CONCERNING OWEN FOSTER

9.    During the alleged time period in question, Officer Owen Foster was a Texas Commission on Law Enforcement licensed police officer. Officer Foster holds a TCOLE Advanced Peace Officer Certification. Officer Foster had met all of the training requirements legislatively mandated and established by TCOLE at the time of the incident in question. The materials reviewed clearly reveal that Officer Foster successfully completed the State Training Standards curriculum and passed the State Licensing Examination.

10.    Officer Foster holds Basic, Intermediate, and Advanced TCOLE Peace Officer Certifications. He had completed the most advanced Use of Force training that TCOLE offers to law enforcement officers. In addition, Officer Foster had successfully completed the Taser course offered by the company that manufacturers the Taser, Taser International.

11.    Based on the above, it is my opinion that Officer Foster was trained on the requirements of the 4th Amendment of the United States Constitution as it relates to Law Enforcement Arrest, Search, and Seizure and more specifically had been trained on the dictates of the stair step requirements and dynamics of Arrest, Search, and Seizure.

### III.   BACKGROUND CONCERNING LAW ENFORCEMENT TRAINING

12.     Law enforcement officers in Texas are trained pursuant to the TCOLE State Training Standards.  Officers are instructed to understand that enforcing Texas Traffic and Criminal Laws is within the scope of their law enforcement authority.  More specifically, relative to that area, they are instructed on the Texas Code of Criminal Procedure, Article 2.13, DUTIES AND POWERS:  "It is the duty of every peace officer to preserve the peace within his jurisdiction. To effect this purpose, he shall use all lawful means.  He shall in every case, where he is authorized by the provision of this code, interfere without a warrant to prevent and suppress crime."  The materials reviewed revealed that the Defendant Officer Owen Foster followed the training he received on the aforementioned Texas Code of Criminal Procedure Article in that in every incident in question his intervention was designed to prevent and suppress crime.

13.     The Plaintiffs bringing claims against Officer Owen Foster in this case have alleged false arrest or arrest without probable cause.  Law enforcement officers receive comprehensive training and education on Arrest, Search, and Seizure.  More specifically, law enforcement officers are trained to understand the requirements to stop and detain, frisk, and arrest persons.  As previously mentioned, the Defendant Officer Owen Foster during the alleged incidents in question was a TCOLE Licensed Peace Officer.  He was licensed after successfully completing the TCOLE State Training Standards and passing the state licensing examination.  The undisputable evidence indicates that he was trained on the requirements of the 4th Amendment of the United States Constitution as it relates to Law Enforcement Arrest, Search, and Seizure and more specifically had been trained on the dictates of the following stair step requirements and dynamics of Arrest, Search, and Seizure:



14.     The aforementioned 4th Amendment Arrest, Search, and Seizure stair step Police-Citizen Contact Continuum is presented to law enforcement officers in a variety of instructional formats.  It is explained to law enforcement officers that neither Reasonable Suspicion nor Probable Cause are required to investigate a situation through a "Consensual Conversation."

15.     Law enforcement officers are further instructed that in order to "Stop and Detain" a person, at a minimum, "Reasonable Suspicion" must exist.  The reasonable suspicion standard involves a level of belief, which is something less than the probable cause standard needed to support arrest.  Law enforcement officers are trained to understand that, in order to justify a detainment, they must be able to point to specific articulable facts, which taken together with rational inferences from those facts, collectively provide a particularized and objective basis for suspecting the person detained of criminal activity.

16.     Law enforcement officers are trained to understand that in order to arrest an individual, probable cause must exist to believe that a specific person has committed or is committing a violation of the law.  Probable cause pursuant to law enforcement training is defined as articulable facts and circumstances that would lead a reasonable law enforcement officer to believe that a specific person(s) has committed or is committing a violation of the law.

17.     Lastly, relative to the aforementioned Police Contact Continuum, law enforcement officers are trained to understand that Municipal, County, District, and Federal Courts employ the standard of "Proof Beyond a Reasonable Doubt" for a conviction.  Law enforcement trainers communicate to law enforcement officers that the standard of "Proof Beyond a Reasonable Doubt" is a higher standard than "Probable Cause."  Officers are instructed to understand that when a defendant is not convicted and/or a prosecutor dismisses a case said action does not necessarily equate to the lack of probable cause.  Probable cause may exist; however, the prosecutor may believe that the higher standard of "Proof Beyond a Reasonable Doubt" cannot be obtained.  Of course, there are many more reasons that a prosecutor might have for dismissing a case.

18.     The detention and arrest authorities, pursuant to law enforcement protocol, will be addressed later in this affidavit relative to the Plaintiffs' allegations in each individual incident in question.

19.     Law enforcement officers receive comprehensive training and education on the Use of Force and Civil Rights.  More specifically, law enforcement officers are trained to understand that the use of force by law enforcement officers is within the course and scope of their authority and not a violation of civil rights when said force is within the parameters of:

1) Texas Penal Code § 9.31, Self-Defense; *"(a) Except as provided in Subsection (b), a person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force."*

2) Texas Penal Code § 9.33 Defense of Third Person; *"A person is justified in using force or deadly force against another to protect a third person if: (1) under the circumstances as the actor reasonably believes them to be, the actor would be justified under Section 9.31 or 9.32 in using force or deadly force to protect himself against the unlawful force or unlawful deadly force he reasonably believes to be threatening the third person he seeks to protect; and (2) the actor reasonably believes that the intervention is immediately necessary to protect the third person."*

3) <u>Texas Penal Code § 9.51. Arrest and Search,</u> *"(a) A peace officer or a person acting in a peace officer's presence and at his direction, is justified in using force against another when and to the degree the actor <u>reasonably believes the force is immediately necessary to make or assist in making an arrest</u> or search, or to prevent or assist in preventing escape after arrest, if: (1) the actor reasonably believes the arrest or search is lawful or, if the arrest or search is made under a warrant, he reasonably believes the warrant is valid, and (2) before using force, the actor manifests his purpose to arrest or search and identifies himself as a peace officer or as one acting at a peace officer direction, unless he reasonably believes his purpose and identity are already known by or cannot reasonably be made known to the person to be arrested..."*

20.     Texas law enforcement officers are trained to understand that Texas law in this regard is consistent with the United States Supreme Court Decision in *Graham v Connor*. While I do not propose to offer expert opinions on the law, because my duties involve training law enforcement officers, I often read court decisions pertaining to law enforcement action, and have used judicial decisions to assist me in providing training to law enforcement officers. Therefore, I am able to provide expert testimony on the standard utilized in training police officers as to both tactical considerations as well as the legal parameters governing their conduct.

21.     It is important to note that when an officer in this case states that the Taser was deployed said statement means that the Taser is removed from the holster, held in hand, and may even be pointed at a suspect. When an officer discharges the Taser or drive stuns an individual with the Taser, it is at that point the Taser is considered used. In all of the alleged incidents in this lawsuit, the Taser was only used ONE time-against Plaintiff Martha Jaramillo.

22.     Furthermore, it is important to note that when an officer merely points the Taser at an individual, said action is not considered the use of force or the use of the Taser. It is no different than when an officer unholsters his/her handgun, said action is not considered the use of Deadly Force.

23.     In the law enforcement profession there are an indefinite number of circumstances that law enforcement officers may encounter when conducting traffic stops, detaining suspects, and/or in arrest situations. Because of the indefinite number of possibilities that exist in said circumstances, law enforcement officers are trained to use their judgment and discretion in arriving at a reasonable course of action.

24.     Law enforcement officers are trained to evaluate the totality of the circumstances as reasonably ascertainable and to use their good judgment and appropriate discretion in arriving at a course of action that is within the range of permissible conduct for a law enforcement officer. If in fact, there were a finite number of circumstances that could be identified, law enforcement officers would not be required to use their judgment or discretion at all. Law enforcement officers would only be trained on the specific number of circumstances and would be instructed to respond with specific actions and/or sets of procedures. Unfortunately, no such list of specific circumstances exists in life for each and every situation that a law enforcement

officer may encounter; thus, law enforcement officers are necessarily required to use their judgment and discretion.

25.     There is no training manual and/or policy manual that can cover every single situation that a law enforcement officer may encounter when conducting traffic stops, detaining suspects, and/or in arrest situations. Officers, therefore, are sent to police training academies and provided instruction intended to provide the officer with a firm foundation upon which to apply the knowledge he has been taught and to utilize legitimate discretion in the performance of those duties he can reasonably be expected to confront in the performance of his responsibilities.

26.     The materials reviewed reveal that Defendant Officer Owen Foster was required to use his judgment and discretion, based upon accepted training and experience. He was required to evaluate the totality of the circumstances and use his judgment and discretion in carrying out his duties and responsibilities as a law enforcement officer. There are no law enforcement manuals, training, and/or policy manual that specifically mandates and/or outlines a step by step procedure in attempting to stabilize the situations in this case and/or in detaining and arresting the Plaintiffs in the alleged incidents in question. Each situation is unique and requires law enforcement officers to use their judgment and discretion. The documents reviewed indicate that Officer Owen Foster was appropriately conducting discretionary law enforcement functions in connection with the Plaintiffs. His discretionary functions will be specifically addressed when each individual incident is examined.

27.     In short, Officer Owen Foster's discretionary responses and actions at times were conducted in uncertain, dangerous, and rapidly evolving circumstances and said actions and responses were within the range of acceptable law enforcement discretionary functions and consistent with law enforcement tactical and constitutional training. The conduct and actions of Officer Owen Foster were consistent with the manner in which we customarily train law enforcement officers to apply the dictates of the United States Supreme Court in such decisions as *Graham v. Conner* and the TCOLE training on Arrest, Search, and Seizure.

## IV.     SCOPE OF AFFIDAVIT

28.     I have previously given a report listing what I believed to be a summary of relevant facts surrounding the incidents in which Officer Owen Foster was involved.    That report also contains my opinions and observations concerning the incidents in which Officer Owen Foster was involved. Because the purpose of this affidavit is to support Officer Owen Foster's Motion for Summary Judgment, I am not reciting facts nor offering opinions concerning facts that I believe may be in dispute.

## V.     REVIEW STANDARD

29.     It is my customary practice to evaluate the objective reasonableness of an officer's conduct on a case-by-case basis. The objective analysis considers the fact that at times law enforcement officers are required to make split second decisions in tense, uncertain, and rapidly involving circumstances. The analysis consists of comparing Officer Owen Foster's actions in relationship to the contemporary training received by law enforcement officers. The

analysis includes the evaluation of the totality of the circumstances in each individual incident as could reasonably be perceived by a well-trained law enforcement officer at the time that Officer Owen Foster exercised his duties and authorities as a law enforcement officer. The evaluation was conducted from the standpoint of what the materials show that Officer Owen Foster knew and perceived at the time on each individual incident in question and not from the point of view that includes information obtained in hindsight. In addition, Officer Owen Foster's actions were evaluated from the perspective of what actions a reasonable and well-trained law enforcement officer could have taken when presented with the same or similar circumstances that each of the individual Plaintiffs presented to the officers in each incident.

## VI.   DECEMBER 28, 2010 INCIDENT INVOLVING MARTHA JARAMILLO

30.   On December 28, 2010, at approximately 10:13 p.m., Officer Owen Foster was working routine patrol and traveling westbound on Avenue D, in Bovina, Texas when he observed a vehicle in front of him traveling in the same direction. The vehicle came to a stop at the intersection of Avenue D and Halsell Street. The driver of the vehicle then activated the right turn signal and turned right. Officer Foster initiated a traffic stop for failure to signal intent to turn within 100 feet of making the turning maneuver. The traffic stop occurred in the parking lot of the school. The driver of the vehicle was later identified as Denise Lara.

31.   At the time of the December 28, 2010 incident in question, Officer Foster was wearing a regulation Bovina Police Department uniform and driving a Bovina Police Department marked patrol car.

32.   Based on the documents reviewed, it is my opinion that Owen Foster had probable cause to stop Denise Lara for violating Texas Transportation Code § 545.104 based on her admission that she pulled up to the stop sign and put on her turn signal once she was at the stop sign, instead of signaling continuously for at least 100 feet of movement of the vehicle before the turn. (See Denise Lara Depo. pp. 19, line 1–pp. 20, line 3). Moreover, any reasonable law enforcement officer could have believed that probable cause existed to stop Denise Lara for failing to signal lane change. Texas Transportation Code § 545.104 provides:

*(a) An operator shall use the signal authorized by Section 545.106 to indicate an intention to turn, change lanes, or start from a parked position.*

*(b) An operator intending to turn a vehicle right or left shall signal continuously for not less than the last 100 feet of movement of the vehicle before the turn. (See* TEX. TRANSP. CODE § 545.104).

33.   Officer Foster approached the vehicle and asked Ms. Lara for her driver's license and proof of insurance. Ms. Lara provided proof of insurance, and informed Officer Foster that she did not have a driver's license. Ms. Lara informed Officer Foster that Martha Jaramillo had loaned her the vehicle, so that she could go pick up Martha Jaramillo's son, Jorge Jaramillo, from a friend's residence. Jorge Jaramillo informed Officer Foster he did not have a driver's license either.

34.     Because neither Ms. Lara nor Jorge Jaramillo had a driver's license, Officer Foster called a tow truck to get the vehicle towed.  At one point, Jorge Jaramillo called his mother, Martha Jaramillo, via his cellular phone.

35.     As Officer Foster was inventorying the vehicle, Plaintiff Jaramillo arrived at the scene of the traffic stop driving a blue Dodge pickup truck. Plaintiff Jaramillo exited the truck and approached Officer Foster from the rear while staying in the parking lot of the school. Officer Foster informed Plaintiff Jaramillo that she needed to get back in her vehicle and wait.

36.     Plaintiff Jaramillo testified that Ms. Lara was driving because her son, Jorge Jaramillo, had allowed Ms. Lara to drive. (See Martha Jaramillo Depo. pp. 13, line 19–pp. 14, line 5). Ms. Lara was not licensed to drive, and Martha Jaramillo's 16 year old son only had a driver's permit.  Furthermore, he did not have the permit with him at the time Officer Foster stopped the vehicle driven by Ms. Lara. In that regard, Plaintiff Jaramillo testified that she told Officer Foster, "Why in the hell are you taking it if my son has his permit – has a permit," in reference to the vehicle being towed. (See Martha Jaramillo Depo. pp. 115, lines 13–18). Plaintiff Jaramillo is mistaken in believing that her 16 year old son can legally drive without a licensed driver in the front seat of the vehicle with him. Plaintiff Jaramillo testified that she was "mad" at Officer Foster.  In fact, she testified that before she cursed at Officer Foster, she was mad at her son Jorge, and had actually slapped Jorge Jaramillo. (See Martha Jaramillo Depo. pp. 115, lines 13–18).

37.     Based on the documents reviewed, it is my opinion that any reasonable and prudent law enforcement officer could have believed that probable caused existed to believe that Plaintiff Martha Jaramillo had allowed Denise Lara, an unlicensed driver, to operate her car in violation of Texas Transportation Code § 521.458 regarding permitting an unauthorized person to drive.  That statute provides:

*(a) A person may not knowingly permit or cause the person's child or ward who is under 18 years of age to operate a motor vehicle on a highway in violation of this chapter.*

*(b) A person may not authorize or knowingly permit a motor vehicle owned by or under the control of the person to be operated on a highway by any person in violation of this chapter.* (See TEX. TRANSP. CODE § 521.458).

38.     Although it is disputed where or how far Plaintiff drove, it is clear that she did get back in her vehicle and moved it for some distance after the first exchange with Officer Foster.

39.     Officer Foster completed the inventory of the vehicle and informed Plaintiff Jaramillo that she was not free to leave because she was going to be given a citation for allowing an unlicensed driver to operate a motor vehicle.  The tow truck driver arrived and began to load the vehicle that had been driven by Ms. Lara. Officer Foster completed writing the citation for Plaintiff Jaramillo allowing an unlicensed driver to operate a motor vehicle.

40.     Officer Foster then approached Plaintiff Jaramillo, and she was visibly angry. Officer Foster informed her about the citation, and Plaintiff Jaramillo responded by stating that she had not let Denise Lara and Jorge Jaramillo take the vehicle. Officer Foster informed Plaintiff Jaramillo that she could argue with the judge, and then explained the citation to her.

Officer Foster asked for her signature on the citation, and she refused to sign. Martha Jaramillo testified, "He came back with a ticket, and I told him I was not going to sign it, because I didn't let—my son had his driver's license or permit. He told me that if I did—if I refused to sign it, he was going to arrest me. I told him, 'Go ahead.' " (See Martha Jaramillo Depo. pp. 17, lines 5–10).

41.     Officer Foster informed Plaintiff Jaramillo that she was under arrest and asked her to exit the vehicle. Plaintiff Jaramillo turned and reached inside the vehicle near the ignition or console area while the vehicle was still running and it was dark outside (after 10:13 p.m.).

42.     Officer Foster was standing near the driver's side door when Plaintiff Jaramillo pushed the door, striking Officer Foster in the left knee. Although Officer Foster could have charged Martha Jaramillo with assault of a peace officer, but he did not. Officer Foster's not filing an assault charge against Plaintiff Jaramillo is additional evidence of the reasonableness of his actions. Officer Foster warned Plaintiff Jaramillo that he was going to "tase" her. Plaintiff Jaramillo said "Go for it" and refused to comply; Officer Foster responded by discharging the Taser.

43.     The materials reviewed indicate that Plaintiff Martha Jaramillo refused to promise to appear before the court for the citation she was given due to her allowing an unauthorized person to drive. They also indicate that she told Officer Foster to arrest her and taunted him when he informed her that he would use the Taser.

44.     Plaintiff Jaramillo testified that she was mad, raised her voice, slapped her son, refused to sign the citation, and admitted that at the time Officer Foster was standing outside the driver's side window of her truck she reached for the truck's ignition, and struck Officer Foster with the truck's door. (See Martha Jaramillo Depo. pp. 115, lines 7–14). Plaintiff Jaramillo also testified that she told Officer Foster, "Go for it", when Officer Foster warned her that he was going to tase her. (See Martha Jaramillo Depo. pp. 123, lines 10–13). The evidence from Officer Foster's observations clearly indicates that Plaintiff Jaramillo was resisting, as evidenced by her striking Officer Foster with the truck's door, Officer Foster's warning her about being tased, and her response of "Go for it."

45.     Any reasonable and well-trained law enforcement officer having observed Plaintiff Martha Jaramillo's behavior of yelling, cursing, and refusing to sign the citation could have then determined that any attempt to physically control her could have led to an outright intense physical altercation in which someone could have gotten seriously injured.

46.     TCOLE establishes the State Training Standards for Texas Police Officers and outlines the State Training Standards on the Use of Force. I have reviewed and am familiar with those standards. Officer Foster was licensed as a police officer by the only law enforcement officer licensure authority in Texas, TCOLE. Officer Foster had been trained in compliance with the TCOLE Use of Force training curriculum. TCOLE establishes the State Training Standards for Texas Police Officers and outlines the State Training Standards on the Use of Force. The State Training Standards Force Options are:

I. Command Presence

II. Verbal Directions

III. Empty Hand Control

IV. Chemical/Electrical Weapons

V. Baton/Impact Weapons

VI. Deadly Force

47.     The materials reviewed indicate that Officer Foster used Command Presence, Verbal Directions, and then opted to use the Taser (Electrical Weapons). The use of Empty Hand Control could have resulted in serious injury either to Officer Foster or Plaintiff Martha Jaramillo because of Plaintiff Martha Jaramillo's demonstrated behavior at the scene. Empty Hand Control, in this case, could have consisted of physically grabbing Plaintiff Martha Jaramillo, and attempting to extract her out of the truck. It is at that point that Plaintiff Martha Jaramillo, because of her admitted agitated state, could have struck Officer Foster, possibly causing injury. Furthermore, in that situation, Officer Foster would have to resort to strikes with a police baton and/or his personal weapons (hand, fist, elbows, etc.). Empty Hand Control requires personal hands on contact whereas the Taser does not; therefore, the risk of injury is significantly decreased.

48.     In an Empty Hand Control scenario, subsequent to any strikes that Officer Foster may have been required to deliver as a result of Plaintiff Martha Jaramillo's combative actions, Officer Foster would have been required to grab one of Plaintiff Martha Jaramillo's arms, twist it behind her back, and if she continued to struggle, Officer Foster would have had to take her down to the ground. Once on the ground, Officer Foster would be required to place a knee behind Plaintiff Martha Jaramillo's back, to keep her pinned to the ground, while he grabbed her other arm and twisted it behind her back for handcuffing.

49.     Any well-trained officer could have believed that the anticipated injury would have been much greater with the use of Empty Hand Control versus the use of the Taser. In most instances, the Taser momentarily "cramps" up the person's body, which affords the officer the opportunity to control and handcuff the person. The anticipated results of the use of the Taser are minor injuries. It is important to note that law enforcement training relating to the United States Supreme Court Decision on *Graham v. Conner* specifically outlines the elements to be analyzed in evaluating an officer's use of force, to include but not limited to:

    a) Severity of the crime being committed by Plaintiff Jaramillo = *Officer Foster believed that Plaintiff Jaramillo was committing the offense of resisting arrest and assault when she struck him with the truck's door.*

    b) Whether Plaintiff Jaramillo presented a danger to Officer Foster or others = *Officer Foster observed Plaintiff Jaramillo's agitated state, had been a victim of her cursing and yelling, had been told to "Go for It" when Officer Foster warned her about being tased, had been struck with the truck's door by Plaintiff Jaramillo, and Plaintiff Jaramillo had yelled at her son.*

c) Whether Plaintiff Jaramillo was actively resisting and/or attempting to evade arrest = *Plaintiff Jaramillo was defiant and also struck Officer Foster with the truck's door; thus, she was actively resisting.*

50.     Officer Foster simply responded to the situation that Plaintiff Martha Jaramillo created, as could any reasonable law enforcement officer.  She cursed at Officer Foster, interfered with his investigation, raised her voice, refused to sign the citation, struck Officer Foster with the truck's door, and told Officer Foster to "Go for it" when she was warned about the Taser as a result of her resisting arrest.  When applying the dictates of the United States Supreme Court Decision in *Graham v. Connor* pursuant to law enforcement training, the evidence clearly indicates that any reasonable and well-trained law enforcement officer could have responded to Plaintiff Martha Jaramillo's unlawful actions in the same or similar manner.

51.     Based on the documents reviewed, it is my opinion that Officer Foster's use of the Taser was objectively reasonable in light of the totality of the circumstances.  Moreover, based on the documents reviewed, it is my opinion that Officer Foster did not use excessive force in connection with Martha Jaramillo.

52.     Officer Foster summoned an ambulance.  EMS arrived, as did Chief of Police Sinclair.  The Taser probes were removed, and EMS evaluated Plaintiff Jaramillo and determined that there was nothing wrong with her.  She was placed under arrest for allowing an unlicensed driver to operate a motor vehicle, not promising to appear before the court, and resisting arrest.  Plaintiff Jaramillo was transported to Parmer County Jail where the book-in female officer noticed that Plaintiff Jaramillo did not have any marks from the Taser.

53.     Plaintiff Martha Jaramillo testified that she suffers from Epilepsy and that when she was tased, she had a seizure.  I have been certified as a Taser Instructor for over 10 years, and I have never heard of the Taser causing seizures.  Regardless, even when considering the evidence in the most favorable light for Plaintiff Martha Jaramillo, and assuming that the Taser caused an alleged seizure, Officer Foster's actions remain objectively reasonable.  Officer Foster used Command Presence and Verbal Directions in an attempt to control Plaintiff Martha Jaramillo and to get her to comply.  Plaintiff Martha Jaramillo did not allow those non-physical force options to be effective; rather, she created a situation in which Officer Foster was required to use the Taser to effectuate her arrest.  Officer Foster's use of the Taser was in compliance with the United States Supreme Court Decision in *Graham v. Connor* and the Texas Penal Code Section 9.51. Most importantly, if Officer Foster would have resorted to Empty Hand Control as opposed to the Taser, the chances of serious injury and/or the chances of a seizure actually occurring could have increased due to the physical and strenuous aspects of Empty Hand Control.

54.     Law enforcement officers rely on medical services in situations in which a person alleges an injury.  The documents reviewed indicate that EMS evaluated Plaintiff Martha Jaramillo and determined that medically there were no issues that prevented her incarceration.

55.     Officer Foster relied on the expertise of EMS, as could any reasonable officer confronted with the same or similar circumstances that existed in this case.  EMS personnel

made the determination of Plaintiff Martha Jaramillo's medical condition and not the Defendant Officers.

56.     Plaintiff Jaramillo has alleged that Officer Foster used the Taser without any instructional guidance.  Officer Foster holds a Basic, Intermediate, and Advanced TCOLE Peace Officer Certifications.  He had completed the most advanced Use of Force TCOLE offers to law enforcement officers.  In addition, Officer Foster had successfully completed the Taser course offered by the company that manufacturers the Taser, Taser International.  There is no evidence to substantiate the Plaintiff's allegation regarding Officer Foster using the Taser without any instructional guidance.

57.     In my opinion, Officer Owen Foster was appropriately conducting legitimate discretionary law enforcement functions in connection with Plaintiff Martha Jaramillo on the date in question and said functions were within the course scope of his law enforcement authority.

58.     Based on all of the materials reviewed, it is my opinion that even when considering the objective evidence in the most favorable light for Plaintiff Martha Jaramillo, Officer Foster's actions on the evening of December 28, 2010 with regard to Ms. Jaramillo were objectively reasonable pursuant to law enforcement training.  It is also my opinion that another reasonable law enforcement officer confronted with the same or similar circumstances as was Officer Foster on the evening in question could have taken the same or similar actions as did Officer Foster on that occasion.


[THE REST OF THIS PAGE INTENTIONALLY LEFT BLANK]

FURTHER AFFIANT SAYETH NOT.

Albert Rodriguez

_____ SWORN TO AND SUBSCRIBED BEFORE ME by Albert Rodriguez, on this 7th day of January, 2014, to certify which witness to my hand and seal of office.

JULIE ROBERTSON
My Commission Expires
August 1, 2016

Notary Public, State of Texas

# Exhibit A

## (Albert Rodriguez Resumé)

APP52

# ALBERT RODRIGUEZ

*Austin, Texas*

| | |
|---|---|
| *Age:* | *60 years* |
| *Wife:* | *Terry Rodriguez* |
| *Children:* | *Steven Alberto* |
| *Height:* | *6'0"* |
| *Weight:* | *215 lbs.* |

## EDUCATION

**Emergency Medical Technician;** 13 Semester Hours; 1991; Austin Community College, Austin, Texas
**Graduate Credit in Criminal Justice;** 16 Semester Hours; 1986; University of Virginia, Quantico, Virginia
**B.S. in Education;** May 1975; Texas A&I University, Kingsville, Texas
**High School Diploma;** 1971; Falfurrias High School, Falfurrias, Texas

## PROFESSIONAL EXPERIENCE

| | |
|---|---|
| 05-01-13 to present | **Captain,** Texas Alcoholic Beverage Commission/Office of Professional Responsibility- Supervise all training staff, and training activities at the Texas Alcoholic Beverage Commission Academy and conducting Use of Force Investigations for the Office of Professional Responsibility. Instruct force concepts to TABC Agents, law enforcement agencies, and present force concepts to requesting District and County Attorney's and grand juries throughout the state upon request. |
| 01-04-10 to 05-01-13 | **Lieutenant,** Texas Alcoholic Beverage Commission, Office of Professional Responsibility – Conducting investigations, training, and policy development. |
| 1993 to-09-30-09 | **Commander, Director of Training,** Texas Department of Public Safety - Supervise one captain, three lieutenants, seven sergeants, 35 non-commissioned employees, and all training activities at the Texas Department of Public Safety Training Academy. Instruct in a variety of courses at several TCLEOSE accredited academies throughout the State of Texas. Retired 9-30-2009. |
| 1985 to present | **Law Enforcement Consultant-** Testified, investigated, and/or consulted in over 1,000 law enforcement criminal and/or civil use of force and deadly force cases throughout the United States. Testified, investigated, and/or consulted in over 150 law enforcement criminal and/or civil use of deadly force cases. |
| 1982 to 1993 | **Lieutenant** - Texas Department of Public Safety - Supervise two staff sergeants and two civilian employees; coordinate Recruit Schools (last Recruit School was March 31 to August 31, 1990); and coordinate In-Service Schools for Traffic Law Enforcement and Criminal Law Enforcement Divisions. Range Master: Instruct firearms courses, oversee all Department firearms issues, repair firearms, develop shooting courses, etc. Instructor in a variety of courses including Use of Force, General Patrol Procedures, Arrest Procedures, Subject Control Tactics, Gun-smithing, etc. |
| 1981 to 1982 | **Training Officer** - Texas Department of Public Safety Academy - Physical Training, Officer Survival and Subject Control Tactics, Patrol Procedures, Use of Force, Arrest Procedures, etc. |
| 1977 to 1981 | **Texas Highway Patrol** - Pearsall, Pleasanton, and Austin, Texas. |
| 1975 to 1977 | **Coach and Teacher** - San Antonio Independent School District - Thomas Jefferson High School. |

## SPECIALIZED TRAINING

- **Americans for Effective Law Enforcement;** Police Civil Liability, September 1996, Las Vegas, Nevada
- **State and Provincial Police Academy Director's Conference;** June 1995; Williamsburg, Virginia
- **Public Agency Training Council - Use of Force/High Speed Police Pursuit;** June, 1995; San Antonio, Texas
- **American Society of Law Enforcement Trainers;** January 1995; Anchorage, Alaska
- **Attorney General's Criminal Law Enforcement Conference;** 1995; Austin, Texas
- **Southwestern Texas State University Leadership Development Conference;** August - September, 1994; Austin, Texas

*Albert Rodriguez*

*Resume*                                                                                    *Page 2*

## • SPECIALIZED TRAINING (Continued)

- U.S. Department of Justice Municipal/Civil Liability Conference; June 1994; Laredo, Texas
- Professional Development Conference; 1994; Texas Department of Public Safety; Austin, Texas
- Attorney General's Criminal Law Enforcement Conference; 1994; Austin, Texas
- American Society of Law Enforcement Trainers; January 1993; Washington, D.C
- Police Civil Liability; 1993; Las Vegas, Nevada
- Accidents Involving Petroleum Gas Division; September 6, 1991; Austin, Texas
- Use of Force Symposium; June 23 - 27, 1991; Federal Law Enforcement Training Center; Glynco, Georgia
- Emergency Medical Technician; June 14, 1991; Austin, Texas
- Tactical Baton Instructor; May 21 - 22, 1991; Austin, Texas
- Smith and Wesson Revolver Armorers' Course, April 1991, Lubbock, Texas
- Pistol Smithing Course, Semi-automatic; April 17 - 18, 1991; Austin, Texas
- Spanish for Law Enforcement Instructor Training; March 19 - 23, 1990; Austin, Texas
- Japanese Karate; 1989 to 1990; Austin, Texas
- Texas Department of Public Safety Firearms Instructors' Course, November, 1985
- Manager of Managers Program; April 16 - 20, 1989; New Braunfels, Texas
- High Performance Management; February 28, 1989; Austin, Texas
- American Society of Law Enforcement Trainer's Workshop; January 3 - 7, 1988; New Orleans, Louisiana
- United States Secret Service Dignitary Protection School; January, 1987
- Federal Bureau of Investigation, National Academy; October 1986 - December 1986; 147th Session; Quantico, Virginia
- Deadly Force and the Peace Officer; September, 1986; Northwestern University, Evanston, Illinois
- State Police and Highway Patrol Training Director's Seminar; March 25 - 29, 1985; Jacksonville, Florida
- Confrontation and Stress Management; April 20, 1984; Texas A&M University; College Station, Texas
- Police Defensive Tactics; March 11, 1984; Smith & Wesson Academy; Springfield, Massachusetts
- First Level Management Training; December 1, 1983; Governor's Council, State of Texas; Lago Vista, Texas
- International Non-Lethal Weapons Association Academy; September 19, 1983; Instructor's Certificate Number 0606
- Advanced Officer Survival Seminar; August 10, 1983; Police Marksman Association: New Orleans, Louisiana
- Officer Tear Gas Training; July 26, 1983; Federal Laboratories, Inc.; Austin, Texas
- Federal Laboratories Tear Gas Seminar; July 1983; Austin, Texas
- Licensed, Emergency Medical Technician; February 11, 1983; Health Resource Center; San Marcos, Texas
- Police Instructors' Baton Training; January 17 to 21, 1983; Texas Department of Public Safety; Austin, Texas
- Advanced Accident Investigation Course; October 25 - November 12, 1982; Texas A&M University; College Station, Texas
- Psycho-Motor Skill Design - Instructor Training Seminar; October 3 - 9, 1982; Justice System Association; Chicago, Illinois
- Street Survival Seminar; September 7 - 8, 1982; North Texas Police Chiefs Association; Arlington, Texas
- FBI Instructors' Course; August 30 - September 3, 1982; Federal Bureau of Investigation (FBI); Austin, Texas
- Advanced Instructors' Course; May 10 - 14, 1982; Texas Police Association; Austin, Texas
- Police Physical Fitness Trainers' Course - Certificate of Proficiency; March 13, 1982; Des Moines, Iowa
- Police Fitness Instructors' School; March 8 - 12, 1982; The Institute for Aerobic Research
- Police Photography School; January 5 - 7, 1982; Texas Department of Public Safety; Austin, Texas
- Physical Fitness Program; November 9 - 13, 1981; International Association of Chiefs of Police; Dallas, Texas
- Arts of Self Defense School; October 5 - 12, 1981; Robinette Academy of Personal Protection; Austin, Texas
- Techniques of Group Instruction School; August 31 to September 4, 1981; Texas Department of Public Safety; Austin, Texas
- Officer Survival School; July 1981; Houston Police Department; Austin, Texas
- Breathalyzer Operator Course; November , 1977; Texas Department of Public Safety, Training Academy; San Antonio, Texas
- Texas Department of Public Safety Training Academy, 1,100 hours; 1977; Austin, Texas
- Americans For Effective Law Enforcement, Police Civil Liability, September 1997, Las Vegas, Nevada
- Highway Patrol In-Service Training 1978, 1980, 1982, 1984, 1986, 1988, 1990, 1992, 1994, 1996, 1998, 2000
- Investigation of Homicides and Violent Crimes, July 2000, Department of Public Safety Training Academy
- Defensive Tactics School/Takedowns, August 2000, Las Vegas, Nevada
- TCLEOSE's Academy Coordinators' Workshop, September 2000, Corpus Christi, Texas

APP54

*Albert Rodríguez*

## • SPECIALIZED TRAINING (Continued)

- **Gang Seminar, (Kim Ogg)**, November 2000, Texas Department of Public Safety Training Academy, Austin, Texas
- **Lewis Grigg's Cultural Diversity Program**, June 2000, Texas Department of Public Safety Training Academy; Austin, Texas
- **Mastering Performance Leadership**, May 2000, Texas Department of Public Safety Training Academy, Austin, Texas
- **Controlled F.O.R.C.E Instructor Certification Program**, August 2000, Las Vegas, Nevada
- **National Summit on the Use of Force in Law Enforcement and Corrections**, January 2001, Las Vegas Nevada
- **Sexual Assault and Homicide Investigation**, February 2001, Texas Department of Public Safety Training Academy, Austin Texas
- **TCLEOSE's Academy Coordinators' Workshop**, September 2001, Corpus Christi, Texas
- **Highway Patrol In-Service**, April 2002, Texas Department of Public Safety Training Academy
- **ASLET International Conference**, February 2002, Anchorage, Alaska
- **Homicide Investigation-Custody Deaths-Excited Delirium/Cocaine Toxicity**, DiMaio, Tx. DPS; April 2002
- **Blood Analysis/Blood Spatter**, Henderson, Tx. DPS, October 2003
- **TCLEOSE's Academy Coordinators' Workshop**, September 2003, Corpus Christi, Texas
- **Reconstruction of Shooting Incidents and the Investigation of Violent Crime Scenes**, April 6, 7 & 8, 2006 Cypress, Texas
- **Shooting Reconstruction School**, May 9-13, 2005, Texas DPS-Ed Huske
- **Crisis Intervention**, September 2006, Texas DPS, Austin, Texas
- **Excited Delirium**, November 16-17, 2006, Institute for Prevention of In-Custody Death, Las Vegas, Nevada
- **Taser Instructor Re-Certification**, October 16-17, 2008, Austin, Texas
- **Excited Delirium**, October 29-31, 2008, Institute for Prevention of In-Custody Death, Las Vegas, Nevada
- **Internal Affairs School**, April 17-19, 2012, Brownsville, Texas; Public Safety Training Council
- The Reid Technique of Interviewing and Interrogation July 17-19, 2012, McKinney, Texas
- 

## CERTIFICATIONS

- **Texas Commission on Law Enforcement Officer Standards and Education**
- Masters' Certificate
- Instructor's Certificate
- Advanced Certificate
- Intermediate Certificate
- Basic Certificate
- **The Aerobic Research Center**
- Physical Fitness for Police Officers
- Certificate of Proficiency
- **Federal Bureau of Investigation Instructor Certification**
- **Emergency Medical Technician** - Certificate No. 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
- **American Society of Law Enforcement Trainers** - Certification No. 006573
- **Cardiopulmonary Resuscitation Certified**; May 17 - 18, 1982; American Red Cross; Austin, Texas
- **Radar Operator Certification**; December 1980; Texas Department of Public Safety; Austin, Texas
- **Firearms Instructor**, July 1983, Texas Department of Public Safety
- **ASP Baton Instructor**, 1991, Texas Department of Public Safety and ASP Inc.
- **Oleoresin Capsicum Instructor**, 1994, Texas Department of Public Safety
- **Air Taser**, June 1999, Texas Department of Public Safety
- **Taser Instructor**, October 2006, (re-cert -2008), Taser Incorporated, Austin, Texas

## SUBJECTS INSTRUCTED

- **3,000 plus Civilian Concealed Handgun Instructors**, Austin, Texas
- **FBI Use of Force Instructor's Course**; Quantico, Virginia
- **Mexico State Police Training Courses:**
- Officer Survival
- Patrol Procedures
- Defensive Tactics

*Albert Rodriguez*

## SUBJECTS INSTRUCTED (Continued)

- Collision Reconstruction
- Probable Cause
- Arrest Procedures
- Police Vehicle Operations
- Firearms
- Excited –Agitated Delirium In-custody death Investigation
- **Officer Survival and Defense Tactics Training Officer's Course**; Northwest University Police Institute; Jacksonville, Florida
- **Officer Survival and Defensive Tactics State Police Director's Course**; Northwest University Police Institute; Jacksonville, Florida
- **Survival and Defensive Tactics Course**; Austin, Texas
- **Officer Survival Course**; Medina County; Hondo, Texas
- **Rape Crisis Course**; Austin, Texas
- **Defensive Tactics Course**; Federal Police; Chihuahua City, Chihuahua, Mexico
- **Attorney General's Criminal Law Enforcement Conference - Use of Force**; Austin, Texas
- **Attorney General's Criminal Law Enforcement Conference - Police Pursuits**; Austin, Texas
- **Arkansas Narcotics Officers Association**, August 1996, Little Rock, Arkansas
- **Oklahoma Narcotics Officers Association**, October 1996, Oklahoma City, Oklahoma
- **United States Attorney's Law Enforcement Coordinating Conference**, May 1997, Corpus Christi, Texas
- **Texas Defensive Tactic's Instructors' Association**, August 1997, Austin, Texas
- **Agencies throughout the State of Texas:**
- Patrol Procedures
- Use of Force
- Use of Deadly Force
- Use of Force in Jail Settings
- Firearms
- Police Emergency Driving
- Police Pursuit Driving
- Probable Cause
- Arrest, Search and Seizure
- Arrest Procedures
- Texas Criminal Laws
- Texas Traffic Laws
- **Use of Force Investigations**, Internal Affairs Units and Texas Rangers (April 2002)
- **Police Pursuits and Emergency Response**, Texas Sheriff Association, Lubbock, Texas
- **Investigation of Police Officer Involved Shootings**, Texas Department of Public Safety
- **Investigation of Police Officer Involved Shootings**, Vancouver, Canada
- **Investigation of Police Officer Involved Shootings**, Sacramento, California
- **Texas Ranger Investigation of Police Involved Shootings Class**

## MEMBERSHIPS AND ASSOCIATIONS

- Texas Police Association
- Texas Sheriff's Association
- Department of Public Safety Association
- FBI National Academy Graduates Associates
- Police Marksman Association
- 1480 Shooter's Club
- Governor's "top twenty"
- Southwest Texas State University Criminal Justice Advisory Board
- Austin Community College Law Enforcement Advisory Board
- Texas Alcohol Beverage Commission Law Enforcement Advisory Board\
- Texas Department of Public Safety Law Enforcement Advisory Board
- International Law Enforcement Educators and Trainers Association

# Exhibit B

## (Albert Rodriguez Affidavit – Materials Reviewed)

Materials Reviewed by Albert Rodriguez
As of: January 2, 2014

1. Plaintiffs' Second Amended Original Complaint,
2. Amended Rule 16 Scheduling Order,
3. Final Order and Judgment of Dismissal with Prejudice,
4. Defendant Owen Foster's Reply to Plaintiffs' Response to Owen Foster's Motion to Dismiss,
5. Defendant Manny Jimenez's Reply to Plaintiffs' Response to Manny Jimenez's Motion to Dismiss,
6. Defendant Jonathan Jimenez's Reply to Plaintiffs' Response to Jonathan Jimenez's Motion to Dismiss,
7. Defendant's Jonathan Jimenez, Manny Jimenez, and Owen Foster in Their Individual Capacities Only's Joint Rule 26(a)(1) Disclosures,
8. Defendant's City of Bovina, Jana Pitcock, Donna Mitchell and Gary Sinclair's Initial Disclosures Pursuant to Rule 26(a)(1),
9. Plaintiffs' Response to First Set of Requests for Production from Defendants City of Bovina, Jana Pitcock, Donna Mitchell and Gary Sinclair,
10. 26(a)(1) Disclosures of Plaintiff Briselda Rodriguez,
11. Documents Produced by Plaintiff in Response to City of Bovina's Request for Production, Re: Claims of Briselda Rodriguez,
12. City of Bovina Documents, Re: Briselda Rodriguez; Produced with/Rule 26(a)(1) Disclosures,
13. City of Bovina Documents, Re: Jose Vega Gonzales; Produced with/Rule 26 (a)(1) Disclosures,
14. 26(A)(1) Disclosures of Plaintiff Jose Vega Gonzales,
15. Deposition of Jose Vega Gonzales,
16. Plaintiff Jose Vega Gonzales' Answers to Defendant Owen Foster's First Set of Interrogatories,
17. Plaintiff Jose Vega Gonzales' Answers to Defendant Manny Jimenez's First Set of Interrogatories
18. Plaintiff Jose Vega Gonzales' Answers to Defendant Jonathan Jimenez's First Set of Interrogatories
19. 26(a)(1) Disclosures of Plaintiff Martha Jaramillo,
20. City of Bovina Documents, Re: Martha Jaramillo, Produced with/Rule 26(a)(1) Disclosures,
21. Documents Produced by Plaintiffs in Response to City of Bovina's Request for Production including DVD of school video; Re: Claims of Martha Jaramillo,
22. Deposition of Martha Jaramillo,
23. Plaintiff Martha Jaramillo's Answers to Defendant Jonathan Jimenez's First Set of Interrogatories,

24. Plaintiff Martha Jaramillo's Answers to Defendant Owen Foster's First Set of Interrogatories,

25. Plaintiff Martha Jaramillo's Answers to Defendant Manny Jimenez's First Set of Interrogatories,

26. 26(a)(1) Disclosures of Plaintiff Eliseo Castaneda,

27. City of Bovina Documents, Re: Eliseo Castaneda, Produced with/Rule 26(a)(1) Disclosures,

28. Documents Produced by Plaintiffs in Response to City of Bovina's Request for Production, Re: Claims of Eliseo Castaneda,

29. Deposition of Eliseo Castaneda,

30. Deposition of Maribel Larrea,

31. Plaintiff Eliseo Castaneda's Answers to Defendant Owen Foster's First Set of Interrogatories,

32. Plaintiff Eliseo Castaneda's Answers to Defendant Manny Jimenez's First Set of Interrogatories,

33. Plaintiff Eliseo Castaneda's Answers to Defendant Jonathan Jimenez's First Set of Interrogatories,

34. 26(a)(1) Disclosures of Plaintiff Rogelio Martinez,

35. City of Bovina Documents, Re: Rogelio Martinez; Produced with/Rule 26(a)(1) Disclosures,

36. Deposition of Rogelio Martinez,

37. Plaintiff Rogelio Martinez's Answers to Defendant Jonathan Jimenez's First Set of Interrogatories,

38. Plaintiff Rogelio Martinez's Answers to Defendant Manny Jimenez's First Set of Interrogatories,

39. Plaintiff Rogelio Martinez's Answers to Defendant Owen Foster's First Set of Interrogatories,

40. 26(a)(1) Disclosures of Plaintiff Federico Vela,

41. City of Bovina Documents Re: Federico Vela, Produced with Rule 26(a)(1) Disclosures,

42. Documents Produced by Plaintiffs in Response to City of Bovina's Request for Production, Re: Claims of Federico Vela,

43. Deposition of Federico Vela,

44. Plaintiff Federico Vela's Answers to Defendant Owen Foster's First Set of Interrogatories,

45. Plaintiff Federico Vela's Answers to Defendant Manny Jimenez's First Set of Interrogatories,

46. Plaintiff Federico Vela's Answers to Defendant Jonathan Jimenez's First Set of Interrogatories,

47. 26(a)(1) Disclosures of Plaintiff Carlos Moreno,

48. City of Bovina Documents Re: Carlos Moreno, Produced with Rule 26(a)(1) Disclosures,

49. Documents Produced by Plaintiffs in Response to City of Bovina's Request for Production, Re: Claims of Carlos Moreno,

50. Deposition of Carlos Moreno,

51. Plaintiff Carlos Moreno's Answers to Defendant Owen Foster's First Set of Interrogatories,

52. 26(a)(1) Disclosures of Plaintiff Sandra Moreno,

53. City of Bovina Documents Re: Sandra Moreno, Produced with Rule 26(a)(1) Disclosures,

54. Documents Produced by Plaintiffs in Response to City of Bovina's Request for Production, Re: Claims of Sandra Moreno,

55. Deposition of Sandra Moreno,

56. Plaintiff Sandra Moreno's Answers to Defendant Owen Foster's First Set of Interrogatories,

57. Plaintiff Sandra Moreno's Answers to Defendant Manny Jimenez's First Set of Interrogatories,

58. Plaintiff Sandra Moreno's Answers to Defendant Jonathan Jimenez's First Set of Interrogatories,

59. Arrest video produced by Plaintiffs,

60. 26(a)(1) Disclosures of Plaintiff Jose Garcia,

61. City of Bovina Documents Re: Jose Garcia, Produced with Rule 26(a)(1) Disclosures,

62. Deposition of Jose Garcia,

63. Deposition of Miguel Ramirez,

64. Plaintiff Jose Garcia's Answers to Defendant Owen Foster's First Set of Interrogatories,

65. Plaintiff Jose Garcia's Answers to Defendant Manny Jimenez's First Set of Interrogatories,

66. Plaintiff Jose Garcia's Answers to Defendant Jonathan Jimenez's First Set of Interrogatories,

67. Patrol car video reference Plaintiff Jose Garcia,

68. Deposition Exhibits 1-12,

69. Deposition of Deanna Curtis,

70. Deposition of Jonathan Jimenez,

71. Deposition of Manny Jimenez,

72. Deposition of Owen Foster,

73. Deposition of Gary Sinclair,

74. Photographs of Plaintiff Garcia's residence (interior and backyard),

75. Plaintiffs' Response to First Set of Request for Production from Defendants Owen Foster, Jonathan Jimenez, and Manny Jimenez,

76. Disk containing all documents produced by Plaintiffs in response to First Set of Requests for Production from Defendants Owen Foster, Jonathan Jimenez, and Manny Jimenez,

77. Plaintiffs; Response to Second Set of Requests for Production from Defendants City of Bovina, Jana Pitcock, Donna Mitchell and Gary Sinclair,

78. Documents produced by Plaintiffs in response to Second Set of Requests for Production from Defendants City of Bovina, Jana Pitcock, Donna Mitchell and Gary Sinclair,

79. Court's Order Dismissing Briselda Rodriguez' Claims,

80. Deposition of Adelmira Gonzales,

81. Deposition of Jesus Guevara,

82. Denise Gonzales Lara,

83. Jacqueline Gonzales,

84. Guadalupe Garcia,

85. Maria Jaramillo,

86. Melquiades Gonzales,

87. Baudelio Vela Salas,

88. Saul Ramirez,

89. Cesar Marquez,

90. Jorge Jaramillo,

91. Deposition of Donna Mitchell,

92.  Deposition of Maria Moreno,

93. Deposition of Faustino Garcia,

94. Deposition of Guadalupe Moreno,

95. Deposition of Jana Pitcock,

96. Deposition of Lupe Garcia,

97. Deposition of Lyndon Lueders,

98. Parmer Medical Center's Medical Records of Jonathan Jimenez,

99. Texas Commission on Law Enforcement Basic Peace Officer Training Curriculum,

100. Texas Commission on Law Enforcement Intermediate Use of Force Training Curriculum,

101. Texas Commission on Law Enforcement Intermediate Arrest, Search, and Seizure,

102. Texas Penal Code,

103. Texas Code of Criminal Procedure,

104. United States Supreme Court Decision in *Graham v Connor*,

105. United States Supreme Court Decision in *Saucier v Katz*,

106. United States Supreme Court Decision in *Pennsylvania vs. Mimms*,

107. United States Supreme Court Decision in *Terry v Ohio*, and

108. the United States Supreme Court Decision in *United States v Cortez*,

109. Capias Warrant for Martha P. Jaramillo,

110. Radio Log Report for Parmer County Sheriff's Office,

111. Call Information Sheet for 05/07/11,

112. Parmer County Clerk records regarding criminal cases against Plaintiffs,

113. Physical inspection of incident sites in Bovina, Texas.

**AFFIDAVIT OF ALBERT RODRIGUEZ CONCERNING CLAIMS
AGAINST DEFENDANT JONATHAN JIMENEZ**

**THE STATE OF TEXAS**

**COUNTY OF TRAVIS**

Before me, the undersigned authority in and for the State of Texas, on this day personally appeared Albert Rodriguez, personally known to me, who, after being by me duly sworn, deposes and says:

### I.   BACKGROUND CONCERNING ALBERT RODRIGUEZ

1.      "My name is Albert Rodriguez. I am over the age of 21, of sound mind, and I am in all respects legally competent and duly authorized to make this Affidavit. I have personal knowledge of the facts contained herein:

2.      I honorably retired from the Texas Department of Public Safety (DPS) on September 30, 2009. I retired with the rank of Commander in the position of Director of Training. Upon retiring, I was commissioned by the DPS as a Special Ranger. On January 2010, I was employed by the Texas Alcoholic Beverage Commission (TABC) as a Lieutenant for the Office of Professional Responsibility. Presently, I hold the position of Director of Training for the TABC with the rank of Captain.

3.      I was employed by the Texas Department of Public Safety (DPS) as a patrol officer in 1977. I served in the Highway Patrol Service as a State Trooper and then promoted to the rank of Training Officer at the Training Academy. At the Training Academy, I was promoted to Staff Development Specialist I, Lieutenant and ultimately to the rank of Commander of the DPS Training Academy in Austin, Texas. I held that position from 1993 to September 30, 2009. I was employed by the DPS as a law enforcement officer and law enforcement trainer for over thirty- two (32) years and was a licensed Texas Peace Officer for that time period. I met all of the standards for licensure set out by statute and by the Texas Commission on Law Enforcement Officer Standards and Education. I have over thirty-six (36) years of law enforcement experience and training.

4.     I hold a Bachelor's Degree in Education from Texas A&M in Kingsville, Texas. I also hold Advanced, Instructors', and Masters' certifications from the Texas Commission on Law Enforcement Officer Standards and Education. I am a graduate of the 147th FBI National Academy in Quantico, Virginia.

5.     I have attended over six thousand (6,000) hours of various law enforcement seminars and schools throughout the United States. I have studied, attended seminars regarding, and instructed classes pertaining to the issues of law enforcement policies and procedures, use of force, detention and arrest procedure, use of force in jail settings, reasonable suspicion, probable cause, police supervision, law enforcement training, patrol procedures, constitutional law and officer safety. I have been qualified in Federal and State courts as an expert witness in the areas of patrol procedures, use of force, use of deadly force, policies and procedures, use of force in jail settings, reasonable suspicion, probable cause, arrest procedures, driving procedures, police supervision, firearms, officer safety, Texas criminal laws, Texas traffic laws, law enforcement training, and police investigations.

6.     I am or have been a member of the FBI National Academy Graduates Association, Texas Police Association, Texas Sheriff's Association, and International Law Enforcement Educators and Trainers Association. I have served on the Southwest Texas State University Criminal Justice Advisory Board, Texas Alcohol Beverage Commission, and the Austin Community College Law Enforcement Advisory Board. I have instructed at the FBI Academy in Quantico, Virginia; Northwest University in Jacksonville, Florida; Texas Attorney General's Annual Law Enforcement Conferences and have instructed police officers throughout the United States, Canada, and Mexico.

7.     I am presently the Director of Training for the Texas Alcoholic Beverage Commission and (a) conduct internal affairs investigations on alleged officer misconduct, including allegations of excessive force; and (b) instruct police officers, including TABC Agents on Use of Force Concepts; (c) and present Use of Force Concepts to Grand Juries to assist them in evaluating police officer use of force and deadly force cases. Attached to this Affidavit as Exhibit A is my resume, which contains a more complete listing of my training and qualifications and is provided for reference of my experience, education, training and skills.

8. My opinions in this affidavit are based upon my training, experience, and upon having visited Bovina and inspected the site of the incident and having reviewed and researched the materials and documents as outlined in the attached Exhibit B to this affidavit.

## II. BACKGROUND CONCERNING JONATHAN JIMENEZ

9. During the alleged time periods in question, Officer Jonathan Jimenez was a Texas Commission on Law Enforcement licensed police officer. Officer Jimenez holds a TCOLE Basic Peace Officer Certification. Officer Jimenez had met all of the training requirements legislatively mandated and established by TCOLE at the time of the incident in question. The materials reviewed reveal that Officer Jimenez successfully completed the State Training Standards curriculum and passed the State Licensing Examination.

10. Based on the above, Officer Jimenez was trained on the requirements of the 4th Amendment of the United States Constitution as it relates to Law Enforcement Arrest, Search, and Seizure and more specifically had been trained on the dictates of the stair step requirements and dynamics of Arrest, Search, and Seizure.

## III. BACKGROUND CONCERNING LAW ENFORCEMENT TRAINING

11. Law enforcement officers in Texas are trained pursuant to the TCOLE State Training Standards. Officers are instructed to understand that enforcing Texas Traffic and Criminal Laws is within the scope of their law enforcement authority. More specifically, relative to that area, they are instructed on the Texas Code of Criminal Procedure, Article 2.13, *DUTIES AND POWERS*: *"It is the duty of every peace officer to preserve the peace within his jurisdiction. To effect this purpose, he shall use all lawful means. He shall in every case, where he is authorized by the provision of this code, interfere without a warrant to prevent and suppress crime."* The materials reviewed revealed that the Defendant Officer Jonathan Jimenez followed the training he received on the aforementioned Texas Code of Criminal Procedure Article in that in every incident in question his intervention was designed to prevent and suppress crime.

12. The Plaintiffs bringing claims against Officer Jonathan Jimenez in this case have alleged false arrest or arrest without probable cause. Law enforcement officers receive

comprehensive training and education on Arrest, Search, and Seizure.  More specifically, law enforcement officers are trained to understand the requirements to stop and detain, frisk, and arrest persons.  As previously mentioned, the Defendant Officer Jonathan Jimenez during the alleged incidents in question was a TCOLE Licensed Peace Officer.  He was licensed after successfully completing the TCOLE State Training Standards and passing the state licensing examination.  The undisputable evidence indicates that he was trained on the requirements of the 4th Amendment of the United States Constitution as it relates to Law Enforcement Arrest, Search, and Seizure and more specifically had been trained on the dictates of the following stair step requirements and dynamics of Arrest, Search, and Seizure:



13.     The aforementioned 4th Amendment Arrest, Search, and Seizure stair step Police-Citizen Contact Continuum is presented to law enforcement officers in a variety of instructional formats.  It is explained to law enforcement officers that neither Reasonable Suspicion nor Probable Cause are required to investigate a situation through a "Consensual Conversation."

14.     Law enforcement officers are further instructed that in order to "Stop and Detain" a person, at a minimum, "Reasonable Suspicion" must exist.  The reasonable suspicion standard involves a level of belief, which is something less than the probable cause standard needed to support arrest.  Law enforcement officers are trained to understand that, in order to justify a detainment, they must be able to point to specific articulable facts, which taken together with

rational inferences from those facts, collectively provide a particularized and objective basis for suspecting the person detained of criminal activity.

15.     Law enforcement officers are trained to understand that in order to arrest an individual, probable cause must exist to believe that a specific person has committed or is committing a violation of the law.  Probable cause pursuant to law enforcement training is defined as articulable facts and circumstances that would lead a reasonable law enforcement officer to believe that a specific person(s) has committed or is committing a violation of the law.

16.     Lastly, relative to the aforementioned Police Contact Continuum, law enforcement officers are trained to understand that Municipal, County, District, and Federal Courts employ the standard of "Proof Beyond a Reasonable Doubt" for a conviction.  Law enforcement trainers communicate to law enforcement officers that the standard of "Proof Beyond a Reasonable Doubt" is a higher standard than "Probable Cause."  Officers are instructed to understand that when a defendant is not convicted and/or a prosecutor dismisses a case said action does not necessarily equate to the lack of probable cause.  Probable cause may exist; however, the prosecutor may believe that the higher standard of "Proof Beyond a Reasonable Doubt" cannot be obtained.  Of course, there are many more reasons that a prosecutor might have for dismissing a case.

17.     The detention and arrest authorities, pursuant to law enforcement protocol, will be addressed later in this affidavit relative to the Plaintiffs' allegations in each individual incident in question.

18.     Law enforcement officers receive comprehensive training and education on the Use of Force and Civil Rights.  More specifically, law enforcement officers are trained to understand that the use of force by law enforcement officers is within the course and scope of their authority and not a violation of civil rights when said force is within the parameters of:

1) Texas Penal Code § 9.31, Self-Defense; "*(a) Except as provided in Subsection (b), a person is justified in using force against another when and to the degree the actor*

<u>*reasonably believes*</u> *the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force."*

2) <u>Texas Penal Code § 9.33 Defense of Third Person;</u> *"A person is justified in using force or deadly force against another to protect a third person if: (1) under the circumstances as the actor <u>reasonably believes</u> them to be, the actor would be justified under Section 9.31 or 9.32 in using force or deadly force to protect himself against the unlawful force or unlawful deadly force he reasonably believes to be threatening the third person he seeks to protect; and (2) the actor <u>reasonably believes</u> that the intervention is immediately necessary to protect the third person."*

3) <u>Texas Penal Code § 9.51. Arrest and Search,</u> *"(a) A peace officer or a person acting in a peace officer's presence and at his direction, is justified in using force against another when and to the degree the actor <u>reasonably believes the force is immediately necessary to make or assist in making an arrest</u> or search, or to prevent or assist in preventing escape after arrest, if: (1) the actor reasonably believes the arrest or search is lawful or, if the arrest or search is made under a warrant, he reasonably believes the warrant is valid, and (2) before using force, the actor manifests his purpose to arrest or search and identifies himself as a peace officer or as one acting at a peace officer direction, unless he reasonably believes his purpose and identity are already known by or cannot reasonably be made known to the person to be arrested..."*

19.    Texas law enforcement officers are trained to understand that Texas law in this regard is consistent with the United States Supreme Court Decision in *Graham v. Connor.* While I do not propose to offer expert opinions on the law, because my duties involve training law enforcement officers, I often read court decisions pertaining to law enforcement action, and have used judicial decisions to assist me in providing training to law enforcement officers. Therefore, I am able to provide expert testimony on the standard utilized in training police officers as to both tactical considerations as well as the legal parameters governing their conduct.

20.    It is important to note that when an officer in this case states that the Taser was deployed said statement means that the Taser is removed from the holster, held in hand, and may

even be pointed at a suspect.  When an officer discharges the Taser or drive stuns an individual with the Taser, it is at that point the Taser is considered used.  In all of the alleged incidents in this lawsuit, the Taser was only used ONE time-against Plaintiff Martha Jaramillo.  The effectiveness and use of the Taser on Plaintiff Jaramillo will be addressed separately.  This information is provided because in reviewing the Plaintiffs' Expert Lyndon Lueder's report it appears that he is under the impression that when an officer deploys the Taser it means that the Taser has actually been discharged and/or used in a drive stun mode.  Contemporary law enforcement use of force and procedure trainers know the difference between Taser deployment, discharging the Taser and Drive Stunning an individual with the Taser.

21.    Furthermore, it is important to note that when an officer merely points the Taser at an individual, said action is not considered the use of force or the use of the Taser.  It is no different than when an officer unholsters his/her handgun, said action is not considered the use of Deadly Force.

22.    In the law enforcement profession there are an indefinite number of circumstances that law enforcement officers may encounter when conducting traffic stops, detaining suspects, and/or in arrest situations.  Because of the indefinite number of possibilities that exist in said circumstances, law enforcement officers are trained to use their judgment and discretion in arriving at a reasonable course of action.

23.    Law enforcement officers are trained to evaluate the totality of the circumstances as reasonably ascertainable and to use their good judgment and appropriate discretion in arriving at a course of action that is within the range of permissible conduct for a law enforcement officer.  If in fact, there were a finite number of circumstances that could be identified, law enforcement officers would not be required to use their judgment or discretion at all.  Law enforcement officers would only be trained on the specific number of circumstances and would be instructed to respond with specific actions and/or sets of procedures.  Unfortunately, no such list of specific circumstances exists in life for each and every situation that a law enforcement officer may encounter; thus, law enforcement officers are necessarily required to use their judgment and discretion.

24.     There is no training manual and/or policy manual that can cover every single situation that a law enforcement officer may encounter when conducting traffic stops, detaining suspects, and/or in arrest situations.  Officers, therefore, are sent to police training academies and provided instruction intended to provide the officer with a firm foundation upon which to apply the knowledge he has been taught and to utilize legitimate discretion in the performance of those duties he can reasonably be expected to confront in the performance of his responsibilities.

25.     The materials reviewed reveal that Officer Jonathan Jimenez was required to use his judgment and discretion, based upon accepted training and experience.  He was required to evaluate the totality of the circumstances and use his judgment and discretion in carrying out his duties and responsibilities as a law enforcement officer.  There are no law enforcement manuals, training, and/or policy manual that specifically mandates and/or outlines a step by step procedure in attempting to stabilize the situations in this case and/or in detaining and arresting the Plaintiffs in the alleged incidents in question.  Each situation is unique and requires law enforcement officers to use their judgment and discretion.  The documents reviewed indicate that Officer Jonathan Jimenez was appropriately conducting discretionary law enforcement functions in connection with the Plaintiffs.  His discretionary functions will be specifically addressed when each individual incident is examined.

26.     In short, Officer Jonathan Jimenez's discretionary responses and actions at times were conducted in uncertain, dangerous, and rapidly evolving circumstances and said actions and responses were within the range of acceptable law enforcement discretionary functions and consistent with law enforcement tactical and constitutional training.  The conduct and actions of Officer Jonathan Jimenez were consistent with the manner in which we customarily train law enforcement officers to apply the dictates of the United States Supreme Court in such decisions as *Graham v. Conner* and the TCOLE training on Arrest, Search, and Seizure.

### IV.   SCOPE OF AFFIDAVIT

27.     I have previously given a report listing what I believed to be a summary of relevant facts surrounding the incidents in which Officer Jonathan Jimenez was involved.   That report also contains my opinions and observations concerning the incidents in which Officer Jonathan Jimenez was involved.   Because the purpose of this affidavit is to support Officer Jonathan Jimenez's Motion for Summary Judgment, I am not reciting facts nor offering opinions concerning facts that I believe may be in dispute.

### V.   REVIEW STANDARD

28.     It is my customary practice to evaluate the objective reasonableness of an officer's conduct on a case-by-case basis.   The objective analysis considers the fact that at times law enforcement officers are required to make split second decisions in tense, uncertain, and rapidly involving circumstances.     The analysis consists of comparing Officer Jonathan Jimenez's actions in relationship to the contemporary training received by law enforcement officers.     The analysis includes the evaluation of the totality of the circumstances in each individual incident as could reasonably be perceived by a well-trained law enforcement officer at the time that Officer Jonathan Jimenez exercised his duties and authorities as a law enforcement officer.   The evaluation was conducted from the standpoint of what the materials show that Officer Jonathan Jimenez knew and perceived at the time on each individual incident in question and not from the point of view that includes information obtained in hindsight.   In addition, Officer Jonathan Jimenez's actions were evaluated from the perspective of what actions a reasonable and well-trained law enforcement officer could have taken when presented with the same or similar circumstances that each of the individual Plaintiffs presented to the officers in each incident.

### VI.   MAY 7, 2011 INCIDENT INVOLVING JOSE GARCIA

#### A.   *Summary of Undisputed Relevant Facts related to incident involving Plaintiff Jose Garcia*

29.     My understanding of the relevant *undisputed* facts is that on May 7, 2011, Officer Jonathan. Jimenez observed a green Ford Mustang, later determined to be driven by Antonio

Dejesus Guevara, accelerating to the degree that the car "fish tailed." Mr. Guevara quickly turned to the right, and failed to signal his intent to turn into the alley behind the 200 block of Halsell Street.  Officer J. Jimenez activated the patrol car's overhead emergency lights in an attempt to get the vehicle stopped.  The Mustang accelerated as if trying to elude Officer J. Jimenez.  Shortly thereafter, Mr. Guevara quickly pulled into the back yard of 203 Halsell Street.

30.     While Officer J. Jimenez was conducting a traffic stop, Jose Garcia came out of the residence located at 203 Halsell, Bovina, Texas. His wife also came outside. Officer Jonathan Jimenez asked Mr. Garcia to get back inside of his residence in Spanish.  Officer J. Jimenez also warned Mr. Garcia that he would be placed under arrest for interference if he didn't go back inside the house. Mr. Garcia went back in to the house and about five minutes later, he came out again.  Officer Jonathan Jimenez called for backup and shortly thereafter Officer Manny Jimenez arrived at that location.

31.     Officer J. Jimenez conducted a Portable Breath Test (PBT) on Mr. Guevara.  The test results indicated no alcohol in his system.  As Officers Jonathan Jimenez and Manny Jimenez were conducting the investigation, Mr. Miguel Ramirez exited the residence.  Officer Jonathan Jimenez asked Mr. Ramirez to get back into the residence.

32.     While the events leading up to Officer Jonathan Jimenez and Officer Manny Jimenez's entry in to Mr. Garcia's home are disputed, it is clear that after the exchange with Miguel Ramirez, both of those officers entered Mr. Garcia's home. While they were in the home, Miguel Ramirez (a non-party to the lawsuit) was arrested for Interference with Public Duties and Resisting Arrest, but Jose Garcia was not arrested that evening.

33.     Mr. Garcia complains in this lawsuit that while they were in his house, Officer Jonathan Jimenez and Officer Manny Jimenez each "shoved" or "pushed" him out of the way in their efforts to arrest Mr. Miguel Ramirez.

34.     The audio portion of the videotaped recording from Officer Jonathan Jimenez's in-car camera, which is in Spanish, confirms that the events inside Mr. Garcia's house that evening were chaotic and unfolding quickly. I am able to read, write speak and understand the Spanish language.

35.     As a result of the events in the house that ended in Mr. Ramirez's arrest, EMS was summoned with regard to treatment of Officer Jonathan Jimenez's arm.   Officer Jonathan Jimenez was transported via EMS to Parmer Medical Center for x-rays.

36.     After the initial traffic stop and the ensuing investigation at the Garcia residence, Officers Jonathan Jimenez and Manny Jimenez completed police reports concerning the events at Mr. Garcia's home on the evening in question. On May 18, 2011, a criminal complaint was completed by former Chief Gary Sinclair based on Officers Jonathan Jimenez's and Manny Jimenez's information.   County Attorney Jeff W. Actkinson accepted and signed the complaint. A warrant of arrest was issued for Plaintiff Garcia.

37.     Neither Officer Jonathan Jimenez nor Officer Manny Jimenez executed the arrest warrant for Jose Garcia.

B.  *Opinions and Observations relative to Plaintiff Jose Garcia*

38.     It is of chief importance to note that Mr. Ramirez is not a Plaintiff in this case.

39.     I also have previously given a report as to my opinions concerning Officer Jonathan Jimenez's and Officer Manny Jimenez's use of force relative to Plaintiff Garcia while in his home. However, because I understand that the circumstances surrounding the exact events that occurred in the home and the exact conversations inside the house that evening are in factual dispute, I am not offering opinions about that aspect of Plaintiff Garcia's claim of excessive force for purposes of this affidavit in support of Officer Jonathan Jimenez's motion for Summary Judgment. Instead, I am taking as true his deposition testimony that he was "shoved" or "pushed" once by each officer while they were in the house attempting to effectuate the arrest of Mr. Ramirez.

40.     As referenced in Exhibit B to my affidavit, I have reviewed not only the in-car camera recording of this incident, but I have also reviewed the depositions of Plaintiff Garcia and those persons present in his residence that night.   While I recognized that Plaintiff Garcia and those other witnesses describe the events as calm and their actions as polite, my review of the audio and video recordings relevant to the timeframe when Officer Jonathan Jimenez and Officer Manny Jimenez where inside Plaintiff Garcia's residence reveal that the events inside the residence were chaotic, fast-paced, and tense.   The officers' purpose inside the residence of Plaintiff Garcia was to arrest Miguel Ramirez.   A law enforcement officer's right to arrest necessarily carries with it the ability to use some force in making the arrest. For even minor

offenses, permissible force includes physical restraint, use of handcuffs, and pushing and/or shoving into walls for control and/or handcuffing. The fact that Officer Manny Jimenez and Officer Jonathan Jimenez either "shoved" or "pushed" Miguel Ramirez once was not clearly excessive to the need, was not objectively unreasonable, and was justified when attempting arrest Miguel Ramirez.

41.   It is important to note that in deposition (pg. 27-28), Plaintiff Garcia testified that he believes he was arrested for assaulting the officers and not for Interference with Public Duties.

42.   Mr. Ramirez testified (pgs. 26 & 28) that the Taser was not discharged by Officers J. Jimenez or M. Jimenez.  Plaintiff Garcia in deposition (pgs. 28) testified that he did not suffer any physical injuries on the evening of May 7, 2011, did not suffer any mental anguish due to the incident, and did not suffer from any sort of anxiety or depression because of the incident.  Plaintiff Garcia testified in deposition (pg. 72) that the only force that was used against him on the evening of May 7, 2011, was that he was grabbed by an officer.

43.   On May 18, 2011, a criminal complaint was completed by former Chief Gary Sinclair based on Officers J. Jimenez's and M. Jimenez's information.  County Attorney Jeff W. Actkinson accepted and signed the complaint.  A warrant of arrest was issued for Plaintiff Garcia.  The materials reviewed indicate that charges against Plaintiff Garcia were dismissed on October 17, 2011.

44.   The fact that the charges were dismissed does not necessarily equate to the lack of probable cause for Plaintiff Garcia's arrest.  In fact, County Attorney Actkinson reviewed the information, signed and accepted the complaint.  In all actually, the County Attorney verified the probable cause and subsequently an arrest warrant was issued.  Again, police officers operate on the standard of "Probable Cause" and not the higher standard of "Proof beyond a Reasonable Doubt."  The fact that the County Attorney approved the complaint verifies the fact that probable cause existed for Plaintiff Garcia's arrest.

45.   The documents reviewed indicate that Officers J. Jimenez and M. Jimenez were appropriately conducting legitimate discretionary law enforcement functions in connection with Plaintiff Garcia, and said functions were within the course and scope of their law enforcement authority (refer to paragraphs #'s 11-26).

## VII.   AUGUST 24, 2011 INCIDENT INVOLVING ROGELIO MARTINEZ

A.   *Summary of Relevant Undisputed Facts related to incident involving Plaintiff Rogelio Martinez*

46.     On August 24, 2011, at approximately 3:09 p.m., Officer Manny Jimenez was traveling westbound in the 800 block of Highway 86 when he observed a white passenger car traveling eastbound in the 700 block of Highway 86. It was later determined that the driver was Rogelio Martinez. Officer Manny Jimenez observed the passenger car change lanes without signaling the intent to change lanes within the required 100 feet before changing lanes, as required by the Texas Transportation Code. Plaintiff Martinez then turned the turn indicator on and switched lanes immediately.

47.     Officer Manny Jimenez made a U-turn and attempted to catch up to the passenger car driven by Plaintiff Martinez.   Sergeant Jimenez activated the patrol car's overhead emergency light, however, Plaintiff Martinez continued to travel west on Highway 86. Eventually, Plaintiff Martinez pulled into a driveway at the residence located at 305 Highway 86.

48.     Plaintiff Martinez exited the passenger car and began to walk towards the residence.

49.     Saul Martinez, Plaintiff Martinez's son, informed Officer Manny Jimenez that he was going to get Plaintiff Martinez out of the house. Plaintiff Martinez later came outside.

B.   *Opinions and Observations relative to Plaintiff Rogelio Martinez*

50.     Officer Manny Jimenez reported that he was traveling westbound in the 800 block of Highway 86 when he observed a white passenger car traveling eastbound in the 700 block of Highway 86. Officer Manny Jimenez observed the passenger car, driven by Plaintiff Martinez, change lanes without signaling within the required 100 feet before changing lanes. Officer Manny Jimenez made a U-turn, activated the patrol car's overhead emergency lights, and followed the vehicle driven by Plaintiff Martinez. Officer Manny Jimenez followed Plaintiff Martinez for approximately four-tenths (4/10) of a mile. Plaintiff Martinez did not yield right of way as required, rather he continued driving until he pulled into the driveway at 305 Highway 86. It is important to note that the speed limit in that stretch of the highway is 40 miles per hour,

thus Plaintiff Martinez had more than ample time to see Officer Manny Jimenez's overhead emergency lights.

51.     Plaintiff Martinez testified that he went outside and, at that point, Officer Manny Jimenez grabbed him.  Plaintiff Martinez then testified (pg. 16) that Officer Jonathan Jimenez arrived immediately thereafter.

52.     Officer Manny Jimenez reported that after following Plaintiff Martinez with the patrol car's overhead emergency lights activated, Plaintiff Martinez, after pulling into the driveway, exited the passenger car and began to walk towards the residence.

53.     The materials reviewed revealed that any reasonable and prudent law enforcement officer could have believed that probable cause existed to arrest Plaintiff Martinez for failing to signal lane change and evading arrest/detention.

54.     Sometime later, Plaintiff Martinez stepped out of the residence.  At that particular point in time, pursuant to law enforcement training, it would have been reasonable to grab Plaintiff Martinez to keep from going back into the residence and to effectuate the arrest.  Of course, any time an officer handcuffs an individual, the officer is required to twist and turn the individual's arms behind their back for handcuffing.  There is no evidence to indicate that unreasonable force was used to effectuate Plaintiff Martinez's arrest.  Plaintiff Martinez has not alleged that he was slapped, hit, pepper sprayed, tased, hit with a baton, punched or kicked, and there is no evidence of such force being used against Plaintiff Martinez.

55.     Officer Manny Jimenez attempted to stop Plaintiff Martinez based on probable cause.  Subsequently, when Plaintiff Martinez did not stop, but rather continued to the driveway and then entered his residence, any reasonable and well-trained officer could have believed that Plaintiff Martinez had evaded arrest/detention.

56.     Plaintiff Martinez in deposition (pg.22) was asked if an excessive amount of force had been used to effectuate his arrest, he responded by stating, "What I'm saying is that they came toward me, didn't ask me a question, didn't tell me anything, grabbed me by the arm and twisted it, and put me toward the car."  Even when viewing the evidence in the most favorable light for Plaintiff Martinez, Officers Manny Jimenez's and Jonathan Jimenez's actions were objectively reasonable.

57.     The documents reviewed indicate that Officer Jonathan Jimenez was appropriately conducting legitimate discretionary law enforcement functions in connection with

Plaintiff Martinez and said functions were within the course and scope of his law enforcement authority.

## VIII.   MAY 11, 2011 INCIDENT INVOLVING PLAINTIFF SANDRA MORENO

A. *Summary of Relevant Undisputed Facts related to incident involving Plaintiff Sandra Moreno*

58.     In addition to the written documentation provided to me, which is listed in Exhibit B to this Affidavit, I have reviewed the video from the in-car camera/dash cam in Officer Jonathan Jimenez's patrol car for the May 11, 2011 incident involving Sandra Moreno.

59.     On May 11, 2011, at approximately 10:20 p.m. Officer Jonathan Jimenez conducted a traffic stop at the intersection of 4th and Avenue F, in Bovina, Texas. The Ford pickup truck was driven by Charles (a/k/a Carlos) Herrera Moreno. Mr. Moreno was stopped for failing to signal a right turn at the stop sign intersection. The Ford pickup truck stopped at about the 300 block of Avenue F.

60.     Officer Jonathan Jimenez walked up to the driver's side of Mr. Moreno's truck and explained the reason for the stop to Mr. Moreno. Mr. Moreno explained that the turn signals were not working and that he had gone to run an errand. Officer Jonathan Jimenez knew who Mr. Moreno was because he had seen him at the Lowes Supermarket in Bovina. Upon receiving Mr. Moreno's drivers' license and insurance, Officer Jonathan Jimenez turned to return to the patrol car. It was night time, and it was dark.

61.     My review of the video indicates that Plaintiff Sandra Moreno approached Officer Jonathan Jimenez from the rear and stood in close proximity to him and directly behind him. The video shows that Officer Jonathan Jimenez told Plaintiff Sandra Moreno that he was on a traffic stop and that she needed to step back inside. Officer Jonathan Jimenez then asked Plaintiff Sandra Moreno "*Okay?*" She replied to Officer Jonathan Jimenez, "*I'm here just,*" and asked "*the house?*" Officer Jonathan Jimenez stated, "*yes or you'll go to jail.*" Officer Jonathan Jimenez again told Plaintiff Sandra Moreno, "*I need for you to step inside, or you go to jail, okay?*" The officer also stated, "*He [Carlos Moreno] is just going to get a warning, but you need to step inside.*"

62.     Plaintiff Sandra Moreno walked up on the curb and out of view of the dash cam video. A short time later, Officer Jonathan Jimenez walked up to her and subsequently arrested

her for Interference with Public Duties.  She was handcuffed behind the back and placed in the patrol car.  Officer Jonathan Jimenez then issued Mr. Carlos Moreno a warning for failure to signal a right turn and released him.  Plaintiff Sandra Moreno was transported to the Parmer County Jail, where she was booked.

B.  *Opinions and Observations relative to Plaintiff Sandra Moreno*

63.     Traffic stops are very dangerous for law enforcement officers.  Normally, officers do not know who they have stopped and/or what the intentions of the occupants of vehicle might be at the time.  Officers are trained on the dictates of the United States Supreme Court Decision in *Pennsylvania v. Mimms* and are instructed that officers may control the movements of the occupants of the vehicle for their safety.  By controlling the movements of the persons in the immediate area, the officer decreases the possibilities of an assault.  Officers can position individuals in locations that decrease the risks to the officer.

64.     The idea of Plaintiff Sandra Moreno not being in the immediate area was for officer safety.  Officers are trained to concentrate on the movements of the occupants of the vehicle during traffic stops.

65.     Any well-trained law enforcement officer could have recognized that Plaintiff Sandra Moreno not only kept Officer Jonathan Jimenez from concentrating on the driver of the vehicle he had stopped, but also presented a possible threat.  Plaintiff Sandra Moreno knowing that she meant no harm does not translate into Officer Jonathan Jimenez and/or any officer knowing the same.  Plaintiff Sandra Moreno had not been patted down or searched; and she was wearing a loose fitting University of Texas sweat shirt on an evening in May.  Dealing with two (2) individuals in two (2) different locations, as was the situation created by Plaintiff Moreno, increased the risks to Officer Jonathan Jimenez.

66.     The totality of the circumstances could have led any reasonable law enforcement officer to believe that the timing of the arrest was very critical.  It is always less difficult to evaluate the consequences of "Action" because in hindsight the results are known.  In this case Plaintiff Moreno was arrested and nothing else occurred.  Conversely, what is very important and more difficult to evaluate is the consequences of "Inaction."

67.     Law enforcement officers are trained to evaluate the consequences of "Action" as well as an officer's "Inaction" as part of the totality of the circumstances.  In order to objectively

evaluate an officer's actions it is paramount to evaluate the possible results of "Inaction." The consequences of "Inaction" are often times not addressed and/or forgotten.

68.    In this case, for example, if Officer Jonathan Jimenez would have waited any longer to arrest Plaintiff Sandra Moreno or allowed her to remain in the immediate area, Plaintiff Moreno could have assaulted Officer Jonathan Jimenez with a weapon if she was armed and/or physically assaulted him.  Said consequences of "Inaction" on Officer Jonathan Jimenez's behalf could have been even more tragic.  The consequences of that particular "Inaction" could have caused Officer Jonathan Jimenez to be seriously injured or killed.  Law enforcement officers and trainers would then be asking and/or wondering why Officer Jonathan Jimenez had not arrested Plaintiff Moreno prior to the tragic event having occurred. In Plaintiffs' Expert Lyndon Lueder's report, he stated that a pat down/frisk of Ms. Moreno would have been appropriate.  What Mr. Lueders fails to understand is that as a result of the United States Supreme Court Decision in *Terry v. Ohio*, law enforcement officers can only conduct pat downs/frisks when there are articulable facts that a certain person is armed and is compromising officer safety.  In this case, there were no specific facts that Ms. Moreno was armed; thus, a pat down/frisk of Ms. Moreno as suggested by Mr. Lueders could have been a violation of Ms. Moreno's constitutional rights.

69.    Reasonable and well-trained law enforcement officers are trained and required to evaluate the consequences of "Inaction" in fractions of a second.   Officers are trained to understand that one of their major responsibilities is to protect human lives, even their own; thus, evaluating the totality of probable consequences is a critical law enforcement function.

70.    Any reasonable law enforcement officer could have been highly suspicious of Plaintiff Sandra Moreno and more so in the manner in which she approached Officer Jonathan Jimenez.  The materials reviewed, including the videotaped recording, indicated that Plaintiff Sandra Moreno approached Officer Jonathan Jimenez from the rear and got very close to Officer Jonathan Jimenez as he was speaking to the driver of the vehicle.  Carlos Moreno, the driver of the vehicle that Officer Jonathan Jimenez had stopped, testified in deposition (pg. 24) that Plaintiff Sandra Moreno got very close to Officer Jonathan Jimenez.  In fact, when viewing the videotaped recording, Officer Jonathan Jimenez is observed immediately stepping away from the driver's side of the vehicle he had just stopped when Plaintiff Sandra Moreno approached him. He immediately addressed Ms. Moreno by telling her that he needed her to get back inside. Officer Jimenez's immediate movements of stepping away from the driver's side reveal the

importance he placed on not having his concentration divided between the occupant of the vehicle he had stopped and Plaintiff Sandra Moreno.   Contemporarily trained police officers understand the importance of tactically dealing with one situation at a time, when possible.

71.   The materials reviewed indicated that Plaintiff Sandra Moreno was instructed by Officer Jonathan Jimenez several times to get back in the house; in essence telling her to leave the immediate area.   He also informed Plaintiff Moreno that he was on a traffic stop, thus informing her that he was occupied.   Officer Jonathan Jimenez also warned Plaintiff Sandra Moreno that if she did not leave the immediate area she would be arrested.   Plaintiff Moreno chose not to abide by Officer Jonathan Jimenez's lawful instructions.

72.   In deposition (pg. 16), Ms. Moreno testified, "*....And I didn't get to say anything, because the police officer faced – turned to look at me, and he said, "Go inside." And then – so I paused for little bit, and **then walked up on the curb**, into the yard. And **I turned around**, I think, but I was just going to – and that's all I got to say. And so that's when he walked onto the yard, and he said, "**Turn around**." And he handcuffed me.*"

73.   The materials reviewed indicate that Plaintiff Moreno walked up and onto the curb and then turned around toward Officer Jonathan Jimenez. Plaintiff Moreno was facing Officer Jonathan Jimenez and not walking away, hence the reason Officer Jonathan Jimenez asked Plaintiff Moreno to turn around for handcuffing behind the back.

74.   Any reasonable law enforcement officer because of officer safety could have believed, as did Officer Jonathan Jimenez, that probable cause existed to arrest Plaintiff Moreno pursuant to the Texas Penal Code, Section 38.15, Interference with Public Duties.   That statute provides:

"*(a) A person commits an offense if the person with criminal negligence interrupts, disrupts, impedes, or otherwise interferes with:*

*(1) a peace officer while the peace officer is performing a duty or exercising authority imposed or granted by law;"*

75.   Any well-trained law enforcement officer could have believed, as did Officer Jonathan Jimenez that Plaintiff Sandra Moreno's presence was disrupting, impeding, and interfering when he was exercising his authority in conducting a traffic stop.   It was not what Plaintiff Moreno said that was the interference, but rather it was her presence in the immediate

area as it relates to officer safety. Plaintiff Moreno was informed that she would be arrested if she did not comply; therefore, probable cause existed to believe that she committed the offense with criminal negligence.

76.     A well-trained police officer could have recognized that probable cause existed to arrest Plaintiff Sandra Moreno for interfering and even more so because of the fact that Officer Jonathan Jimenez took time to tell her to leave the area or she would be arrested before she was actually arrested.

77.     As previously articulated in this affidavit, law enforcement officers operate on the standard of probable cause for arrest purposes. The fact that a prosecutor decides to dismiss charges against a person is not indicative that probable cause did not exist for the arrest. The dismissal could have been because the prosecutor did not believe that he/she could prove the offense on the higher standard of "proof beyond reasonable doubt" or for some other unknown reason. A well-trained police officer could have recognized that probable cause existed to arrest Plaintiff Moreno for interfering and even more so because of the fact that Officer J. Jimenez took time to tell her to leave the area or she would be arrested before she was actually arrested.

78.     The materials reviewed indicate that Officer Jonathan Jimenez's actions in arresting Plaintiff Sandra Moreno in this situation were objectively reasonable and legal pursuant to law enforcement training. Based on the totality of the circumstances any reasonable law enforcement officer could have taken the same or similar actions that Officer Jonathan Jimenez took when presented with the same or similar circumstances.

79.     There is no evidence to indicate that Officer Jonathan Jimenez used unnecessary and/or excessive force in arresting Plaintiff Moreno. Officer Jonathan Jimenez handcuffed Plaintiff Sandra Moreno without incident and then when placing her in the back seat of the patrol car, he took the precaution of lowering her head so that she would not hit the top of the patrol car's roof while entering. (*See S. Moreno deposition*, page 43). Additionally, Ms. Moreno testified that she was not injured as the result of her arrest. (*See S. Moreno deposition*, page 25).

80.     The documents reviewed indicate that Officer Jonathan Jimenez was appropriately conducting legitimate discretionary law enforcement functions in connection with Plaintiff Sandra Moreno and said functions were within the course and scope of his law enforcement authority.

81.     Based on all of the materials reviewed, it is my opinion that even when considering the objective evidence in the most favorable light for Plaintiff Sandra Moreno, Officer Jonathan Jimenez's actions on the evening of May 7, 2011 with regard to Ms. Moreno were objectively reasonable pursuant to law enforcement training.   It is also my opinion that another reasonable law enforcement officer confronted with the same or similar circumstances as was Officer Jonathan Jimenez on the evening in question could have taken the same or similar actions as did Officer Jimenez on that occasion.

### IX.     DECEMBER 6, 2010 INCIDENT INVOLVING PLAINTIFF ELISEO CASTANEDA

A. *Summary of Relevant Undisputed Facts related to incident involving Plaintiff Eliseo Castaneda*

82.     On December 6, 2010, City of Bovina Municipal Court Judge Donna Mitchell issued a Capias Warrant for the arrest of Eliseo Castaneda.  The warrant specifically stated, "To any Peace Officer of the State of Texas:  Greeting:  YOU ARE HEREBY COMMANDED to arrest ELISIO CASTANEDA, a defendant, and bring ___ before the Municipal Court to be dealt with according to law.   Said defendant entered a plea of on[sic] to the offense of: 911 EMERGENCY CURB PAINTING VIOLATION-NO NUMBER ON CURB which is against the laws of the State of Texas, and against the city ordinances of said city.  Currently you have not completed the rendered judgment amount, $324.00, the remaining unpaid balance owed is $324.00.  Herein fail not, but due service and return of this warrant of arrest, showing how you executed the same."  The Capias Warrant was signed by Judge Donna Mitchell on December 6, 2010.  The warrant was issued as a result of City Inspector Cesar Marquez having issued a citation for the violation of for "911 Emergency curb painting violation-no number on curb."

83.     On June 5, 2011, Officer Jonathan Jimenez arrested Eliseo Castaneda pursuant to the orders of the Capias Warrant.  Plaintiff Castaneda was handcuffed without incident.  Officer Jonathan Jimenez, upon arresting Plaintiff Castaneda, transported him to the Bovina City Hall. Officer Jonathan Jimenez called Plaintiff Castaneda's common-law wife, Maribel Larrea, and informed her of Plaintiff Castaneda's arrest and the amount due as a result of the violation addressed in the Capias Warrant.  Officer Jonathan Jimenez informed Ms. Larrea that he was going to wait for 15 minutes for her before booking Plaintiff Castaneda.  Ms. Larrea did not arrive by the prescribed time; however, Officer Jonathan Jimenez had not taken any action to

book Plaintiff Castaneda.  Ms. Larrea arrived and paid the fine.  Plaintiff Castaneda was released.

84.    The evidence indicates that on December 6, 2010, City of Bovina Municipal Court Judge Donna Mitchell issued a Capias Warrant of Arrest for Plaintiff Castaneda.  On June 5, 2011, Officer Jonathan Jimenez simply served the warrant by arresting Plaintiff Castaneda. Officer Jonathan Jimenez followed the orders set forth in the warrant as would any reasonable and prudent law enforcement officer.

   B.  *Opinions and Observations relative to Plaintiff Eliseo Castaneda*

85.    The materials reviewed revealed that Officer Jonathan Jimenez had nothing to do with issuing the citation to Plaintiff Castaneda for failing to abide by the city ordinance of having 911 Emergency Numbers painted on the curb.  In fact, there is no evidence that indicates that Officer Jonathan Jimenez had ever written any citations for the violation of not having 911 Emergency Numbers painted on the curb.

86.    The evidence, including Ms. Larrea's deposition testimony, shows that City Inspector, Cesar Marquez, was the individual that issued the citation to Plaintiff Castaneda. Furthermore, Officer Jonathan Jimenez had nothing to do with writing and/or sending letters to Plaintiff Castaneda informing him of the citation.

87.    The evidence indicates that on December 6, 2010, City of Bovina Municipal Court Judge Donna Mitchell issued a Capias Warrant of Arrest for Plaintiff Castaneda.  On June 5, 2011, Officer Jonathan Jimenez simply served the warrant by arresting Plaintiff Castaneda. Officer Jonathan Jimenez followed the orders set forth in the warrant as would any reasonable and prudent law enforcement officer.  City Inspector Cesar Marquez was the individual enforcing the city ordinance, and not Officer Jonathan Jimenez.  There is no evidence to indicate that Officer Jonathan Jimenez should have known that, allegedly, Plaintiff Castaneda had not been informed of the citation or the warrant.  It is true that Officer Jonathan Jimenez arrested Plaintiff Castaneda; however, he did so pursuant to the court's orders.

88.    Officer Jonathan Jimenez, rather than taking Castaneda to jail because there was no magistrate available allowed him to make arrangements that evening to pay the amount noted in the warrant.  Giving persons the opportunity to take care of the fine stated in the warrant is a common law enforcement procedure when an arrest is made during non-business hours as was the case in this situation.

89.     Officer Jonathan Jimenez not seeking and/or obtaining his supervisor's approval to release Plaintiff Castaneda pursuant to law enforcement training does not violate Plaintiff Castaneda's rights. The alleged Departmental violation is an administrative issue rather than a constitutional issue, pursuant to law enforcement protocol.

90.     The documents reviewed indicate that Officer Jonathan Jimenez appropriately conducted legitimate discretionary law enforcement functions in connection with Plaintiff Castaneda and said functions were within the course scope of his law enforcement authority.

91.     Based on all of the materials reviewed, it is my opinion that even when considering the objective evidence in the most favorable light for Plaintiff Eliseo Castaneda, Officer Jonathan Jimenez's actions on the evening of June 5, 2011 with regard to Mr. Castaneda were objectively reasonable pursuant to law enforcement training. It is also my opinion that another law enforcement officer confronted with the same or similar circumstances as was Officer Jonathan Jimenez on the evening in question could taken the same or similar actions as did Officer Jimenez on that occasion.

## X.     SEPTEMBER 4, 2011 INCIDENT INVOLVING JOSE VEGA GONZALES

### A.     *Summary of Relevant Undisputed Facts related to incident involving Plaintiff Jose Vega Gonzales*

92.     On September 04, 2011, at approximately 1:53 a.m., Officer Manny Jimenez was on routine patrol, driving westbound on the 300 block of Brock Street. He observed two (2) males, later identified as Jose Vega Gonzales and his brother, Jaime, walking eastbound on Brock Street. Officer Manny Jimenez also observed Jose carrying an ice chest. It appeared to Officer Manny Jimenez that once Jose and his brother saw him, they walked toward a driveway. Because of past reported break-ins, the officer decided to stop them for investigative purposes.

93.     Officer Manny Jimenez called to both subjects to stop; Jaime complied. Plaintiff Jose Gonzales did not comply.

94.     Plaintiff Gonzales continued walking toward the rear of the residence located at 303 Brock, and once he was at the side area of the residence, Plaintiff Gonzales lost his balance and fell to the ground. Plaintiff Gonzales then entered the residence. He remained inside the residence for anywhere from 15-30 minutes. The materials reviewed indicated the residence that

Plaintiff Gonzales entered was not his, but belonged to his brother Melquiades (Mickey) Gonzales.

95.     At one point, family members convinced Plaintiff Gonzales to step outside.  Once he was outside, he was taken into custody without further incident.  While speaking to Plaintiff Gonzales, Officer Manny Jimenez noticed that he had blood shot and glassy eyes, was "thick tongued," and had slurred speech.  Plaintiff Gonzales admitted to having consumed 6 or 7 beers that night.    Plaintiff Gonzales was charged with Public Intoxication and Evading Arrest/Detention.

96.     Officer Jonathan Jimenez's limited involvement consisted of showing up as back-up and conducting the Portable Breath Test, but he did not touch Plaintiff Gonzales at any point.

B.  *Opinions and Observations relative to Plaintiff Jose Vega Gonzales*

97.     The materials reviewed revealed that on September 04, 2011, at approximately 1:53 a.m., Officer Manny Jimenez observed two (2) males, later identified as Jose Vega Gonzales and his brother, Jaime, walking eastbound on the 300 block of Brock Street, in Bovina, Texas.

98.     The evidence indicates that any reasonable law enforcement officer could have believed that reasonable suspicion existed to stop and detain Plaintiff Gonzales and his brother for investigative purposes.  In short, reasonable suspicion pursuant to law enforcement training is defined as articulable facts and circumstances to believe that crime may be afoot.  It is paramount to understand that law enforcement training informs law enforcement officers that pursuant to the United States Supreme Court Decision in *United States v. Cortez*, law enforcement officers may use their training and experience in arriving at probable cause and reasonable suspicion.

99.     In this case, Officer Manny Jimenez was aware of recent break-ins in the area, it was approximately 1:53 a.m. and Plaintiff Gonzales was observed carrying an ice chest. In addition, Officer Manny Jimenez noticed that when Plaintiff Gonzales and his brother saw the marked patrol car they immediately began to walk toward a driveway.  Based on the information known at the time, any well-trained law enforcement officer could have believed that reasonable suspicion existed to stop and detain Plaintiff Gonzales and his brother.

100.    Officer Manny Jimenez was in a Bovina Police Department marked patrol car; thus, he was readily identifiable as a police officer.  Officer Manny Jimenez called for both

subjects to stop; Jaime complied.  Plaintiff Gonzales did not comply.  Plaintiff Gonzales signaled to Officer Manny Jimenez that he was not complying, dropped the ice chest, and walked away. It is also irrefutable that Officer Manny Jimenez called for him to stop and Plaintiff Gonzales continued to disregard his commands.

101.    Any reasonable law enforcement officer could have believed that probable cause existed to arrest Plaintiff Gonzales for the offense of evading detention pursuant to the Texas Penal Code 38.04 Evading Arrest or Detention. That statute provides:

> "(a) A person commits an offense if he intentionally flees from a person he knows is a peace officer attempting lawfully to arrest or detain him.
> (b) An offense under this section is a Class B misdemeanor,.........:"

102.    In deposition (pg. 17-18), Plaintiff Gonzales testified that Officer Manny Jimenez told him, "Hey, come here" and that he did not respond to the officer.  He further testified that he motioned and told Officer Manny Jimenez that he was not going to come to him because he was on his property.  Based on the above, Officer Jimenez could have reasonably believed that Plaintiff Gonzales was aware that Officer Manny Jimenez was attempting to detain him, and he fled from the officer.

103.    The undisputed evidence indicates that Plaintiff Gonzales committed the aforementioned offense.  In deposition (pg. 17-18), Plaintiff Gonzales testified that Officer M. Jimenez told him, "Hey, come here" and that he did not respond to the officer.  He further testified that he motioned and told Officer M. Jimenez that he was not going to come to him because he was on his property.  Plaintiff Gonzales also testified (pg. 19) that he dropped the ice chest and walked away from Officer M. Jimenez.  The irrefutable evidence indicates that Plaintiff Gonzales was aware that Officer M. Jimenez was attempting to detain him, and he fled from the officer.  In fact, Plaintiffs' Third Amended Complaint, states that Plaintiff Gonzales wanted to get away from Officer M. Jimenez.  The reasonable suspicion that existed to stop and detain Plaintiff Gonzales was because of the recent break-ins and related information and not for suspicion of public intoxication.

104.    Even when considering the evidence in the most favorable light for Plaintiff Gonzales and assuming Plaintiff Gonzales was on private property when Officer M. Jimenez observed him, the officer's actions in attempting to detain Plaintiff Gonzales remain objectively

reasonable.  Pursuant to law enforcement training officers can detain persons for investigative purposes when reasonable suspicion exists.  Again, the reasonable suspicion that existed at the time was not for public intoxication, rather it was because of the recent break-ins and related circumstances.  If the reasonable suspicion would have been solely for suspected public intoxication on private property the attempted detention pursuant to law enforcement training would not have been within the parameters of proper law enforcement protocol.  That was not the case in this situation.  The signs of public intoxication were not observed until after the attempted detention.

105.    Officer M. Jimenez noticed that as Plaintiff Gonzales was walking away, he was having a difficult time with his balance.  Officer M. Jimenez also noticed that Plaintiff Gonzales was swaying from side to side.  Plaintiff Gonzales continued walking toward the rear of the residence located at 303 Brock, and once he was at the side area of the residence, Plaintiff Gonzales lost his balance and fell on the ground.  Plaintiff Gonzales, in deposition (pg. 23-24), admits that he fell to the ground.  Officer M. Jimenez repeatedly continued to instruct Plaintiff Gonzales to come back.  Plaintiff Gonzales did not comply.  Plaintiff Gonzales falling to the ground is consistent with Officer M. Jimenez's observations reference Plaintiff Gonzales's signs of intoxication.

106.    Officer M. Jimenez continued to follow Plaintiff Gonzales to the back of the residence.  Plaintiff Gonzales entered the residence.  Officer M. Jimenez asked the occupants of the residence to get him out of the house.  Plaintiff Gonzales admits in deposition that Officer M. Jimenez continued to ask him to step out of the house.

107.    While Plaintiff Gonzales was inside the house, Officer M. Jimenez radioed for assistance.  Officer J. Jimenez, Deputy Sergeant Kroop and Deputy Romero arrived.  Officer M. Jimenez briefed Sergeant Kroop on the situation.

108.    At one point, family members convinced Plaintiff Gonzales to step outside.  Once he was outside, Officer M. Jimenez took Plaintiff Gonzales into custody without further incident.  While speaking to Plaintiff Gonzales, Officer M. Jimenez noticed that he had blood shot and glassy eyes, was "thick tongued," and had slurred speech.  Plaintiff Gonzales was asked if he would submit to a PBT and he agreed.  Plaintiff Gonzales did not follow the prescribed instructions on taking the PBT.  Plaintiff Gonzales admitted to having consumed 6 or 7 beers

that night. Plaintiff Gonzales was charged with Evading Arrest/Detention. There should be no question that probable cause existed for said charge.

109.   Probable cause existed to arrest Plaintiff Gonzales for Evading Arrest/Detention. The charge of Evading Arrest/Detention was dismissed. Again, the fact that the charge of Evading Arrest/Detention was dismissed does not equate to Officer M. Jimenez not having probable cause to arrest Plaintiff Gonzales.

110.   Any reasonable law enforcement officer could have believed that reasonable suspicion existed to stop and detain Plaintiff Gonzales and his brother for investigative purposes. (See ¶ 99).

111.   Pursuant to law enforcement training, officers can detain persons for investigative purposes when reasonable suspicion exists. In these circumstances, the reasonable suspicion was because of the recent break-ins in the area and Plaintiff Gonzales walking at night with a cooler and another gentleman.

112.   The documents reviewed indicate that Officer Manny Jimenez was appropriately conducting legitimate discretionary law enforcement functions in connection with Plaintiff Gonzales and said functions were within the course and scope of his law enforcement authority.

113.   Officer Jonathan Jimenez's limited involvement consisted of showing up as back-up and conducting the PBT, but he did not touch Plaintiff Gonzales at any point during this incident, nor was he involved in Plaintiff Gonzales's arrest.

## XI.   DECEMBER 6, 2011 INCIDENT INVOLVING MARTHA JARAMILLO

### A.   *Summary of Relevant Undisputed Facts related to incident involving Plaintiff Martha Jaramillo*

114.   On December 6, 2011, City of Bovina Municipal Court Judge Donna Mitchell issued a Capias Warrant for the arrest of Martha Jaramillo. The warrant specifically stated, "To any Peace Officer of the State of Texas: Greetings: YOU ARE HEREBY COMMANDED to arrest MARTHA JARAMILLO, a defendant, and bring her before the Municipal Court to be dealt with according to law. Said defendant entered a plea of NOT GUILTY on December 29, 2010 to the offense of: D/L - NON-GUARDIAN PERMITTED UNLICENSED DRIVER TO DRIVE, which is against the laws of the State of Texas, and against the city ordinances of said

city. Currently you have not completed the rendered judgment amount, $339.00, the remaining unpaid balance owed is $159.00. Herein fail not, but due service and return of this warrant of arrest, showing how you executed the same." The Capias Warrant was signed by Judge Donna Mitchell on December 6, 2011.

115.    The evidence indicates that on December 6, 2011, City of Bovina Municipal Court Judge Donna Mitchell issued a Capias Warrant of Arrest for Plaintiff Jaramillo. Later that same evening at approximately 5:22 p.m., Officer Jonathan Jimenez simply served the warrant on Plaintiff Jaramillo. Officer Jonathan Jimenez did inform her of the Capias Warrant and that money was owed as a result of the violation addressed in the Capias Warrant. Officer Jonathan Jimenez followed the orders set forth in the warrant as would any reasonable and prudent law enforcement officer.

B.  *Opinions and Observations relative to Plaintiff Martha Jaramillo*

116.    The materials reviewed revealed that Officer Jonathan Jimenez had nothing to do with issuing the citation to Plaintiff Jaramillo for allowing an unlicensed driver to drive a motor vehicle. In fact, the evidence indicates that citation, which arose out of the December 28, 2010 arrest of Ms. Jaramillo, was issued before the date of Officer Jonathan Jimenez's employment with the City. Thus, Officer Jonathan Jimenez had nothing to do with the citation.

117.    It appears to be true from the materials reviewed that Officer Jonathan Jimenez arrested Plaintiff Jaramillo; however, he did so pursuant to the court's orders.

118.    Officer Jonathan Jimenez, rather than taking Jaramillo to jail because there was no magistrate available, instead allowed her to make arrangements that evening to pay the amount noted in the warrant. Giving persons the opportunity to take care of the fine stated in the warrant is a common law enforcement procedure when an arrest is made during non-business hours, as was the case in this situation.

119.    The documents reviewed indicate that Officer Jonathan Jimenez appropriately conducted legitimate discretionary law enforcement functions in connection with Plaintiff Jaramillo and said functions were within the course and scope of his law enforcement authority.

120.    Based on all of the materials reviewed, it is my opinion that even when considering the objective evidence in the most favorable light for Plaintiff Martha Jaramillo, Officer Jonathan Jimenez's actions on the evening of December 6, 2011 with regard to Ms. Jaramillo were objectively reasonable pursuant to law enforcement training. It is also my

opinion that another law enforcement officer confronted with the same or similar circumstances as was Officer Jonathan Jimenez on the evening in question could have taken the same or similar actions as did Officer Jimenez on that occasion.

## XII.   MAY 11, 2011 INCIDENT INVOLVING CARLOS MORENO

A. *Summary of Relevant Undisputed Facts related to incident involving Plaintiff Carlos Moreno*

121.    On May 11, 2011, Plaintiff Carlos Moreno was stopped by Officer Jonathan Jimenez for failing to signal a right turn at a stop sign intersection.  During the contact Plaintiff Carlos Moreno explained to Officer Jonathan Jimenez that the turn indicators of the pickup truck were not working.  Officer Jonathan Jimenez issued Plaintiff Moreno a warning (number 00058) for the offense.

122.    The traffic stop conducted by Officer Jonathan Jimenez on May 11, 2011 in connection with Plaintiff Carlos Moreno was recorded via Officer Jonathan Jimenez's patrol car's in-car camera.  The materials reviewed indicate that on the day in question Officer Jonathan Jimenez issued Plaintiff Moreno a warning (No. 00058) for failure violating Texas Transportation Code, 545.104, Failure to Signal Intent to Turn.  That statute provides:

> *"(a) An operator shall use the signal authorized by Section 545.106 to indicate an intention to turn, change lanes, or start from a parked position.*
>
> *(b) An operator intending to turn a vehicle right or left shall signal continuously for not less than the last 100 feet of movement of the vehicle before the turn."*

B. *Opinions and Observations relative to Plaintiff Carlos Moreno*

123.    Officer Jonathan Jimenez's actions in enforcing traffic violations were within the course and scope of his law enforcement authority.  The fact that Officer Jonathan Jimenez issued Plaintiff Moreno a warning for failure to signal intent to turn and not a citation is evidence of Officer Jonathan Jimenez's reasonableness in dealing with Plaintiff Moreno.

124.    The videotaped recording from Officer Jonathan Jimenez's in-car camera clearly indicates that Officer Jonathan Jimenez had probable cause to stop Mr. Moreno for failing to signal intent to turn.  Plaintiff Moreno informed Officer Jonathan Jimenez that his turn indicators were inoperable.

[THE REST OF THIS PAGE INTENTIONALLY LEFT BLANK]

FURTHER AFFIANT SAYETH NOT.

_____
Albert Rodriguez

SWORN TO AND SUBSCRIBED BEFORE ME by Albert Rodriguez, on this ⸍7⸍ day

of ⸍January⸍, 2014, to certify which witness to my hand and seal of office.

JULIE ROBERTSON
My Commission Expires
August 1, 2016

_____
Notary Public, State of Texas

# Exhibit A

## (Albert Rodriguez Resumé)

# ALBERT RODRIGUEZ

*Austin, Texas*

*Age:*      *60 years*
*Wife:*      *Terry Rodriguez*
*Children:*      *Steven Alberto*
*Height:*      *6'0"*
*Weight:*      *215 lbs.*

## EDUCATION

Emergency Medical Technician; 13 Semester Hours; 1991; Austin Community College, Austin, Texas
Graduate Credit in Criminal Justice; 16 Semester Hours; 1986; University of Virginia, Quantico, Virginia
B.S. in Education; May 1975; Texas A&I University, Kingsville, Texas
High School Diploma; 1971; Falfurrias High School, Falfurrias, Texas

## PROFESSIONAL EXPERIENCE

**05-01-13 to present**      **Captain, Texas Alcoholic Beverage Commission/Office of Professional Responsibility-** Supervise all training staff, and training activities at the Texas Alcoholic Beverage Commission Academy and conducting Use of Force Investigations for the Office of Professional Responsibility. Instruct force concepts to TABC Agents, law enforcement agencies, and present force concepts to requesting District and County Attorney's and grand juries throughout the state upon request.

**01-04-10 to 05-01-13**      **Lieutenant, Texas Alcoholic Beverage Commission, Office of Professional Responsibility –** Conducting investigations, training, and policy development.

**1993 to-09-30-09**      **Commander, Director of Training, Texas Department of Public Safety -** Supervise one captain, three lieutenants, seven sergeants, 35 non-commissioned employees, and all training activities at the Texas Department of Public Safety Training Academy. Instruct in a variety of courses at several TCLEOSE accredited academies throughout the State of Texas. Retired 9-30-2009.

**1985 to present**      **Law Enforcement Consultant-** Testified, investigated, and/or consulted in over 1,000 law enforcement criminal and/or civil use of force and deadly force cases throughout the United States. Testified, investigated, and/or consulted in over 150 law enforcement criminal and/or civil use of deadly force cases.

**1982 to 1993**      **Lieutenant -** Texas Department of Public Safety - Supervise two staff sergeants and two civilian employees; coordinate Recruit Schools (last Recruit School was March 31 to August 31, 1990); and coordinate In-Service Schools for Traffic Law Enforcement and Criminal Law Enforcement Divisions. Range Master: Instruct firearms courses, oversee all Department firearms issues, repair firearms, develop shooting courses, etc. Instructor in a variety of courses including Use of Force, General Patrol Procedures, Arrest Procedures, Subject Control Tactics, Gun-smithing, etc.

**1981 to 1982**      **Training Officer -** Texas Department of Public Safety Academy - Physical Training, Officer Survival and Subject Control Tactics, Patrol Procedures, Use of Force, Arrest Procedures, etc.

**1977 to 1981**      **Texas Highway Patrol -** Pearsall, Pleasanton, and Austin, Texas.

**1975 to 1977**      **Coach and Teacher -** San Antonio Independent School District - Thomas Jefferson High School.

## SPECIALIZED TRAINING

- **Americans for Effective Law Enforcement;** Police Civil Liability, September 1996, Las Vegas, Nevada
- **State and Provincial Police Academy Director's Conference;** June 1995; Williamsburg, Virginia
- **Public Agency Training Council -** Use of Force/High Speed Police Pursuit; June, 1995; San Antonio, Texas
- **American Society of Law Enforcement Trainers;** January 1995; Anchorage, Alaska
- **Attorney General's Criminal Law Enforcement Conference;** 1995; Austin, Texas
- **Southwestern Texas State University Leadership Development Conference;** August - September, 1994; Austin, Texas

*Albert Rodríguez*

*Resume*                                                                                                          *Page 2*

## • SPECIALIZED TRAINING (Continued)

- U.S. Department of Justice Municipal/Civil Liability Conference; June 1994; Laredo, Texas
- Professional Development Conference; 1994; Texas Department of Public Safety; Austin, Texas
- Attorney General's Criminal Law Enforcement Conference; 1994; Austin, Texas
- American Society of Law Enforcement Trainers; January 1993; Washington, D.C
- Police Civil Liability; 1993; Las Vegas, Nevada
- Accidents Involving Petroleum Gas Division; September 6, 1991; Austin, Texas
- Use of Force Symposium; June 23 - 27, 1991; Federal Law Enforcement Training Center; Glynco, Georgia
- Emergency Medical Technician; June 14, 1991; Austin, Texas
- Tactical Baton Instructor; May 21 - 22, 1991; Austin, Texas
- Smith and Wesson Revolver Armorers' Course, April 1991, Lubbock, Texas
- Pistol Smithing Course, Semi-automatic; April 17 - 18, 1991; Austin, Texas
- Spanish for Law Enforcement Instructor Training; March 19 - 23, 1990; Austin, Texas
- Japanese Karate; 1989 to 1990; Austin, Texas
- Texas Department of Public Safety Firearms Instructors' Course, November, 1985
- Manager of Managers Program; April 16 - 20, 1989; New Braunfels, Texas
- High Performance Management; February 28, 1989; Austin, Texas
- American Society of Law Enforcement Trainer's Workshop; January 3 - 7, 1988; New Orleans, Louisiana
- United States Secret Service Dignitary Protection School; January, 1987
- Federal Bureau of Investigation, National Academy; October 1986 - December 1986; 147th Session; Quantico, Virginia
- Deadly Force and the Peace Officer; September, 1986; Northwestern University, Evanston, Illinois
- State Police and Highway Patrol Training Director's Seminar; March 25 - 29, 1985; Jacksonville, Florida
- Confrontation and Stress Management; April 20, 1984; Texas A&M University; College Station, Texas
- Police Defensive Tactics; March 11, 1984; Smith & Wesson Academy; Springfield, Massachusetts
- First Level Management Training; December 1, 1983; Governor's Council, State of Texas; Lago Vista, Texas
- International Non-Lethal Weapons Association Academy; September 19, 1983; Instructor's Certificate Number 0606
- Advanced Officer Survival Seminar; August 10, 1983; Police Marksman Association: New Orleans, Louisiana
- Officer Tear Gas Training; July 26, 1983; Federal Laboratories, Inc.; Austin, Texas
- Federal Laboratories Tear Gas Seminar; July 1983; Austin, Texas
- Licensed, Emergency Medical Technician; February 11, 1983; Health Resource Center; San Marcos, Texas
- Police Instructors' Baton Training; January 17 to 21, 1983; Texas Department of Public Safety; Austin, Texas
- Advanced Accident Investigation Course; October 25 - November 12, 1982; Texas A&M University; College Station, Texas
- Psycho-Motor Skill Design - Instructor Training Seminar; October 3 - 9, 1982; Justice System Association; Chicago, Illinois
- Street Survival Seminar; September 7 - 8, 1982; North Texas Police Chiefs Association; Arlington, Texas
- FBI Instructors' Course; August 30 - September 3, 1982; Federal Bureau of Investigation (FBI); Austin, Texas
- Advanced Instructors' Course; May 10 - 14, 1982; Texas Police Association; Austin, Texas
- Police Physical Fitness Trainers' Course - Certificate of Proficiency; March 13, 1982; Des Moines, Iowa
- Police Fitness Instructors' School; March 8 - 12, 1982; The Institute for Aerobic Research
- Police Photography School; January 5 - 7, 1982; Texas Department of Public Safety; Austin, Texas
- Physical Fitness Program; November 9 - 13, 1981; International Association of Chiefs of Police; Dallas, Texas
- Arts of Self Defense School; October 5 - 12, 1981; Robinette Academy of Personal Protection; Austin, Texas
- Techniques of Group Instruction School; August 31 to September 4, 1981; Texas Department of Public Safety; Austin, Texas
- Officer Survival School; July 1981; Houston Police Department; Austin, Texas
- Breathalyzer Operator Course; November , 1977; Texas Department of Public Safety, Training Academy; San Antonio, Texas
- Texas Department of Public Safety Training Academy, 1,100 hours; 1977; Austin, Texas
- Americans For Effective Law Enforcement, Police Civil Liability, September 1997, Las Vegas, Nevada
- Highway Patrol In-Service Training 1978, 1980, 1982, 1984, 1986, 1988, 1990, 1992, 1994, 1996, 1998, 2000
- Investigation of Homicides and Violent Crimes, July 2000, Department of Public Safety Training Academy
- Defensive Tactics School/Takedowns, August 2000, Las Vegas, Nevada
- TCLEOSE's Academy Coordinators' Workshop, September 2000, Corpus Christi, Texas

*Albert Rodriguez*

*Resume*                                                                                            *Page 3*

## • SPECIALIZED TRAINING (Continued)

- **Gang Seminar, (Kim Ogg),** November 2000, Texas Department of Public Safety Training Academy, Austin, Texas
- **Lewis Grigg's Cultural Diversity Program,** June 2000, Texas Department of Public Safety Training Academy; Austin, Texas
- **Mastering Performance Leadership,** May 2000, Texas Department of Public Safety Training Academy, Austin, Texas
- **Controlled F.O.R.C.E Instructor Certification Program,** August 2000, Las Vegas, Nevada
- **National Summit on the Use of Force in Law Enforcement and Corrections,** January 2001, Las Vegas Nevada
- **Sexual Assault and Homicide Investigation,** February 2001, Texas Department of Public Safety Training Academy, Austin Texas
- **TCLEOSE's Academy Coordinators' Workshop,** September 2001, Corpus Christi, Texas
- **Highway Patrol In-Service,** April 2002, Texas Department of Public Safety Training Academy
- **ASLET International Conference,** February 2002, Anchorage, Alaska
- **Homicide Investigation-Custody Deaths-Excited Delirium/Cocaine Toxicity,** DiMiao, Tx. DPS; April 2002
- **Blood Analysis/Blood Spatter,** Henderson, Tx. DPS, October 2003
- **TCLEOSE's Academy Coordinators' Workshop,** September 2003, Corpus Christi, Texas
- **Reconstruction of Shooting Incidents and the Investigation of Violent Crime Scenes,** April 6, 7 & 8, 2006 Cypress, Texas
- **Shooting Reconstruction School,** May 9-13, 2005, Texas DPS-Ed Huske
- **Crisis Intervention,** September 2006, Texas DPS, Austin, Texas
- **Excited Delirium,** November 16-17, 2006, Institute for Prevention of In-Custody Death, Las Vegas, Nevada
- **Taser Instructor Re-Certification,** October 16-17, 2008, Austin, Texas
- **Excited Delirium,** October 29-31, 2008, Institute for Prevention of In-Custody Death, Las Vegas, Nevada
- **Internal Affairs School, April 17-19, 2012, Brownsville, Texas; Public Safety Training Council**
- The Reid Technique of Interviewing and Interrogation July 17-19, 2012, McKinney, Texas
- 

## C E R T I F I C A T I O N S
- **Texas Commission on Law Enforcement Officer Standards and Education**
- Masters' Certificate
- Instructor's Certificate
- Advanced Certificate
- Intermediate Certificate
- Basic Certificate
- **The Aerobic Research Center**
- Physical Fitness for Police Officers
- Certificate of Proficiency
- **Federal Bureau of Investigation Instructor Certification**
- **Emergency Medical Technician -** Certificate No. 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
- **American Society of Law Enforcement Trainers -** Certification No. 006573
- **Cardiopulmonary Resuscitation Certified;** May 17 - 18, 1982; American Red Cross; Austin, Texas
- **Radar Operator Certification;** December 1980; Texas Department of Public Safety; Austin, Texas
- **Firearms Instructor,** July 1983, Texas Department of Public Safety
- **ASP Baton Instructor,** 1991, Texas Department of Public Safety and ASP Inc.
- **Oleoresin Capsicum Instructor,** 1994, Texas Department of Public Safety
- **Air Taser,** June 1999, Texas Department of Public Safety
- **Taser Instructor,** October 2006, (re-cert -2008), Taser Incorporated, Austin, Texas

## SUBJECTS INSTRUCTED
- **3,000 plus Civilian Concealed Handgun Instructors,** Austin, Texas
- **FBI Use of Force Instructor's Course;** Quantico, Virginia
- **Mexico State Police Training Courses:**
- Officer Survival
- Patrol Procedures
- Defensive Tactics

## SUBJECTS INSTRUCTED (Continued)

- Collision Reconstruction
- Probable Cause
- Arrest Procedures
- Police Vehicle Operations
- Firearms
- Excited –Agitated Delirium In-custody death Investigation
- **Officer Survival and Defense Tactics Training Officer's Course; Northwest University Police Institute; Jacksonville, Florida**
- **Officer Survival and Defensive Tactics State Police Director's Course; Northwest University Police Institute; Jacksonville, Florida**
- **Survival and Defensive Tactics Course; Austin, Texas**
- **Officer Survival Course; Medina County; Hondo, Texas**
- **Rape Crisis Course; Austin, Texas**
- **Defensive Tactics Course; Federal Police; Chihuahua City, Chihuahua, Mexico**
- **Attorney General's Criminal Law Enforcement Conference - Use of Force; Austin, Texas**
- **Attorney General's Criminal Law Enforcement Conference - Police Pursuits; Austin, Texas**
- **Arkansas Narcotics Officers Association, August 1996, Little Rock, Arkansas**
- **Oklahoma Narcotics Officers Association, October 1996, Oklahoma City, Oklahoma**
- **United States Attorney's Law Enforcement Coordinating Conference, May 1997, Corpus Christi, Texas**
- **Texas Defensive Tactic's Instructors' Association, August 1997, Austin, Texas**
- **Agencies throughout the State of Texas:**
- Patrol Procedures
- Use of Force
- Use of Deadly Force
- Use of Force in Jail Settings
- Firearms
- Police Emergency Driving
- Police Pursuit Driving
- Probable Cause
- Arrest, Search and Seizure
- Arrest Procedures
- Texas Criminal Laws
- Texas Traffic Laws
- **Use of Force Investigations, Internal Affairs Units and Texas Rangers (April 2002)**
- **Police Pursuits and Emergency Response, Texas Sheriff Association, Lubbock, Texas**
- **Investigation of Police Officer Involved Shootings, Texas Department of Public Safety**
- **Investigation of Police Officer Involved Shootings, Vancouver, Canada**
- **Investigation of Police Officer Involved Shootings, Sacramento, California**
- **Texas Ranger Investigation of Police Involved Shootings Class**

# MEMBERSHIPS AND ASSOCIATIONS

- Texas Police Association
- Texas Sheriff's Association
- Department of Public Safety Association
- FBI National Academy Graduates Associates
- Police Marksman Association
- 1480 Shooter's Club
- Governor's "top twenty"
- Southwest Texas State University Criminal Justice Advisory Board
- Austin Community College Law Enforcement Advisory Board
- Texas Alcohol Beverage Commission Law Enforcement Advisory Board\
- Texas Department of Public Safety Law Enforcement Advisory Board
- International Law Enforcement Educators and Trainers Association

# Exhibit B

## (Albert Rodriguez Affidavit – Materials Reviewed)

Materials Reviewed by Albert Rodriguez
As of: January 2, 2014

1. Plaintiffs' Second Amended Original Complaint,
2. Amended Rule 16 Scheduling Order,
3. Final Order and Judgment of Dismissal with Prejudice,
4. Defendant Owen Foster's Reply to Plaintiffs' Response to Owen Foster's Motion to Dismiss,
5. Defendant Manny Jimenez's Reply to Plaintiffs' Response to Manny Jimenez's Motion to Dismiss,
6. Defendant Jonathan Jimenez's Reply to Plaintiffs' Response to Jonathan Jimenez's Motion to Dismiss,
7. Defendant's Jonathan Jimenez, Manny Jimenez, and Owen Foster in Their Individual Capacities Only's Joint Rule 26(a)(1) Disclosures,
8. Defendant's City of Bovina, Jana Pitcock, Donna Mitchell and Gary Sinclair's Initial Disclosures Pursuant to Rule 26(a)(1),
9. Plaintiffs' Response to First Set of Requests for Production from Defendants City of Bovina, Jana Pitcock, Donna Mitchell and Gary Sinclair,
10. 26(a)(1) Disclosures of Plaintiff Briselda Rodriguez,
11. Documents Produced by Plaintiff in Response to City of Bovina's Request for Production, Re: Claims of Briselda Rodriguez,
12. City of Bovina Documents, Re: Briselda Rodriguez; Produced with/Rule 26(a)(1) Disclosures,
13. City of Bovina Documents, Re: Jose Vega Gonzales; Produced with/Rule 26 (a)(1) Disclosures,
14. 26(A)(1) Disclosures of Plaintiff Jose Vega Gonzales,
15. Deposition of Jose Vega Gonzales,
16. Plaintiff Jose Vega Gonzales' Answers to Defendant Owen Foster's First Set of Interrogatories,
17. Plaintiff Jose Vega Gonzales' Answers to Defendant Manny Jimenez's First Set of Interrogatories
18. Plaintiff Jose Vega Gonzales' Answers to Defendant Jonathan Jimenez's First Set of Interrogatories
19. 26(a)(1) Disclosures of Plaintiff Martha Jaramillo,
20. City of Bovina Documents, Re: Martha Jaramillo, Produced with/Rule 26(a)(1) Disclosures,
21. Documents Produced by Plaintiffs in Response to City of Bovina's Request for Production including DVD of school video; Re: Claims of Martha Jaramillo,
22. Deposition of Martha Jaramillo,
23. Plaintiff Martha Jaramillo's Answers to Defendant Jonathan Jimenez's First Set of Interrogatories,

24. Plaintiff Martha Jaramillo's Answers to Defendant Owen Foster's First Set of Interrogatories,

25. Plaintiff Martha Jaramillo's Answers to Defendant Manny Jimenez's First Set of Interrogatories,

26. 26(a)(1) Disclosures of Plaintiff Eliseo Castaneda,

27. City of Bovina Documents, Re: Eliseo Castaneda, Produced with/Rule 26(a)(1) Disclosures,

28. Documents Produced by Plaintiffs in Response to City of Bovina's Request for Production, Re: Claims of Eliseo Castaneda,

29. Deposition of Eliseo Castaneda,

30. Deposition of Maribel Larrea,

31. Plaintiff Eliseo Castaneda's Answers to Defendant Owen Foster's First Set of Interrogatories,

32. Plaintiff Eliseo Castaneda's Answers to Defendant Manny Jimenez's First Set of Interrogatories,

33. Plaintiff Eliseo Castaneda's Answers to Defendant Jonathan Jimenez's First Set of Interrogatories,

34. 26(a)(1) Disclosures of Plaintiff Rogelio Martinez,

35. City of Bovina Documents, Re: Rogelio Martinez; Produced with/Rule 26(a)(1) Disclosures,

36. Deposition of Rogelio Martinez,

37. Plaintiff Rogelio Martinez's Answers to Defendant Jonathan Jimenez's First Set of Interrogatories,

38. Plaintiff Rogelio Martinez's Answers to Defendant Manny Jimenez's First Set of Interrogatories,

39. Plaintiff Rogelio Martinez's Answers to Defendant Owen Foster's First Set of Interrogatories,

40. 26(a)(1) Disclosures of Plaintiff Federico Vela,

41. City of Bovina Documents Re: Federico Vela, Produced with Rule 26(a)(1) Disclosures,

42. Documents Produced by Plaintiffs in Response to City of Bovina's Request for Production, Re: Claims of Federico Vela,

43. Deposition of Federico Vela,

44. Plaintiff Federico Vela's Answers to Defendant Owen Foster's First Set of Interrogatories,

45. Plaintiff Federico Vela's Answers to Defendant Manny Jimenez's First Set of Interrogatories,

46. Plaintiff Federico Vela's Answers to Defendant Jonathan Jimenez's First Set of Interrogatories,

47. 26(a)(1) Disclosures of Plaintiff Carlos Moreno,

48. City of Bovina Documents Re: Carlos Moreno, Produced with Rule 26(a)(1) Disclosures,

49. Documents Produced by Plaintiffs in Response to City of Bovina's Request for Production, Re: Claims of Carlos Moreno,

50. Deposition of Carlos Moreno,

51. Plaintiff Carlos Moreno's Answers to Defendant Owen Foster's First Set of Interrogatories,

52. 26(a)(1) Disclosures of Plaintiff Sandra Moreno,

53. City of Bovina Documents Re: Sandra Moreno, Produced with Rule 26(a)(1) Disclosures,

54. Documents Produced by Plaintiffs in Response to City of Bovina's Request for Production, Re: Claims of Sandra Moreno,

55. Deposition of Sandra Moreno,

56. Plaintiff Sandra Moreno's Answers to Defendant Owen Foster's First Set of Interrogatories,

57. Plaintiff Sandra Moreno's Answers to Defendant Manny Jimenez's First Set of Interrogatories,

58. Plaintiff Sandra Moreno's Answers to Defendant Jonathan Jimenez's First Set of Interrogatories,

59. Arrest video produced by Plaintiffs,

60. 26(a)(1) Disclosures of Plaintiff Jose Garcia,

61. City of Bovina Documents Re: Jose Garcia, Produced with Rule 26(a)(1) Disclosures,

62. Deposition of Jose Garcia,

63. Deposition of Miguel Ramirez,

64. Plaintiff Jose Garcia's Answers to Defendant Owen Foster's First Set of Interrogatories,

65. Plaintiff Jose Garcia's Answers to Defendant Manny Jimenez's First Set of Interrogatories,

66. Plaintiff Jose Garcia's Answers to Defendant Jonathan Jimenez's First Set of Interrogatories,

67. Patrol car video reference Plaintiff Jose Garcia,

68. Deposition Exhibits 1-12,

69. Deposition of Deanna Curtis,

70. Deposition of Jonathan Jimenez,

71. Deposition of Manny Jimenez,

72. Deposition of Owen Foster,

73. Deposition of Gary Sinclair,

74. Photographs of Plaintiff Garcia's residence (interior and backyard),

75. Plaintiffs' Response to First Set of Request for Production from Defendants Owen Foster, Jonathan Jimenez, and Manny Jimenez,

76. Disk containing all documents produced by Plaintiffs in response to First Set of Requests for Production from Defendants Owen Foster, Jonathan Jimenez, and Manny Jimenez,

77. Plaintiffs; Response to Second Set of Requests for Production from Defendants City of Bovina, Jana Pitcock, Donna Mitchell and Gary Sinclair,

78. Documents produced by Plaintiffs in response to Second Set of Requests for Production from Defendants City of Bovina, Jana Pitcock, Donna Mitchell and Gary Sinclair,

79. Court's Order Dismissing Briselda Rodriguez' Claims,

80. Deposition of Adelmira Gonzales,

81. Deposition of Jesus Guevara,

82. Denise Gonzales Lara,

83. Jacqueline Gonzales,

84. Guadalupe Garcia,

85. Maria Jaramillo,

86. Melquiades Gonzales,

87. Baudelio Vela Salas,

88. Saul Ramirez,

89. Cesar Marquez,

90. Jorge Jaramillo,

91. Deposition of Donna Mitchell,

92. Deposition of Maria Moreno,

93. Deposition of Faustino Garcia,

94. Deposition of Guadalupe Moreno,

95. Deposition of Jana Pitcock,

96. Deposition of Lupe Garcia,

97. Deposition of Lyndon Lueders,

98. Parmer Medical Center's Medical Records of Jonathan Jimenez,

99. Texas Commission on Law Enforcement Basic Peace Officer Training Curriculum,

100. Texas Commission on Law Enforcement Intermediate Use of Force Training Curriculum,

101. Texas Commission on Law Enforcement Intermediate Arrest, Search, and Seizure,

102. Texas Penal Code,

103. Texas Code of Criminal Procedure,

104. United States Supreme Court Decision in *Graham v Connor*,

105. United States Supreme Court Decision in *Saucier v Katz*,

106. United States Supreme Court Decision in *Pennsylvania vs. Mimms*,

107. United States Supreme Court Decision in *Terry v Ohio,* and

108. the United States Supreme Court Decision in *United States v Cortez*,

109. Capias Warrant for Martha P. Jaramillo,

110. Radio Log Report for Parmer County Sheriff's Office,

111. Call Information Sheet for 05/07/11,

112. Parmer County Clerk records regarding criminal cases against Plaintiffs,

113. Physical inspection of incident sites in Bovina, Texas.

**AFFIDAVIT OF ALBERT RODRIGUEZ**
**CONCERNING CLAIMS AGAINST**
**DEFENDANT MANNY JIMENEZ**

**THE STATE OF TEXAS**

**COUNTY OF TRAVIS**


Before me, the undersigned authority in and for the State of Texas, on this day personally appeared Albert Rodriguez, personally known to me, who, after being by me duly sworn, deposes and says:

## I.   BACKGROUND CONCERNING ALBERT RODRIGUEZ

1.      "My name is Albert Rodriguez. I am over the age of 21, of sound mind, and I am in all respects legally competent and duly authorized to make this Affidavit. I have personal knowledge of the facts contained herein:

2.      I honorably retired from the Texas Department of Public Safety (DPS) on September 30, 2009. I retired with the rank of Commander in the position of Director of Training. Upon retiring, I was commissioned by the DPS as a Special Ranger. On January 2010, I was employed by the Texas Alcoholic Beverage Commission (TABC) as a Lieutenant for the Office of Professional Responsibility. Presently, I hold the position of Director of Training for the TABC with the rank of Captain.

3.      I was employed by the Texas Department of Public Safety (DPS) as a patrol officer in 1977. I served in the Highway Patrol Service as a State Trooper and then promoted to the rank of Training Officer at the Training Academy. At the Training Academy, I was promoted to Staff Development Specialist I, Lieutenant and ultimately to the rank of Commander of the DPS Training Academy in Austin, Texas. I held that position from 1993 to September 30, 2009. I was employed by the DPS as a law enforcement officer and law enforcement trainer for over thirty- two (32) years and was a licensed Texas Peace Officer for that time period. I met all of the standards for licensure set out by statute and by the Texas Commission on Law Enforcement Officer Standards and Education. I have over thirty-six (36) years of law enforcement experience and training.

4.      I hold a Bachelor's Degree in Education from Texas A&M in Kingsville, Texas. I also hold Advanced, Instructors', and Masters' certifications from the Texas Commission on Law Enforcement Officer Standards and Education. I am a graduate of the 147th FBI National Academy in Quantico, Virginia.

5.      I have attended over six thousand (6,000) hours of various law enforcement seminars and schools throughout the United States. I have studied, attended seminars regarding, and instructed classes pertaining to the issues of law enforcement policies and procedures, use of

force, detention and arrest procedure, use of force in jail settings, reasonable suspicion, probable cause, police supervision, law enforcement training, patrol procedures, constitutional law and officer safety. I have been qualified in Federal and State courts as an expert witness in the areas of patrol procedures, use of force, use of deadly force, policies and procedures, use of force in jail settings, reasonable suspicion, probable cause, arrest procedures, driving procedures, police supervision, firearms, officer safety, Texas criminal laws, Texas traffic laws, law enforcement training, and police investigations.

6.      I am or have been a member of the FBI National Academy Graduates Association, Texas Police Association, Texas Sheriff's Association, and International Law Enforcement Educators and Trainers Association. I have served on the Southwest Texas State University Criminal Justice Advisory Board, Texas Alcohol Beverage Commission, and the Austin Community College Law Enforcement Advisory Board. I have instructed at the FBI Academy in Quantico, Virginia; Northwest University in Jacksonville, Florida; Texas Attorney General's Annual Law Enforcement Conferences and have instructed police officers throughout the United States, Canada, and Mexico.

7.      I am presently the Director of Training for the Texas Alcoholic Beverage Commission and (a) conduct internal affairs investigations on alleged officer misconduct, including allegations of excessive force; and (b) instruct police officers, including TABC Agents on Use of Force Concepts; (c) and present Use of Force Concepts to Grand Juries to assist them in evaluating police officer use of force and deadly force cases. Attached to this Affidavit as <u>Exhibit A</u> is my resume, which contains a more complete listing of my training and qualifications and is provided for reference of my experience, education, training and skills.

8.      My opinions in this affidavit are based upon my training, experience, and upon having visited Bovina and inspected the site of the incident and having reviewed and researched the materials and documents as outlined in the attached <u>Exhibit B</u> to this affidavit.

## II.   BACKGROUND CONCERNING MANNY JIMENEZ

9.      During the alleged time period in question, Officer Manny Jimenez was a Texas Commission on Law Enforcement licensed police officer. Officer Jimenez holds a TCOLE Peace Officer License and a TCOLE Peace Officer Intermediate Certification. Officer Jimenez had met all of the training requirements legislatively mandated and established by TCOLE at the time of the incidents in question. The materials reviewed clearly reveal that Officer Jimenez successfully completed the State Training Standards curriculum and passed the State Licensing Examination.

10.      Based on the above, Officer Manny Jimenez was trained on the requirements of the 4th Amendment of the United States Constitution as it relates to Law Enforcement Arrest, Search, and Seizure and more specifically had been trained on the dictates of the stair step requirements and dynamics of Arrest, Search, and Seizure.

### III.   BACKGROUND INFORMATION CONCERNING LAW ENFORCEMENT TRAINING

11.     Law enforcement officers in Texas are trained pursuant to the TCOLE State Training Standards.  Officers are instructed to understand that enforcing Texas Traffic and Criminal Laws is within the scope of their law enforcement authority.  More specifically, relative to that area, they are instructed on the Texas Code of Criminal Procedure, Article 2.13, DUTIES AND POWERS:  "It is the duty of every peace officer to preserve the peace within his jurisdiction. To effect this purpose, he shall use all lawful means.  He shall in every case, where he is authorized by the provision of this code, interfere without a warrant to prevent and suppress crime."  The materials reviewed revealed that the Defendant Officers followed the training they received on the aforementioned Texas Code of Criminal Procedure Article in that in every incident in question their intervention was designed to prevent and suppress crime.

12.     The Plaintiffs bringing claims against Officer Manny Jimenez in this case have alleged false arrest or arrest without probable cause.  Law enforcement officers receive comprehensive training and education on Arrest, Search, and Seizure.  More specifically, law enforcement officers are trained to understand the requirements to stop and detain, frisk, and arrest persons.  As previously mentioned, Officer Manny Jimenez during the alleged incidents in question was a TCOLE Licensed Peace Officer.  He was licensed after successfully completing the TCOLE State Training Standards and passing the state licensing examination.  The undisputable evidence indicates that the he was trained on the requirements of the 4th Amendment of the United States Constitution as it relates to Law Enforcement Arrest, Search, and Seizure and more specifically had been trained on the dictates of the following stair step requirements and dynamics of Arrest, Search, and Seizure:



13.     The aforementioned 4th Amendment Arrest, Search, and Seizure stair step Police-Citizen Contact Continuum is presented to law enforcement officers in a variety of instructional formats.  It is explained to law enforcement officers that neither Reasonable Suspicion nor Probable Cause are required to investigate a situation through a "Consensual Conversation."

14.     Law enforcement officers are further instructed that in order to "Stop and Detain" a person, at a minimum, "Reasonable Suspicion" must exist. The reasonable suspicion standard involves a level of belief, which is something less than the probable cause standard needed to support arrest. Law enforcement officers are trained to understand that, in order to justify a detainment, they must be able to point to specific articulable facts, which taken together with rational inferences from those facts, collectively provide a particularized and objective basis for suspecting the person detained of criminal activity.

15.     Law enforcement officers are trained to understand that in order to arrest an individual, probable cause must exist to believe that a specific person has committed or is committing a violation of the law. Probable cause pursuant to law enforcement training is defined as articulable facts and circumstances that would lead a reasonable law enforcement officer to believe that a specific person(s) has committed or is committing a violation of the law.

16.     Lastly, relative to the aforementioned Police Contact Continuum, law enforcement officers are trained to understand that Municipal, County, District, and Federal Courts employ the standard of "Proof Beyond a Reasonable Doubt" for a conviction. Law enforcement trainers communicate to law enforcement officers that the standard of "Proof Beyond a Reasonable Doubt" is a higher standard than "Probable Cause." Officers are instructed to understand that when a defendant is not convicted and/or a prosecutor dismisses a case said action does not necessarily equate to the lack of probable cause. Probable cause may exist; however, the prosecutor may believe that the higher standard of "Proof Beyond a Reasonable Doubt" cannot be obtained. Of course, there are many more reasons that a prosecutor might have for dismissing a case.

17.     The detention and arrest authorities, pursuant to law enforcement protocol, will be addressed later in this affidavit relative to the Plaintiffs' allegations in each individual incident in question.

18.     Law enforcement officers receive comprehensive training and education on the Use of Force and Civil Rights. More specifically, law enforcement officers are trained to understand that the use of force by law enforcement officers is within the course and scope of their authority and not a violation of civil rights when said force is within the parameters of:

1) Texas Penal Code § 9.31, Self-Defense; "*(a) Except as provided in Subsection (b), a person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force.*"

2) Texas Penal Code § 9.33 Defense of Third Person; "*A person is justified in using force or deadly force against another to protect a third person if: (1) under the circumstances as the actor reasonably believes them to be, the actor would be*

*justified under Section 9.31 or 9.32 in using force or deadly force to protect himself against the unlawful force or unlawful deadly force he reasonably believes to be threatening the third person he seeks to protect; and (2) the actor reasonably believes that the intervention is immediately necessary to protect the third person."*

3) Texas Penal Code § 9.51. Arrest and Search, *"(a) A peace officer or a person acting in a peace officer's presence and at his direction, is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to make or assist in making an arrest or search, or to prevent or assist in preventing escape after arrest, if: (1) the actor reasonably believes the arrest or search is lawful or, if the arrest or search is made under a warrant, he reasonably believes the warrant is valid, and (2) before using force, the actor manifests his purpose to arrest or search and identifies himself as a peace officer or as one acting at a peace officer direction, unless he reasonably believes his purpose and identity are already known by or cannot reasonably be made known to the person to be arrested..."*

19.     Texas law enforcement officers are trained to understand that Texas law in this regard is consistent with the United States Supreme Court Decision in *Graham v. Connor.* While I do not propose to offer expert opinions on the law, because my duties involve training law enforcement officers, I often read court decisions pertaining to law enforcement action, and have used judicial decisions to assist me in providing training to law enforcement officers. Therefore, I am able to provide expert testimony on the standard utilized in training police officers as to both tactical considerations as well as the legal parameters governing their conduct.

20.     It is important to note that when an officer in this case states that the Taser was deployed said statement means that the Taser is removed from the holster, held in hand, and may even be pointed at a suspect.  When an officer discharges the Taser or drive stuns an individual with the Taser, it is at that point the Taser is considered used.  In all of the alleged incidents in this case, the Taser was only used ONE time-against Plaintiff Martha Jaramillo.   The effectiveness and use of the Taser on Plaintiff Jaramillo will be addressed separately.  This information is provided because in reviewing the Plaintiffs' Expert Lyndon Lueder's report it appears that he is under the impression that when an officer deploys the Taser it means that the Taser has actually been discharged and/or used in a drive stun mode.   Contemporary law enforcement use of force and procedure trainers know the difference between Taser deployment, discharging the Taser and Drive Stunning an individual with the Taser.

21.     Furthermore, it is important to note that when an officer merely points the Taser at an individual, said action is not considered the use of force or the use of the Taser. It is no different than when an officer unholsters his/her handgun, said action is not considered the use of Deadly Force.

22.     In the law enforcement profession there are an indefinite number of circumstances that law enforcement officers may encounter when conducting traffic stops, detaining suspects, and/or in arrest situations. Because of the indefinite number of possibilities that exist in said circumstances, law enforcement officers are trained to use their judgment and discretion in arriving at a reasonable course of action.

23.     Law enforcement officers are trained to evaluate the totality of the circumstances as reasonably ascertainable and to use their good judgment and appropriate discretion in arriving at a course of action that is within the range of permissible conduct for a law enforcement officer. If in fact, there were a finite number of circumstances that could be identified, law enforcement officers would not be required to use their judgment or discretion at all. Law enforcement officers would only be trained on the specific number of circumstances and would be instructed to respond with specific actions and/or sets of procedures. Unfortunately, no such list of specific circumstances exists in life for each and every situation that a law enforcement officer may encounter; thus, law enforcement officers are necessarily required to use their judgment and discretion.

24.     There is no training manual and/or policy manual that can cover every single situation that a law enforcement officer may encounter when conducting traffic stops, detaining suspects, and/or in arrest situations. Officers, therefore, are sent to police training academies and provided instruction intended to provide the officer with a firm foundation upon which to apply the knowledge he has been taught and to utilize legitimate discretion in the performance of those duties he can reasonably be expected to confront in the performance of his responsibilities.

25.     The materials reviewed reveal that Defendant Officer Manny Jimenez was required to use his judgment and discretion, based upon accepted training and experience. He was required to evaluate the totality of the circumstances and use his judgment and discretion in carrying out his duties and responsibilities as a law enforcement officer. There are no law enforcement manuals, training, and/or policy manual that specifically mandates and/or outlines a step by step procedure in attempting to stabilize the situations in this case and/or in detaining and arresting the Plaintiffs in the alleged incidents in question. Each situation is unique and requires law enforcement officers to use their judgment and discretion. The documents reviewed indicate that Officer Manny Jimenez was appropriately conducting discretionary law enforcement functions in connection with the Plaintiffs. His discretionary functions will be specifically addressed when each individual incident is examined.

26.     In short, Officer Manny Jimenez's discretionary responses and actions at times were conducted in uncertain, dangerous, and rapidly evolving circumstances and said actions and responses were within the range of acceptable law enforcement discretionary functions and consistent with law enforcement tactical and constitutional training. The conduct and actions of Officer Manny Jimenez was consistent with the manner in which we customarily train law

enforcement officers to apply the dictates of the United States Supreme Court in such decisions as *Graham v. Conner* and the TCOLE training on Arrest, Search, and Seizure.

## IV.   SCOPE OF AFFIDAVIT

27.      I have previously given a report listing what I believed to be a summary of relevant facts surrounding the incidents in which Officer Manny Jimenez was involved.   That report also contains my opinions and observations concerning the incidents in which Officer Manny Jimenez was involved.  Because the purpose of this affidavit is to support Officer Manny Jimenez's Motion for Summary Judgment, I am not reciting facts nor offering opinions concerning facts that I believe may be in dispute.

## V.   REVIEW STANDARD

28.      It is my customary practice to evaluate the objective reasonableness of an officer's conduct on a case-by-case basis.  The objective analysis considers the fact that at times law enforcement officers are required to make split second decisions in tense, uncertain, and rapidly involving circumstances.  The analysis consists of comparing Officer Manny Jimenez's actions in relationship to the contemporary training received by law enforcement officers.  The analysis includes the evaluation of the totality of the circumstances in each individual incident as could reasonably be perceived by a well-trained law enforcement officer at the time that Officer Manny Jimenez exercised his duties and authorities as a law enforcement officer.  The evaluation was conducted from the standpoint of what the materials show that Officer Manny Jimenez knew and perceived at the time on each individual incident in question and not from the point of view that includes information obtained in hindsight.  In addition, Officer Manny Jimenez's actions were evaluated from the perspective of what actions a reasonable and well-trained law enforcement officer could have taken when presented with the same or similar circumstances that each of the individual Plaintiffs presented to the officers in each incident.

## VI.   MAY 7, 2011 INCIDENT INVOLVING JOSE GARCIA

### A.  *SUMMARY OF UNDISPUTED RELEVANT FACTS RELATED TO INCIDENT INVOLVING PLAINTIFF JOSE GARCIA*

29.      My understanding of the relevant *undisputed* facts is that on May 7, 2011, Officer Jonathan. Jimenez observed a green Ford Mustang, later determined to be driven by Antonio Dejesus Guevara, accelerating to the degree that the car "fish tailed." Mr. Guevara quickly turned to the right, and failed to signal his intent to turn into the alley behind the 200 block of Halsell Street.  Officer J. Jimenez activated the patrol car's overhead emergency lights in an attempt to get the vehicle stopped.  The Mustang accelerated as if trying to elude Officer J. Jimenez.  Shortly thereafter, Mr. Guevara quickly pulled into the back yard of 203 Halsell Street.

30.      While Officer J. Jimenez was conducting a traffic stop, Jose Garcia came out of the residence located at 203 Halsell, Bovina, Texas. His wife also came outside. Officer Jonathan Jimenez asked Mr. Garcia to get back inside of his residence in Spanish. Officer J. Jimenez also

warned Mr. Garcia that he would be placed under arrest for interference if he didn't go back inside the house. Mr. Garcia went back in to the house and about five minutes later, he came out again. Officer Jonathan Jimenez called for backup and shortly thereafter Officer Manny Jimenez arrived at that location.

31.       Officer J. Jimenez conducted a Portable Breath Test (PBT) on Mr. Guevara. The test results indicated no alcohol in his system.   As Officers Jonathan Jimenez and Manny Jimenez were conducting the investigation, Mr. Miguel Ramirez exited the residence.   Officer Jonathan Jimenez asked Mr. Ramirez to get back into the residence.

32.       While the events leading up to Officer Jonathan Jimenez and Officer Manny Jimenez's entry in to Mr. Garcia's home are disputed, it is clear that after the exchange with Miguel Ramirez, both of those officers entered Mr. Garcia's home. While they were in the home, Miguel Ramirez (a non-party to the lawsuit) was arrested for Interference with Public Duties and Resisting Arrest, but Jose Garcia was not arrested that evening.

33.       Mr. Garcia complains in this lawsuit that while they were in his house, Officer Jonathan Jimenez and Officer Manny Jimenez each "shoved" or "pushed" him out of the way in their efforts to arrest Mr. Miguel Ramirez.

34.       The audio portion of the videotaped recording from Officer Jonathan Jimenez's in-car camera, which is in Spanish, confirms that the events inside Mr. Garcia's house that evening were chaotic and unfolding quickly. I am able to read, write speak and understand the Spanish language.

35.       As a result of the events in the house that ended in Mr. Ramirez's arrest, EMS was summoned with regard to treatment of Officer Jonathan Jimenez's arm.   Officer Jonathan Jimenez was transported via EMS to Parmer Medical Center for x-rays.

36.       After the initial traffic stop and the ensuing investigation at the Garcia residence, Officers Jonathan Jimenez and Manny Jimenez completed police reports concerning the events at Mr. Garcia's home on the evening in question. On May 18, 2011, a criminal complaint was completed by former Chief Gary Sinclair based on Officers Jonathan Jimenez's and Manny Jimenez's information. County Attorney Jeff W. Actkinson accepted and signed the complaint. A warrant of arrest was issued for Plaintiff Garcia.

37.       Neither Officer Jonathan Jimenez nor Officer Manny Jimenez executed the arrest warrant for Jose Garcia.

### B. *OPINIONS AND OBSERVATIONS RELATIVE TO PLAINTIFF JOSE GARCIA*

38.       It is of chief importance to note that Mr. Ramirez is not a Plaintiff in this case.

39.       I also have previously given a report as to my opinions concerning Officer Jonathan Jimenez's and Officer Manny Jimenez's use of force relative to Plaintiff Garcia while in his home. However, because I understand that the circumstances surrounding the exact events that occurred in the home and the exact conversations inside the house that evening are in factual dispute, I am not offering opinions about that aspect of Plaintiff Garcia's claim of excessive force

for purposes of this affidavit in support of Officer Jonathan Jimenez's motion for Summary Judgment. Instead, I am taking as true his deposition testimony that he was "shoved" or "pushed" once by each officer while they were in the house attempting to effectuate the arrest of Mr. Ramirez.

40.     As referenced in Exhibit B to my affidavit, I have reviewed not only the in-car camera recording of this incident, but I have also reviewed the depositions of Plaintiff Garcia and those persons present in his residence that night. While I recognized that Plaintiff Garcia and those other witnesses describe the events as calm and their actions as polite, my review of the audio and video recordings relevant to the timeframe when Officer Jonathan Jimenez and Officer Manny Jimenez where inside Plaintiff Garcia's residence reveal that the events inside the residence were chaotic, fast-paced, and tense. The officers' purpose inside the residence of Plaintiff Garcia was to arrest Miguel Ramirez. A law enforcement officer's right to arrest necessarily carries with it the ability to use some force in making the arrest. For even minor offenses, permissible force includes physical restraint, use of handcuffs, and pushing and/or shoving into walls for control and/or handcuffing. The fact that Officer Manny Jimenez and Officer Jonathan Jimenez either "shoved" or "pushed" Miguel Ramirez once was not clearly excessive to the need, was not objectively unreasonable, and was justified when attempting arrest Miguel Ramirez.

41.     It is important to note that in deposition (pg. 27-28), Plaintiff Garcia testified that he believes he was arrested for assaulting the officers and not for Interference with Public Duties.

42.     Mr. Ramirez testified (pgs. 26 & 28) that the Taser was not discharged by Officers J. Jimenez or M. Jimenez. Plaintiff Garcia in deposition (pgs. 28) testified that he did not suffer any physical injuries on the evening of May 7, 2011, did not suffer any mental anguish due to the incident, and did not suffer from any sort of anxiety or depression because of the incident. Plaintiff Garcia testified in deposition (pg. 72) that the only force that was used against him on the evening of May 7, 2011, was that he was grabbed by an officer.

43.     On May 18, 2011, a criminal complaint was completed by former Chief Gary Sinclair based on Officers J. Jimenez's and M. Jimenez's information. County Attorney Jeff W. Actkinson accepted and signed the complaint. A warrant of arrest was issued for Plaintiff Garcia. The materials reviewed indicate that charges against Plaintiff Garcia were dismissed on October 17, 2011.

44.     The fact that the charges were dismissed does not necessarily equate to the lack of probable cause for Plaintiff Garcia's arrest. In fact, County Attorney Actkinson reviewed the information, signed and accepted the complaint. In all actually, the County Attorney verified the probable cause and subsequently an arrest warrant was issued. Again, police officers operate on the standard of "Probable Cause" and not the higher standard of "Proof beyond a Reasonable Doubt." The fact that the County Attorney approved the complaint verifies the fact that probable cause existed for Plaintiff Garcia's arrest.

45.     The documents reviewed indicate that Officers J. Jimenez and M. Jimenez were appropriately conducting legitimate discretionary law enforcement functions in connection with

Plaintiff Garcia, and said functions were within the course and scope of their law enforcement authority (refer to paragraphs #'s 11-26).

## VII.   AUGUST 24, 2011 INCIDENT INVOLVING ROGELIO MARTINEZ

### A.   *SUMMARY OF RELEVANT UNDISPUTED FACTS RELATED TO INCIDENT INVOLVING PLAINTIFF ROGELIO MARTINEZ*

46.      On August 24, 2011, at approximately 3:09 p.m., Officer Manny Jimenez was traveling westbound in the 800 block of Highway 86 when he observed a white passenger car traveling eastbound in the 700 block of Highway 86. It was later determined that the driver was Rogelio Martinez. Officer Manny Jimenez observed the passenger car change lanes without signaling the intent to change lanes within the required 100 feet before changing lanes, as required by the Texas Transportation Code. Plaintiff Martinez then turned the turn indicator on and switched lanes immediately.

47.      Officer Manny Jimenez made a U-turn and attempted to catch up to the passenger car driven by Plaintiff Martinez.  Sergeant Jimenez activated the patrol car's overhead emergency light, however, Plaintiff Martinez continued to travel west on Highway 86. Eventually, Plaintiff Martinez pulled into a driveway at the residence located at 305 Highway 86.

48.      Plaintiff Martinez exited the passenger car and began to walk towards the residence.

49.      Saul Martinez, Plaintiff Martinez's son, informed Officer Manny Jimenez that he was going to get Plaintiff Martinez out of the house. Plaintiff Martinez later came outside.

### B.   *OPINIONS AND OBSERVATIONS RELATIVE TO PLAINTIFF ROGELIO MARTINEZ*

50.      Officer Manny Jimenez reported that he was traveling westbound in the 800 block of Highway 86 when he observed a white passenger car traveling eastbound in the 700 block of Highway 86. Officer Manny Jimenez observed the passenger car, driven by Plaintiff Martinez, change lanes without signaling within the required 100 feet before changing lanes. Officer Manny Jimenez made a U-turn, activated the patrol car's overhead emergency lights, and followed the vehicle driven by Plaintiff Martinez. Officer Manny Jimenez followed Plaintiff Martinez for approximately four-tenths (4/10) of a mile. Plaintiff Martinez did not yield right of way as required, rather he continued driving until he pulled into the driveway at 305 Highway 86. It is important to note that the speed limit in that stretch of the highway is 40 miles per hour, thus Plaintiff Martinez had more than ample time to see Officer Manny Jimenez's overhead emergency lights.

51.      Plaintiff Martinez testified that he went outside and, at that point, Officer Manny Jimenez grabbed him. Plaintiff Martinez then testified (pg. 16) that Officer Jonathan Jimenez arrived immediately thereafter.

52.     Officer Manny Jimenez reported that after following Plaintiff Martinez with the patrol car's overhead emergency lights activated, Plaintiff Martinez, after pulling into the driveway, exited the passenger car and began to walk towards the residence.

53.     The materials reviewed revealed that any reasonable and prudent law enforcement officer could have believed that probable cause existed to arrest Plaintiff Martinez for failing to signal lane change and evading arrest/detention.

54.     Sometime later, Plaintiff Martinez stepped out of the residence. At that particular point in time, pursuant to law enforcement training, it would have been reasonable to grab Plaintiff Martinez to keep from going back into the residence and to effectuate the arrest. Of course, any time an officer handcuffs an individual, the officer is required to twist and turn the individual's arms behind their back for handcuffing. There is no evidence to indicate that unreasonable force was used to effectuate Plaintiff Martinez's arrest. Plaintiff Martinez has not alleged that he was slapped, hit, pepper sprayed, tased, hit with a baton, punched or kicked, and there is no evidence of such force being used against Plaintiff Martinez.

55.     Officer Manny Jimenez attempted to stop Plaintiff Martinez based on probable cause. Subsequently, when Plaintiff Martinez did not stop, but rather continued to the driveway and then entered his residence, any reasonable and well-trained officer could have believed that Plaintiff Martinez had evaded arrest/detention.

56.     Plaintiff Martinez in deposition (pg.22) was asked if an excessive amount of force had been used to effectuate his arrest, he responded by stating, "What I'm saying is that they came toward me, didn't ask me a question, didn't tell me anything, grabbed me by the arm and twisted it, and put me toward the car." Even when viewing the evidence in the most favorable light for Plaintiff Martinez, Officers Manny Jimenez's and Jonathan Jimenez's actions were objectively reasonable.

57.     The documents reviewed indicate that Officer Manny Jimenez was appropriately conducting legitimate discretionary law enforcement functions in connection with Plaintiff Martinez and said functions were within the course and scope of his law enforcement authority.

### VIII.   SEPTEMBER 4, 2011 INCIDENT INVOLVING JOSE VEGA GONZALES

#### A. *SUMMARY OF RELEVANT UNDISPUTED FACTS RELATED TO INCIDENT INVOLVING PLAINTIFF JOSE VEGA GONZALES*

58.     On September 04, 2011, at approximately 1:53 a.m., Officer Manny Jimenez was on routine patrol, driving westbound on the 300 block of Brock Street. He observed two (2) males, later identified as Jose Vega Gonzales and his brother, Jaime, walking eastbound on Brock Street. Officer Manny Jimenez also observed Jose carrying an ice chest. It appeared to Officer Manny Jimenez that once Jose and his brother saw him, they walked toward a driveway. Because of past reported break-ins, the officer decided to stop them for investigative purposes.

59.     Officer Manny Jimenez called to both subjects to stop; Jaime complied. Plaintiff Jose Gonzales did not comply.

60.     Plaintiff Gonzales continued walking toward the rear of the residence located at 303 Brock, and once he was at the side area of the residence, Plaintiff Gonzales lost his balance and fell to the ground.  Plaintiff Gonzales then entered the residence.  He remained inside the residence for anywhere from 15-30 minutes. The materials reviewed indicated the residence that Plaintiff Gonzales entered was not his, but belonged to his brother Melquiades (Mickey) Gonzales.

61.     At one point, family members convinced Plaintiff Gonzales to step outside.  Once he was outside, he was taken into custody without further incident.  While speaking to Plaintiff Gonzales, Officer Manny Jimenez noticed that he had blood shot and glassy eyes, was "thick tongued," and had slurred speech.  Plaintiff Gonzales admitted to having consumed 6 or 7 beers that night.    Plaintiff Gonzales was charged with Public Intoxication and Evading Arrest/Detention.

62.     Officer Jonathan Jimenez's limited involvement consisted of showing up as back-up and conducting the Portable Breathalyzer test, but he did not touch Plaintiff Gonzales at any point.

## B. *OPINIONS AND OBSERVATIONS RELATIVE TO PLAINTIFF JOSE VEGA GONZALES*

63.     The materials reviewed revealed that on September 04, 2011, at approximately 1:53 a.m., Officer Manny Jimenez observed two (2) males, later identified as Jose Vega Gonzales and his brother, Jaime, walking eastbound on the 300 block of Brock Street, in Bovina, Texas.

64.     The evidence indicates that any reasonable law enforcement officer could have believed that reasonable suspicion existed to stop and detain Plaintiff Gonzales and his brother for investigative purposes.  In short, reasonable suspicion pursuant to law enforcement training is defined as articulable facts and circumstances to believe that crime may be afoot.  It is paramount to understand that law enforcement training informs law enforcement officers that pursuant to the United States Supreme Court Decision in *United States v. Cortez*, law enforcement officers may use their training and experience in arriving at probable cause and reasonable suspicion.

65.     In this case, Officer Manny Jimenez was aware of recent break-ins in the area, it was approximately 1:53 a.m. and Plaintiff Gonzales was observed carrying an ice chest. In addition, Officer Manny Jimenez noticed that when Plaintiff Gonzales and his brother saw the marked patrol car they immediately began to walk toward a driveway.  Based on the information known at the time, any well-trained law enforcement officer could have believed that reasonable suspicion existed to stop and detain Plaintiff Gonzales and his brother.

66.     Officer Manny Jimenez was in a Bovina Police Department marked patrol car; thus, he was readily identifiable as a police officer.  Officer Manny Jimenez called for both subjects to stop; Jaime complied.  Plaintiff Gonzales did not comply.  Plaintiff Gonzales signaled to Officer Manny Jimenez that he was not complying, dropped the ice chest, and walked away. It is also irrefutable that Officer Manny Jimenez called for him to stop and Plaintiff Gonzales continued to disregard his commands.